**25-20386**

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

**TRINIDAD CUTSHALL,
Plaintiff - Appellee,**

*versus*

**DONALD DILLOW, SERGEANT, IN HIS INDIVIDUAL CAPACITY;
NAHUEL FAIURA, DEPUTY, IN HIS INDIVIDUAL CAPACITY; TODD
KLOSTERMAN, SERGEANT, IN HIS INDIVIDUAL CAPACITY; N.
POIRIER, DEPUTY, IN HIS INDIVIDUAL CAPACITY; D.R. CALHOUN,
LIEUTENANT, IN HIS INDIVIDUAL CAPACITY; M.A. CARRIZALES,
SERGEANT, IN HIS INDIVIDUAL CAPACITY; R.W. HOLLEY, DEPUTY,
IN HIS INDIVIDUAL CAPACITY; C. MARSHALL, DEPUTY, IN HIS
INDIVIDUAL CAPACITY; P. BATTON, DEPUTY, IN HIS INDIVIDUAL
CAPACITY,**
**Defendants-Appellants.**

Appeal from the United States District Court
for the Southern District of Texas
Houston Division
4:25-CV-2899

_____

**BRIEF OF APPELLANTS
DEPUTY P.BATTON**, IN HIS INDIVIDUAL CAPACITY;
**LIEUTENANT D.R. CALHOUN**, IN HER INDIVIDUAL CAPACITY;
**SERGEANT M.A. CARRIZALES**, IN HIS INDIVIDUAL CAPACITY;
**DEPUTY R.W. HOLLEY**, IN HIS INDIVIDUAL CAPACITY; and
**DEPUTY C. MARSHALL**, IN HIS INDIVIDUAL CAPACITY

_____

David Adler
1415 North Loop West
Suite 905
Houston, Texas 77008
713-666-7576
davidadler1@hotmail.com

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons as described in the fourth sentence of 5th Cir. Rule 28.2 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.   Mr. Garrett Lee Gibbins, Houston, Texas, Attorney for Trinidad Cutshall.

2.   Mr. Francis Joseph Ford of Harris County Attorney's Office, Houston, TX, Attorney for Harris County, Texas.

3.   Mr. David Adler, Houston, Texas,  Attorney for Deputies C. Marshall, R.W. Holley, D.R. Calhoun, M.A. Carrizales and P. Batton.

4.   Mr. Richard Kuniansky, Houston, Texas, Attorney for Deputies Donald Dillow, Nahuel Faiura, Todd Klosternan and N. Poirier.  (Mr. Kuniansky also represents additional deputy defendants S. Cogburn, E. Hernandez, J. Luna, and K.Sandor in *Cutshshall v, Sandor*, 25-20499, before this Court and which is directly related to this case.  A motion to consolidate theses cases will presumably be filed.)

/s/ David Adler

_____

Attorney for Appellants:
Deputy P. Batton, in his individual capacity;
Lieutenant D.R. Calhoun, in her individual capacity;
Sergeant M.A. Carrizales, in his individual capacity;
Deputy R.W. Holley, in his individual capacity;
Deputy C. Marshall, in his individual capacity

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Defendant-Appellants Deputy P. Batton, in his individual capacity; Lieutenant D.R. Calhoun, in her individual capacity; Sergeant M.A. Carrizales, in his individual capacity; Deputy R.W. Holley, in his individual capacity; and Deputy C. Marshall, in his individual capacity, do not request oral argument in this case.[1]

---

[1] Oral argument is not requested unless this Court is inclined to ask plaintiff's counsel what else the defendant deputies could have done to take Mr. Cutshall into custody without putting their hands on him. If that question is to be asked of plaintiff's counsel, the undersigned would like to be in the courtroom to see and hear the response.

# **TABLE OF CONTENTS**

Page

CERTIFICATE OF INTERESTED PARTIES ........................................................i

STATEMENT REGARDING ORAL ARGUMENT................................................ii

TABLE OF CONTENTS........................................................................................iii

TABLE OF AUTHORITIES ...................................................................................v

STATEMENT OF JURISDICTION ........................................................................1

STATEMENT OF THE ISSUE................................................................................1

STATEMENT OF THE CASE .................................................................................1

    I. Factual Background .......................................................................................1

    II. Procedural History. ....................................................................................17

SUMMARY OF THE ARGUMENT .....................................................................18

ARGUMENT AND AUTHORITIES.....................................................................22

        ISSUE: Whether the district court erred in holding the individual deputies were not entitled to qualified immunity ...............................................................................................22

    I. Standard of Review .....................................................................................22

    II. Argument.....................................................................................................23

        A.     Qualified Immunity....................................................................23

        B.     Count 1 - Excessive Force .........................................................26

        C.     Count 4 - Failure to Intervene/Bystander Liability...................33

        D.     Count 6 - Summary Punishment ................................................35

        E.     Count 7 - Failure To Render Timely Medical Care ..................36

# TABLE OF CONTENTS (cont'd)

F.     Counts 8 and 15 - State Court Claims/Gross Negligence .........37

CONCLUSION.......................................................................................40

CERTIFICATE OF SERVICE ............................................................42

CERTIFICATE OF COMPLIANCE......................................................43

# TABLE OF AUTHORITIES

## CASES

U.S. Supreme Court

*Anderson v. Creighton*, 483 U.S. 635, 97 L.Ed.2d 523,
    107 S.Ct. 3034 (1987).\ ..........................................................................25, 34

*Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S.Ct. 2074,
    179 L.Ed.2d 1149 (2011)........................................................................32, 34

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009)............31

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955,
    67 L.Ed.2d 929 (2007)....................................................................................22

*District of Columbia v. Wesby*,  583 U.S. 48, 138 S. Ct. 577,
    199 L. Ed. 2d 453 (2018)........................................................................32, 33

*Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ...24, 28

*Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466,
    192 L.Ed.2d 416 (2015)..................................................................................28

*Kisela v. Hughes*, 584 U.S. 100, 138 S. Ct. 1148,  200 L.Ed.2d 449 (2018)...........24

*Malley v. Briggs*, 475 U.S. 335, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986) ......23, 25

*Messerschmidt v. Millender*, 565 U.S. 535, 132 S.Ct 1235,
    181 L. Ed. 2d 394 (2011)................................................................................26

*Mullenix v. Luna*, 577 U.S. 7, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015)...............25

*Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 172 L.Ed.2d 565 (2009)........27

*Plumhoff v. Rickard*, 572 U.S. 765,  134 S.Ct. 2012,
    188 L.Ed.2d 1056 (2013)..........................................................................24, 25

*Reichle v. Howards*, 566 U.S. 658, 132 S. Ct. 1733, 182 L.Ed.2d 985 (2012) .......23

*Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L.Ed.2d 272 (2001)..............40

**TABLE OF AUTHORITIES** (cont'd)

<u>CASES</u> (cont'd)

<u>U.S. Courts of Appeal</u>

*Anderson  v. Estrada*, 140 F.4th 634 (5th Cir. 2025)......................... 1, 26, 27, 29, 30

*Anderson v. Valdez*, 845 F.3d 580 (5th Cir. 2016)....................................................26

*Armstrong v. Ashley*, 60 F.4th 262 (5th Cir. 2023) ....................................................22

*Backe v. LeBlanc*, 691 F.3d 645 (5th Cir. 2012). .....................................................26

*Berry v. McLemore* 795 F.2d 452 (5th Cir. 1986).....................................................36

*Bustos v. Martini Club, Inc.*, 599 F.3d 458 (5th Cir. 2010) .....................................39

*Cantrell v. City of Murphy*, 666 F.3d 911 (5th Cir. 2012).. .....................................26

*Darden v. City of Fort Worth*, 880 F.3d 722 (5th Cir. 2018)...............................26, 34

*Deville v. Marcantel*, 567 F.3d 156 (5th Cir. 2009)...................................................28

*Dudley v. Angel*, 209 F.3d 460 (5th Cir. 2000)............................................................25

*Dunn v. Tyler Independent School District*, 460 F.2d 137 (5th  Cir.1972)...............35

*Galvan v. City of San Antonio*, 435 Fed. Appx. 309 (5th Cir. 2010) ......................32

*Harmon v. City of Arlington*, 16 F.4th 1159 (5th Cir. 2021) .......................22, 24, 27

*Hassan Ex Rel. Hassan v. Lubbock Independent School District*,
     55 F.3d 1075 (5th Cir. 1985) ............................................................35

*Hill v. New Orleans City*, 643 Fed. Appx. 332 (5th Cir. 2016) ................................42

*Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319 (5th Cir. 2020)...........24, 33

*Lempar v. Collier*, 710 F. App'x 231 (5th Cir. 2018).................................................41

*Lewis v. Danos*, 83 F.4th 948 (5th Cir. 2023)...........................................................37

**TABLE OF AUTHORITIES** (cont'd)

Page

CASES (cont'd)

U.S. Courts of Appeal (cont'd)

*Meadours v. Ermel*, 483 F.3d 417 (5th Cir. 2007)....................................42

*Morrow v. Meachum*, 917 F.3d 870 (5th Cir. 2019)................................24

*Poole v. City of Shreveport*, 691 F.3d 624 (5th Cir. 2012) ...............27, 32

*Ramirez v. Escajeda*, 44 F.4th 287 (5th Cir. 2022) ................................24

*Sandstrom v. Butterworth*, 738 F.2d 1200 (11th Cir. 1984).....................36

*Tarver v. City of Edna*, 410 F.3d 745 (5th Cir. 2005)..............................28

*Timpa v. Dillard*, 20 F.4th 1020 (5th Cir. 2021)......................................33

*Trammel v. Fruge*, 868 F.3d 322 (5th Cir. 2017).....................................27

*U.S. v. Harrimon*, 568 F.3d 531 (5th Cir. 2009)..................................... 28

*U.S. v. St. Luke's Episcopal Hospital*, 355 F.3d 376 (5th Cir. 2004).........................2

*Valencia v. Wiggins*, 981 F.2d 1440 (5th Cir. 1993)................................35

Texas Supreme Court

*Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653 (Tex.2008).......38, 39

Texas Courts of Appeal

*Singleton v. Casteel*, 267 S.W.3d 547
    (Tex. App.- Houston [14th Dist.] 2008) ...................................38, 39

*Brown v. Xie*, 260 S.W.3d 118 (Tex. App. - Houston [1st Dist.] 2008, no pet.) .....39

STATUTES AND RULES

28 U.S.C. § 1291...................................................................................1

**TABLE OF AUTHORITIES** (cont'd)

STATUTES AND RULES (cont'd)

28 U.S.C. § 1292....................................................................................1

42 U.S.C. § 1983........................................................................17, 34, 37

Federal Rule of Civil Procedure 8(a) ......................................................33

Federal Rule of Civil Procedure 8(a)(2) .................................................34

Federal Rule of Civil Procedure 10(c). .....................................................2

Federal Rule of Civil Procedure 12(b)(6) .........................................*passim*

Federal Rule of Evidence 201 .................................................................37

Texas Civil Practices and Remedies Code § 101.023 (Vernon 2005) .....................38

Texas Civil Practices and Remedies Code § 101.106 (Vernon 2005) ...............38, 40

Texas Civil Practices and Remedies Code § 101.106(e) (Vernon 2005)................39

MISCELLANEOUS

Michael S. Hull et al., *House Bill 4 and Proposition 12: An Analysis with
Legislative History, Part Three: Detailed Analysis of the Medical Liability
Reforms*, 36 Texas Tech Law Review 169 (2005)...................................38

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1292 because a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable final decision within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment. *Anderson v. Estrada*, 140 F.4th 634 (5th Cir. 2025).

Deputy P. Batton, Lieutenant D.R. Calhoun, Sergeant M.A. Carrizales, Deputy R.W. Holley, and Deputy C. Marshall filed a joint notice of appeal within 30 days of the October 28, 2025, District Court order denying qualified immunity. ROA 25-20386.1240.

## STATEMENT OF THE ISSUE

Whether the district court erred in holding the individual deputies were not entitled to qualified immunity.

## STATEMENT OF THE CASE

### I.   FACTUAL BACKGROUND

Determining whether an officer is entitled to qualified immunity is a fact intensive determination requiring careful attention to the facts and circumstances of each particular case. *Anderson v. Estrada*, 140 F.4th 634 (5th Cir. 2025). Normally at the 12(b)(6) motion to dismiss stage, there may be factual disputes. However, in this case, it is undisputed that Mr. Cutshall was completely incoherent during the events in question, and has derived all of his facts from the Harris

County Sheriff Incident Report, which is attached to his Complaint as Exhibit B. ROA.652-711. The individual defendant deputies rely upon the same facts. Exhibits attached to a complaint are part of the complaint "for all purposes." Fed.R.Civ.P. 10(c). Therefore, the exhibits to the complaint may be considered in a Rule 12(b)(6) motion. *U.S. v. St. Luke's Episcopal Hospital*, 355 F.3d 376 (5th Cir. 2004).

The facts here are divided into the following sections: (1) "Patrol Officers" addresses events starting when patrol officers first observed Mr. Cutshall's truck traveling on a major Houston highway at five miles per hour until - by using spikes - they were able to get the truck to a stop; and then addresses their unsuccessful efforts to get Mr. Cutshall's attention and to get him to exit the truck through negotiation; and lastly describes the decision to request the assistance of SWAT officers; (2) "SWAT Officers" addresses the facts beginning with the arrival of the SWAT team, and the events of Mr. Cutshall's forceful removal from the cab of the truck and eventual apprehension; and (3) "After Removal" describes the events from when Mr. Cutshall was taken out of the truck until he was taken from the scene to a hospital.

The fourth section then details the facts relevant to each of the defendant officers represented by the undersigned counsel.

(1)    <u>Patrol Officers</u>

On December 27, 2023, Harris County Sheriff Department Sergeant Carrizales observed a tractor trailer driving approximately five miles per hour on Interstate 10.  ROA.693.  Carrizales stayed behind the truck, using his horn and sirens to get Mr. Cutshall to stop.  ROA.693.  Mr. Cutshall refused to pull over.  ROA.693.  Carrizales believed Mr. Cutshall was either experiencing a medical emergency or under the influence of drugs or alcohol.  ROA.693.  Carrizales called for assistance.  ROA.693.  Additional patrol cars arrived.  ROA.693.  Carrizales and one other deputy again attempted to get Mr. Cutshall's attention.  ROA.693.  Mr. Cutshall looked down from his truck at Deputy Carrizales at one point, but continued driving.[2]  ROA.693.  They flanked him and continued using their lights, sirens, and loudspeaker systems to no avail.  ROA.693.  Ultimately road spikes were deployed to stop Mr. Cutshall's truck.  ROA.693.  He drove over three sets of spikes, but continued to drive.  ROA.693.  A deputy standing on the side of the road attempt to flag down Mr. Cutshall as he continued to drive on the punctured tires.  ROA.695.  When the truck's tires deflated, Mr. Cutshall veered into the inside shoulder, where his truck stopped moving forward.  ROA.693.  The pursuit of Mr. Cutshall lasted approximately 42 minutes over 3.7 miles.  ROA.655.

---

[2]The Court should note that the cab of an 18 wheeler is approximately 5 feet higher than street level, making it difficult for deputies to observe what Mr. Cutshall was doing inside the truck during the entire incident until they entered the cab.

Mr. Cutshall was repeatedly instructed via the patrol cars' loudspeakers to exit his truck. ROA.668. He refused to do so. ROA.668. Instead, Mr. Cutshall continued to actively try to drive the truck forward. ROA.662. The deputies observed him accelerating and shifting gears as if he was still driving. ROA.693. Mr. Cutshall showed no signs acknowledging police were on the scene and trying to communicate with him. ROA.696. The deputies could not tell at this time if Mr. Cutshall was armed. ROA.690. Lieutenant Calhoun and Sergeant Carrizales then authorized Deputy Batton to launch non-lethal 40 mm rounds at the truck to either get Mr. Cutshall's attention or get him to exit the vehicle. ROA.696. Four rounds were discharged to the front passenger window with no response from Mr. Cutshall. ROA.696.

Deputy Robinson made several announcements over his loudspeaker instructing Mr. Cutshall to shut off the truck, open the door, come out with empty hands. ROA.662. Robinson also gave several warnings that the truck would be forcibly opened and a police dog would enter the cab if Mr. Cutshall did not voluntarily exit the vehicle. ROA.662. Robinson is a trained police dog handler. ROA.662. He felt deployment of the dog was appropriate because (a) Mr. Cutshall was then wanted for the felony offense of evading arrest; (b) he had not been searched for weapons; and (c) the Mr. Cutshall posed a risk of flight on foot in a highly congested area. ROA.662. Nevertheless, Robinson did not immediately deploy the dog. ROA.662.

(2)  <u>SWAT Officers</u>

The deputies on the scene eventually contacted the SWAT team.  ROA.670.

SWAT arrived with an armored response vehicle ("BEAR") that is equipped with a

"Rook."  ROA.689.  The Rook is capable of tearing off parts of a vehicle without

harming the driver or officers.  *See*  https://therook.ringpower.com/  and

https://abc13.com/post/the-rook-hcso-vehicle-that-ends-standoffs-machine-harris-c

ounty-sheriffs-office/13697219/

The SWAT team parked the BEAR vehicle in front of Mr. Cutshall's truck

to ensure he could not move.  ROA.668.  The team then continued attempts to

extract Mr. Cutshall, starting with minimally invasive techniques and ascending to

more invasive techniques when their initial efforts were unsuccessful.

The officers on the scene used a crisis negotiator attempted to talk to Mr.

Cutshall into exiting the truck.  ROA.683.  The crisis negotiator addressed Mr.

Cutshall in both English and Spanish using a loudspeaker system.  ROA.664.  Mr.

Cutshall was advised he was now subject to arrest.  ROA.672.  Mr. Cutshall

remained in the truck and continued to ignore what was happening around him.

ROA.683.

The deputies also contacted Mr. Cutshall's trucking company about the

situation.  ROA.683.  A trucking company representative tried multiple times to

call Mr. Cutshall on his cell phone.  ROA.673.  Mr. Cutshall refused to answer the

calls.  ROA.673.  Additionally, Deputy Eldreth called Mr. Cutshall's cell phone 71 times without receiving an answer.  ROA.679.

The SWAT deputies then sought to introduce a chemical irritant into the truck that would ordinarily make an individual want to leave the vehicle. ROA.675.  Two ferret rounds were fired at the front windshield but only one breached the front windshield. ROA.665. This had no effect whatsoever on Mr. Cutshall, who still appeared as if he thought he was  driving the truck. ROA.703.

The SWAT team next employed the Rook.  ROA.665.  The Rook is designed to create openings in a vehicle which would permit the driver to exit or for SWAT officers to deploy additional chemicals inside.  The creation of an opening in the truck would also allow the officers to enter and remove Mr. Cutshall if he continued to disobey the lawful instructions to exit.

The Rook breached the rear window of the cab, but Mr. Cutshall still did not comply with commands.  ROA.701.  More chemical agents were hand delivered into the interior of the cab by SWAT officers.  ROA.676.  The irritants seemed to have minimal effect on Mr. Cutshall.  ROA.689.  The Rook then breached the passenger side sleeper window and a CS tri-chamber gas irritant[3] was deployed. ROA.689.  The CS tri-chamber emits a large concentration of CS intended to saturate the cab and cause Mr. Cutshall to exit.  ROA.701.  He was then observed coughing, but still would not exit the truck.  ROA.701.  This type of minimal

_____

[3]CS gas is often referred to as 'tear gas.'

reaction is often observed with mentally ill suspects or suspects under the influence of alcohol or drugs.  ROA.690.

The Rook then removed the passenger side door.  ROA.701.  The plan was to use a small team of officers, a dog, and non-lethal force to remove Mr. Cutshall.  ROA.690.  When the small team moved into position, Mr. Cutshall was observed to have both hands in his lap, covered by a sweater.  ROA.710.  The team members could not determine if he had a weapon under the sweater.  ROA.710.  Deputy Marshall then deployed his dog, which is trained to apprehend suspects, in an attempt to pull Mr. Cutshall from the vehicle.  ROA.710.  The dog bit Mr. Cutshall on the right forearm, just above the wrist.  ROA.669.  Deputy Marshall attempted to pull Mr. Cutshall out, but Mr. Cutshall had braced himself by using his legs to lock himself in the driver's seat.  ROA.669.

Deputy Poirier entered the cab of the truck through the rear cab window (which had been breached by the Rook).  ROA.676.  From this position, he was able to observe Mr. Cutshall resisting the dog, Deputy Marshall, and then the other team members who attempted to remove Mr. Cutshall.  ROA.676.  Poirier also observed what appeared to be several pocket knives in the Mr. Cutshall's front pocket.  ROA.676. Deputy Marshall then removed his dog.  ROA.669.  Mr. Cutshall then resisted the other SWAT officers' efforts to pull him from the cab of the truck.  ROA.671.

Deputy Poirier deployed 3 foam rounds into the cab.  ROA.676.  Two of the rounds struck Mr. Cutshall.  ROA.676.  He still refused to exit the truck. ROA.676.

Due to the Mr. Cutshall's lengthy and continuing resistance, Deputy Poirier struck him in the head and face.  Mr. Cutshall still did not comply but instead took hold of Deputy Poirier's arm.  ROA.676.  Mr. Cutshall refused to release his grasp of Poirier.  ROA.676.  Deputy Poirier struck Mr. Cutshall several more times to free himself.  ROA.676.

At the same time, SWAT officers Faiura, Klosterman, Dillow and Cogburn were attempting to pull Mr. Cutshall from the cab.  ROA.684.  Faiura handed his rifle to another deputy and grabbed Mr. Cutshall by the shirt.  ROA.684.  Mr. Cutshall continued to resist the efforts to remove him.  ROA.684.  Deputy Cogburn entered the cab through the passenger door and observed Mr. Cutshall grabbing deputies while screaming.  ROA.690.  Cogburn observed Mr. Cutshall place his hands on several pocket knives that were clipped to his pants pocket.  ROA.690. When Mr. Cutshall reached for a knife, Cogburn grabbed his hand and squeezed it to gain control.  ROA.690.  Cogburn then removed the knives while the other deputies held Mr. Cutshall's arms.  ROA.690.  Mr. Cutshall nonetheless continued to resist.  ROA.690.  Eventually, Cogburn was able to grab hold of Mr. Cutshall's pants rear waistline and - with the help of the other deputies - finally remove Mr. Cutshall from the cab.  ROA.690.  Even after being removed, Mr. Cutshall

continued to fight with the deputies and attempted to bite Deputy Cogburn and other SWAT officers.  ROA.690.

Sergeant Klosterman was another SWAT team member involved in pulling Mr. Cutshall from the cab.  ROA.702.  He observed Mr. Cutshall grab another team member.  ROA.702.  When Mr. Cutshall refused to release the other deputy's arm. Klosterman delivered three hammer fist strikes to Mr. Cutshall's face, which allowed the deputy to free himself from Mr. Cutshall's grip.  ROA.702.  However, Mr. Cutshall then grabbed Klosterman's arm.  ROA.702.  Nevertheless, no further strikes were delivered.  ROA.702.  Sergeant Klosterman also observed Mr. Cutshall anchor his legs to the dashboard and driver's seat, making it extremely difficult to remove him.  ROA.702.  Sergeant Dillow saw Mr. Cutshall wedging his legs and trying to hold onto the truck.  ROA.704.  Dillow helped to pull Mr. Cutshall out. ROA.704.

Mr. Cutshall landed on his chest and face.  ROA.666.  The broken glass from the truck windows caused lacerations to Mr. Cutshall's face, yet he continued to resist arrest while on the ground.  ROA.666.  Mr. Cutshall was observed moving his head back and forth over the roadside gravel and broken glass.  ROA.671.  He again attempted to bite Deputy Cogburn and other deputies.  ROA.690, 710.  Mr. Cutshall also attempted to grab his knives while struggling on the ground but was stopped by the officers.  ROA.685.

(3)    <u>After Removal</u>

Emergency medical care was provided to Mr. Cutshall immediately after he was finally removed from his truck.  ROA 687-688.  Mr. Cutshall was placed into custody at 15:59 and Deputy Cogburn called for emergency medical services (EMS)  personnel - who were already at the scene - to approach and check Mr. Cutshall's welfare.  ROA.671, 685, 687, 690.  The EMS staff evaluated Mr. Cutshall's condition.  ROA.676.  After the evaluation, Mr. Cutshall placed in an ambulance and taken to a hospital.  ROA.702.  The medical records attached to the complaint shows Mr. Cutshall arrived at the hospital at 16:57.  ROA.63.  This was approximately one hour after he was arrested.  (The hospital records also describe Mr. Cutshall as "Occasionally speaking unintelligibly.  Not responding to commands or questions.  Attempting to hit staff."  ROA.68)

(4)    <u>Facts Specific to Individual Officers</u>

In total, more than forty law enforcement officers were involved in the incident Mr. Cutshall caused, including the Harris County Sheriff himself (Ed Gonzalez) and Major J. Nanny.  ROA. 653 and 694.  The relevant actions of the officers represented by the undersigned counsel are listed next.

A.    <u>Facts Specific to Deputy Batton</u>

Deputy Batton initially assisted in containing the perimeter around Mr. Cutshall's disabled truck.  ROA.696-697.  He also relayed any movements he observed Mr. Cutshall make while other deputies attempted to contact Mr.

Cutshall.  Mr. Cutshall refused to exit the truck.  ROA.696-697.  Deputy Batton was authorized to use a Harris County issued 40MM Less-Lethal Launcher.  ROA.696-697.  Batton discharged one round which struck the front passenger windshield of Mr. Cutshall's truck.  ROA.696-697.  Mr. Cutshall did not react to the round's impact.  ROA.696-697.

Deputy Batton was then authorized to continue utilizing the 40MM Less-Lethal Launcher to get the Mr. Cuthsll's attention or get him to exit the truck.  ROA.696-697.  Batton discharged two more rounds at the front passenger window with "little to no reaction" from Mr. Cutshall.  ROA.696-697.  Batton then fired one of Deputy Holley`s Direct Impact Marking rounds at the passenger window, which still did not cause Mr. Cutshall to react.  ROA.696-697.

Deputy Batton was then instructed to return to holding the perimeter because SWAT officers had been contacted and were *en route* to the scene.  ROA.696-697.  Batton was relieved after the SWAT officers arrived.  ROA.696-697.  He had no further involvement in the incident.  ROA.696.  Mr. Cuthsall remained in his truck and was uninjured at the time Deputy Batton was relieved.  ROA.696-697.

B.   Facts Specific to Lieutenant Calhoun

When Mr. Custhall refused to stop his vehicle, Lieutenant Calhoun advised Deputy Villarreal to use spike strips to stop the truck if the spikes could be safely deployed.  ROA 667.  After the spikes were used and Mr. Cutshall's truck was

unable to move, Lieutenant Calhoun requested additional deputies come to the scene to assist with setting up a safety perimeter. ROA 674.

Lieutenant Calhoun authorized Deputy Holley to discharge a 40mm Less-Than-Lethal round to the front passenger window of the truck in an effort to gain Mr. Cutshall's attention. ROA. 659.

After several minutes of no response from Mr. Cutshall, Lieutenant Calhoun (along with Sergeant Carrizales) authorized Deputy Holley to fire a 40 mm Direct Impact marking round[4] at the window. ROA 696.

C.    Facts Specific To Sergeant Carrizales

Sergeant Carrizales advised his dispatch he was following a slow-moving tractor trailer truck on I-10. ROA.693-694. The truck was impeding traffic by driving less than five mph in lane number 4 of the highway, which has a posted speed limit of 55 miles per hour. ROA.693-694. The truck - driven by Mr. Cutshall - was causing motorists to slam on their brakes to avoid an accident. ROA.654. Sergeant Carrizales activated his emergency equipment, including lights and sirens, in an attempt to pull the vehicle over, but Mr. Cutshall refused to stop. ROA.693-694. Carrizales positioned his marked patrol vehicle directly behind the right rear of the tractor trailer so the driver could see Carrizales's emergency equipment was activated. ROA.693.

---

[4]The incident report appears to contain a typographical error in that it describes a '400 Direct Impact Marking round"
*See*:
https://www.defense-technology.com/product/direct-impact-40-mm-marking-crushable-foam-round/

Sergeant Carrizales then drove in front of Mr. Cutshall's vehicle and instructed Mr. Cutshall to stop by using a loudspeaker.  ROA.693-694.  Mr. Cutshall refused to pull over, and made several lane changes without signaling.  ROA.654.  Mr. Cutshall also drove past several safe stopping points.  ROA 654.

Mr. Cutshall continued driving eastbound in lane number four at a slow rate of speed, approximately five miles per hour.  ROA.693-694.  Sergeant Carrizales stayed behind the tractor trailer, while using his horn and sirens to get Mr. Cutshall to stop.  ROA.693-694.  Mr. Cutshall refused to do so.  ROA.693-694.  Carrizales was concerned the truck driver was experiencing a medical emergency or under the influence of narcotics or alcohol, so he requested an additional patrol units come to the scene.  ROA.693.  Carrizales and another deputy both attempted to get Mr. Cutshall's attention by flanking him and using their respective public announcement system.  ROA.693-694.  Sergeant Carrizales pulled up to the driver's side door of Mr. Cutshall's still-moving truck.  ROA.693-694.  Mr. Cutashall looked down at the patrol vehicle patrol vehicle, but then continued to look forward.  ROA.693-694.  Additional units arrived at the scene.  ROA.693-694.

Eventually, Sgt. Carrizales approved the deployment of spike strips to stop Mr. Cutshall's vehicle.  ROA 654.  Deputy Villarreal safely went around Mr. Cuthshall's tractor trailer and deployed the spikes.  ROA.693.  Mr. Cutshall did not stop.  ROA.693-694.  Sergeant Custer and Deputy Richardson deployed additional

spikes. ROA.693. Mr. Cutshall continued driving eastbound at approximately five miles per hour, despite having driven over all three sets of spikes. ROA.693-694. However, the truck's tires began to deflate. ROA.693. Mr. Cutshall veered onto the inside shoulder and continued to drive until the right passenger rim of the truck turned into the fender well. ROA.693. The truck was then disabled in the 15900 block of East Freeway (I-10), in Channelview, Texas. ROA.693. Even though his vehicle was disabled, Mr. Cutshall refused to exit despite several commands to do so by officers using their loud speakers. ROA.693.

Mr. Cutshall continued accelerating his engine, causing the tires to spin. ROA.693. The truck appeared to be in gear and the rear tires were smoking. ROA.693. At that point, Lt. Calhoun authorized the use of 40 mm Less-Lethal Launcher in an attempt to break the front passenger window, so that the officers could see inside the cab of the tractor trailer. ROA 693

Upon seeing that the 40 mm was not effective and that Mr. Cutshall refused to exit the vehicle, Sergeant Carrizles contacted Watch Command, who put him in contact with SWAT Lieutenant Buccini. ROA.694. Sergeant Carrizales described the scene to Lieutenenat Buccini, who advised that SWAT would come to the location. ROA.694. When the SWAT officers arrived, the scene was released to them. ROA.694. Mr. Cuthsall remained in his truck and was uninjured at the time Sergeant Carrizales was relieved. ROA.694.

D.     <u>Facts Specific To Deputy Holley</u>

After receiving authorization from Lieutenant Calhoun, Deputy Holley approached Mr. Cutshall's truck and fired a 40mm round at the passenger front window.  ROA.659.  Holley then discharged two additional rounds at the front passenger window, which both missed.  ROA.659.  He then immediately returned to his assigned post and was relieved by a member of the SWAT team.  ROA 659.  Mr. Cuthsall remained in his truck and was uninjured at the time Deputy Holley was relieved.  ROA.659.

E.     <u>Facts Specific To Deputy Marshall</u>

Deputy Marshall and his dog, 'Timon,' were deployed to gain compliance [from Mr. Cutshall] and prevent harm to deputies on scene. ROA.665.   He identified three factors supporting the deployment of his dog: 1) [Cutshall] was wanted for the felony offense of evading arrest, 2) [Cutshall] posed a threat to law enforcement and the public due to not being searched for weapons, and 3) [Cutshall] was barricaded inside the cab of a tractor trailer, which provided many areas of concealment posing the threat of ambush to officers.  ROA.668.  Timon is trained and certified in the detection of specific illegal narcotics and criminal apprehension.  ROA.668-669.

As the team approached the passenger side of Mr. Cutshall's truck, Marshall gave commands to Mr. Cutshall to show his hands.  ROA.668-669.  Mr. Cutshall continued to keep his hands towards his lower half.   ROA.668-669.  Marshall saw

discharge of the two less-than-lethal impact rounds have no effect on Mr. Custhall's continued unwillingness to comply. ROA.668-669. Deputy Marshall also observed Mr. Cutshall lower his right hand out of sight. ROA.668-669. In a rapidly developing and tense situation, and in an attempt to prevent a deadly force encounter, Marshall commanded the dog to apprehend Mr. Cutshall. ROA.668-669. The dog attempted to jump into the cab but fell. ROA.668-669. Marshall assisted his dog into the vehicle. ROA.668-669. Once the dog inside the vehicle, Deputy Marshall heard Mr. Cutshall yell. ROA.668-669. Marshall again shouted commands for Mr. Cutshall to come out. ROA.668-669. Mr. Cutshall continued to refuse to exit the truck. ROA.668-669. Deputy Marshall entered the cab and observed his dog biting Mr. Cutshall's right forearm just above the wrist. ROA.668-669. Marshall was able to reach over and unbuckle Mr. Cutshall's seatbelt. ROA.668-669. Deputy Marshall then attempted to pull Mr. Cutshall out of the vehicle, but Mr. Cutshall braced himself and was using his legs to lock himself in the driver`s seat. ROA.668-669. Mr. Cutshall continued to resist by not exiting the vehicle or placing his hands behind his back. ROA.668-669. Once enough team members were inside the cab and gained control of both of Mr. Cutshall's arms, Deputy Marshall attempted to instruct his dog to exit the truck. ROA.668-669. Due to the dog`s rear half hanging out of the vehicle and the close proximity of other team members, Marshall chose to physically take the dog out of

the truck to prevent further injuries to Mr. Cutshall or team members. ROA.668-669.

Once Timon was removed, Deputy Marshall backed away from the truck by approximately 8 feet. ROA.668-669. Marshall observed Mr. Cutshall continue to struggle with SWAT members even when outside of the vehicle and on the ground. ROA.668-669. Once Mr. Cutshall was detained, the Channelview Fire Department Medic 12 immediately began to treat Mr. Cutshall for his injuries. ROA 669.

II.    <u>PROCEDURAL HISTORY</u>

On June 22, 2025, Plaintiff Trinidad Cutshall filed a Complaint against Harris County, Texas, and 13 individual deputies alleging they used excessive force in violation of 42 U.S.C. § 1983. ROA.9. Mr. Cutshall also alleges bystander liability against the individual deputies for failing to intervene; as well as claims 'summary punishment.,' failure to render timely medical care, and violations of Texas law including gross negligence. (He also filed additional claims against Harris County which are not at issue here.)

On August 27, 2025, the defendant officers filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). ROA.869 (Batton), ROA.883 (Calhoun), ROA.897 (Carrizales), ROA.911 (Holley), and ROA.925 (Marshall). The plaintiff filed responses to each defendant's motion. ROA.1042 (Batton), ROA.1063 (Calhoun), ROA.1084 (Carrizales), ROA.1106 (Holley), and ROA.1127 (Marshall).

The District Court summarily denied the motions *en masse* on September 4, 2025: "Having considered the motions, submissions, and applicable law ***in detail,*** the Court determines that each motion should be denied." (Bolding and italics in original). ROA 1232.

Defendants Batton, Calhoun, Carrizales, Holley, and Marshall filed a joint notice of appeal on September 8, 2025. ROA.1240.

## SUMMARY OF THE ARGUMENT

The individual deputy defendants came nowhere near using excessive force on Mr. Cutshall. To the contrary, the restraint shown during the course of the approximately 42 minutes of vehicle pursuit and 3 hour standoff with Mr. Cutshall was a model of professional law enforcement conduct.

The deputies used a plethora of tactics of increasing intensity in their attempt to 1) stop Mr. Cutshall's erratic and dangerous driving of a tractor-trailer truck (albeit at 5 miles per hour) on an Interstate highway, and 2) have him exit the vehicle.

Mr. Cutshall failed to respond to (or even acknowledge) the following actions by dozens of deputies who encountered him, until he was ultimately pulled from the truck:

1.    Following Mr. Cutshall's vehicle with lights and sirens activated;

2.    Pulling alongside his truck (both sides) and using loudspeaker systems to instruct Mr. Cutshall to pull over;

3.      Using spike strips to preclude Mr. Cutshall's continued driving of the 18 wheeler;

4.      Having a deputy standing on the side of the road attempt to flag down Mr. Cutshall as he continued to drive on flattened tires.

5.      Again using loudspeaker systems to instruct Mr. Cutshall to exit his disabled vehicle;

6.      Parking an armored police vehicle in front of Mr. Cutshall's vehicle (because he was continuing attempts to move forward in the truck);

7.      Contacting Mr. Cutshall's supervisor and having the supervisor (unsuccessfully) attempt to communicate with Mr. Cutshall on the phone;

8.      Directly calling Mr. Cutshall's cell number seventy-one (71) times in an effort to speak with him;

9.      Repeatedly attempting to communicate with Mr. Cutshall that he should exit his vehicle with nothing in his hands;

10.     Using a crisis intervention negotiator to try to communicate with Mr. Cuthsall (in English and Spanish), or at least have him acknowledge the presence of law enforcement officers;

11.     Firing non-lethal rounds at the truck to get Mr. Cutshall's attention;

12.     Firing non-lethal rounds at the truck to break a window and then allow the introduction of chemical irritants into the cab;

13.    Introducing two different types of chemical irritants into the cab of Mr. Cutshall's truck;

14.    Firing non-lethal rounds at Mr. Cutshall;

15.    Using the armored police vehicle to remove the windows (and eventually) a door of the truck;

16.    Placing a police dog into the vehicle (which bit Mr. Cutshall's arm but was unable to get him to exit the truck);

17.    Entering the vehicle in sufficient numbers to restrain Mr. Cutshall's efforts to reach for knives he was carrying, and to bite the deputies;

18.    Striking Mr. Cuthshall with fists in an effort to have him release his grasp of the deputy who stopped him from pulling a knife out;

19.    Pulling Mr. Cutshall with sufficient force to counteract his efforts to resist exiting the truck by using his legs to brace himself against the seat and vehicle dashboard.

20.    Restraining Mr. Cutshall to stop him from again trying to bite the deputies who were placing him in handcuffs after he was out of the truck.

The force used by each officer during the marathon incident caused by Mr. Cutshall was clearly objectively reasonable. None of the police actions - individually or in any combination - constituted excessive force.  Moreover, none of the officers violated a clearly established right in the use of their force.

Because no excessive force was used, there is no basis for a claim of failure to intervene against any deputy.

Again, because no excessive force was used, Mr. Cutshall was not subject to any type of 'summary punishment' from the deputies actions (to the extent that claim has any potential merit in a situation in which the plaintiff is not a student, a jail inmate, or a participant in a court proceeding).

The undisputed facts made part of his complaint demonstrate Mr. Cutshall was not denied timely medical care after (finally) being removed from the truck. Because of the lengthy passage of time Mr. Cuthsall remained in his vehicle, the deputies had ample time to arrange for emergency medical personnel to come to the scene. Within seconds of being dragged from his truck, Mr. Cutshall was being evaluated by medical technicians. He was then taken to a hospital, arriving less than an hour after his arrest (where he similarly tried to bite the hospital's staff). The claim that he did not receive timely medical care is arguably frivolous given the facts of this case.

Mr. Cutshall's state law claims are also arguably frivolous, given current Fifth Circuit interpretations of Texas law. The complaint makes no acknowledgment of this, and makes no statements concerning presenting the claim only for possible further review by the U.S. Supreme Court.

Mr. Cutshall does not present sufficient facts (or really, *any* facts) to support his claim that the deputies were grossly negligent in their handling of the pursuit and standoff with Mr. Cutshall.

The District Court erred by summarily rejecting the deputies' Rule 12(b)(6) motions based upon qualified immunity.

## ARGUMENT AND AUTHORITIES

Issue Restated - Whether the district court erred in holding the individual deputies were not entitled to qualified immunity.

## I.    STANDARD OF REVIEW

This court reviews *de novo* a district court's denial of a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss for failure to state a claim. *See Harmon v. City of Arlington*, 16 F.4th 1159, 1162 (5th Cir. 2021). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), *quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). "But this court does not presume true a number of categories of statements, including legal conclusions; mere labels; threadbare recitals of the elements of a cause of action; conclusory statements; and naked assertions devoid of further factual enhancement." *Armstrong v. Ashley*, 60 F.4th 262, 269 (5th Cir. 2023) (quotation marks and citations omitted).

## II.    ARGUMENT

### A.    Qualified Immunity

Governmental officials are protected from both suit and liability by qualified immunity unless their alleged conduct: (1) violated a Constitutional or statutory right; and (2) the illegality of the alleged conduct was clearly established at the time. *District of Columbia v. Wesby*,  583 U.S. 48, 138 S.Ct. 577, 589 (2018).  The phrase "clearly established" means that at the time of the official's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful. *Id*., *quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

Existing law must have placed the constitutionality of the official's conduct "beyond debate." *Id.,* 563 U.S. at 741.  This demanding standard means that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id., quoting Malley v. Briggs*, 475 U.S. 335, 341 (1986).

To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. *Id.*  It is not enough that the rule is [merely] suggested by then-existing precedent. *Id*. *at* 590.  The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *Id.  See also Reichle v. Howards*, 566 U.S. 658, 664 (2012).  Otherwise, the rule is not one that "every reasonable official would know." *Id.*

The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. *Id*. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*., *quoting Saucier v. Katz*, 533 U.S. 194, 202 (2001). Courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id*., *quoting Plumhoff v. Rickard*, 571 U.S. 765, 779 (2014). The legal principle in question must clearly prohibit the specific conduct of the official in the particular circumstances that were confronting the official. *Wesby*, *supra*, 138 S.Ct. at 590.

This Court held in *Ramirez v. Escajeda*, 44 F.4th 287, 292 (5th Cir. 2022):

The clearly established inquiry is demanding, especially in claims for excessive force." *Harmon v. City of Arlington*, 16 F.4th 1159, 1167 (5th Cir. 2021) (citing *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019)). Excessive force cases often involve officers' "mak[ing] split-second decisions" and "[t]he results depend 'very much on the facts of each case.' " *Id.* at 1166 (quoting *Kisela v. Hughes*, ___ U.S. ___, 138 S. Ct. 1148, 1153, 200 L.Ed.2d 449 (2018) (per curiam); *see Plumhoff v. Rickard*, 572 U.S. 765, 774, 134 S.Ct. 2012, 188 L.Ed.2d 1056 (2014) (observing "officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation" (quoting *Graham v. Connor*, 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989))). This means existing precedent must "squarely govern the specific facts at issue, such that only someone who is plainly incompetent or who knowingly violates the law would have behaved as the official did." *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020)

(cleaned up). . . An officer can be stripped of qualified immunity only when "the violative nature of the *particular* conduct is clearly established . . . in light of the specific context of the case, not as a broad general proposition." . . . In sum, controlling precedent must have placed the question "beyond debate," with "the right's contours . . . sufficiently definite that any reasonable official in the [officer's] shoes would have understood that he was violating it." *Plumhoff*, 572 U.S. at 778–79, 134 S.Ct. 2012 (quoting *al-Kidd*, 563 U.S. at 741, 131 S.Ct. 2074).

A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Id., quoting Anderson v. Creighton*, 483 U.S. 635, 641 (1987). The specificity of the rule is "especially important in the Fourth Amendment context." *Id*., *citing Mullenix v. Luna*, 577 U.S. 7, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015) (*per curiam*).

Qualified immunity is overcome only if, at the time and under the circumstances of the challenged conduct, all reasonable officers would have realized the conduct was prohibited by the federal law on which the suit is founded. *Dudley v. Angel*, 209 F.3d 460, 462 (5th Cir. 2000). The question is whether a reasonable officer could have believed that the actions of the defendant officer were lawful in light of clearly established law and the information the officer possessed at the time. *Anderson*, *supra*, 483 U.S. at 641. If reasonable officers could differ on the lawfulness of a defendant officer's actions, the defendant is entitled to qualified immunity. *Malley, supra*, 475 U.S. at 341.

Qualified immunity may be raised in a 12(b)(6) motion to dismiss. *Anderson v. Valdez*, 845 F.3d 580, 589-90 (5th Cir. 2016). Qualified immunity recognizes government officials may "make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546, 132 S.Ct 1235 (2012).

"[A] plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012). When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense. *Cantrell v. City of Murphy*, 666 F.3d 911, 918 (5th Cir. 2012).

Finally, this Court assesses each officer's actions separately. *Darden v. City of Fort Worth*, 880 F.3d 722, 731 (5th Cir. 2018)

B.    Count 1 - Excessive Force

In a recent case, this Court reversed the District Court's denial of the officers' 12(b)(6) motions asserting qualified immunity as to both the alleged use of excessive force and as to bystander liability. *See Anderson v. Estrada, supra,* 140 F.4th 634 (5th Cir. 2025).

Anderson crashed in a minor one car accident. He admitted to responding officers that he was under the influence of PCP. The officers sought to arrest him

for DUI. After he was handcuffed, Anderson refused to fully get into the patrol car. One officer tried to push Anderson into the patrol car "but Anderson prevented this by stiffening his legs and hooking his feet under the door." *Id*., at 640. The officers negotiated with him for ten minutes before tasing him. *Id*. The officers were eventually able to get Anderson into the car, and drove him to a jail facility.

Anderson was unresponsive upon arrival. Emergency medical personnel attempted to revive him to no avail. Anderson was transported to a hospital and pronounced dead.

The Fifth Circuit held:

> An officer "is entitled to qualified immunity at the motion-to-dismiss stage unless the plaintiffs have alleged facts sufficient to plausibly show that (1) the defendant's conduct violated a constitutional right and (2) the constitutional right was clearly established at the time of the alleged misconduct." *Harmon*, 16 F.4th at 1163 (citing *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S. Ct. 808, 816, 172 L.Ed.2d 565 (2009)). We are "permitted to exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236, 129 S. Ct. at 818, *overruling in part Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L.Ed.2d 272 (2001).

. . .

> "The Fourth Amendment creates a 'right to be free from excessive force during a seizure." *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017) (quoting *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012)). "To establish a claim of excessive force under the Fourth Amendment, plaintiffs must demonstrate: '(1) injury, (2) which resulted directly and only from a use of force that was clearly

excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (*per curiam*) (quoting *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005)).

Determining whether the force used was clearly excessive and clearly unreasonable "requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, 576 U.S. 389, 397, 135 S. Ct. 2466, 2473, 192 L.Ed.2d 416 (2015).

*Id*. at 642-43.

Applying the *Graham* factors to Mr. Cutshall's, the 'crime at issue' was serious. The deputies sought to arrest Mr. Cutshall for felony evading arrest in a vehicle. Fleeing by vehicle is considered such a serious offense that it is a predicate offense for 'armed career offender' status in criminal cases. This Court has held that fleeing in a vehicle is:

> . . . purposeful, violent and aggressive . . . fleeing by vehicle requires disregarding an officer's lawful order, which is a clear challenge to the officer's authority and typically initiates pursuit. Taking flight causes the officer to give chase, and aside from any accompanying risk to pedestrians and other motorists, such flight dares the officer to needlessly endanger himself in pursuit.

*U.S. v. Harrimon*, 568 F.3d 531, 534-535 (5th Cir. 2009) (internal citations omitted).

Turning to the second *Graham* factor, Mr. Cutshall posed an immediate risk to the public and to the deputies' safety. His erratic - even bizarre - behavior meant the deputies were unable to predict what violent actions he might engage in. This, of course, also meant the public was at risk given the location of the incident on a major highway. The *Anderson v. Estrada* Court held that erratic behavior is enough to establish a threat to officers because "any of the officers could be injured by [Anderson's] kicking, thrashing and throwing himself around. *Anderson v. Estrada, supra* 140 F.4th at 644. As was ultimately the case with Mr. Cutshall, he did fight back against the deputies efforts to remove him from the truck, even going so far as attempting to bite them.

Additionally, Mr. Cuthshall had his hands concealed for much of the standoff. He was eventually seen to be armed with pocket knives, which he reached for as deputies entered the truck. ROA.690.

The third *Graham* factor concerns the degree to which an arrestee resists the officer's objective or if the arrestee is attempting to evade by flight. The incident with Mr. Cutshall began, of course, when he refused to pull over. At the other end of the timeline, he was actively fighting with the deputies once they entered the cab of the truck. In *Anderson v. Estrada*, this Court also held:

> . . . the video shows that Anderson actively resisted the officers in this case. Anderson kicked at them when attempting to hook his feet under the SUV door, thrashed as the officers struggled to secure him inside the SUV, used his weight to make the officers' task more difficult, and failed to comply with countless orders by the officers to stop resisting

and to sit in the vehicle with his legs inside. Anderson's actions, which
frustrated for a lengthy period the officers' attempts to secure him
inside the SUV, constituted active resistance.

*Id.,* 140 F.4th at 646-47.

The *Anderson v Estrada* court weighed the *Graham* factors and held the officers'

actions did not violate Anderson's Fourth Amendment rights. *Id*. at 647.

Importantly for this Court's analysis of Mr. Cutshall's claims, the *Anderson*

*v. Estrada* Court also observed that the officers' "measured and ascending actions

were proportionate to the escalating situation. No force was used for the first hour.

Only after the officers realized the futility of their approach did the officer pull out

his taser." *Id.,* 140 F.4th at 647-48.

Here, as stated earlier, the deputies used the following actions that increased

in severity as Mr. Cutshall began to resist and continued to do so:

1.     Following Mr. Cutshall's vehicle with lights and sirens activated;

2.     Pulling alongside his truck (both sides) and using loudspeaker systems to
instruct Mr. Cutshall to pull over;

3.     Using spike strips to preclude Mr. Cutshall's continued driving of the 18
wheeler;

4.     Having a deputy standing on the side of the road attempt to flag down Mr.
Cutshall as he continued to drive on flattened tires.

5.     Again using loudspeaker systems to instruct Mr. Cutshall to exit his disabled
vehicle;

6.     Parking an armored police vehicle in front of Mr. Cutshall's vehicle (because he was continuing attempts to move forward in the truck);

7.     Contacting Mr. Cutshall's supervisor and having the supervisor (unsuccessfully) attempt to communicate with Mr. Cutshall on the phone;

8.     Directly calling Mr. Cutshall's cell number seventy-one (71) times in an effort to speak with him;

9.     Repeatedly attempting to communicate with Mr. Cutshall that he should exit his vehicle with nothing in his hands;

10.    Using a crisis intervention negotiator to try to communicate with Mr. Cuthsall or at least have him acknowledge the presence of law enforcement officers;

11.    Firing non-lethal rounds at the truck to get Mr. Cutshall's attention;

12.    Firing non-lethal rounds at the truck to break a window and then allow the introduction of chemical irritants into the cab;

13.    Introducing two different types of chemical irritants into the cab of Mr. Cutshall's truck;

14.    Firing non-lethal rounds at Mr. Cutshall;

15.    Using the armored police vehicle to remove the windows (and eventually) a door of the truck;

16.    Placing a police dog into the vehicle (which bit Mr. Cutshall's arm but was unable to get him to exit the truck);

17.     Entering the vehicle in sufficient numbers to restrain Mr. Cutshall's efforts to reach for knives he was carrying, and to bite the deputies;

18.     Striking Mr. Cuthshall with fists in an effort to have him release his grasp of the deputy who stopped him from pulling a knife out;

19.     Pulling Mr. Cutshall with sufficient force to counteract his efforts to resist exiting the truck by using his legs to brace himself against the seat and vehicle dashboard.

20.     Restraining Mr. Cutshall to stop him from again trying to bite the deputies who were placing him in handcuffs after he was out of the truck.

Rather than facing suit, the deputies here should be commended for the manner in which they handled the situation. They used ascending measures only when necessary, and extracted an armed and violent suspect from the truck using only that degree of force necessary to apprehend Mr. Cutshall. Law enforcement officers may use "measured and ascending" actions that correspond to an arrestee's "escalating verbal and physical resistance." *Poole, supra,* 691 F.3d at 629, *citing Galvan v. City of San Antonio*, 435 Fed. Appx. 309, 311 (5th Cir. 2010) (*explaining that the use of force was reasonable when it involved "measured and ascending responses to a Plaintiff's noncompliance"*).

Over the course of several hours, Mr. Cutshall made it abundantly clear he was not going to voluntarily stop his truck, leave his truck, and comply with the deputies' instructions. The deputies would plainly be derelict in their

responsibilities if they simply walked away and left an incoherent suspect accused of felony evading arrest sitting in his disabled truck on a major Houston highway. Mr. Cutshall was a danger to both himself and others. The officers' actions were without question reasonable and necessary to protect the public, themselves, and Mr. Cuthsall.

C.    Count 4 - Failure to Intervene/Bystander Liability

Because no excessive force was used, Mr. Cutshall's claim of failure to intervene/bystander liability should have been dismissed against all of the individual deputies.

Within the Fifth Circuit, "[a]n officer is liable for failure to intervene when that officer: (1) knew a fellow officer was violating an individual's constitutional rights, (2) was present at the scene of the constitutional violation, (3) had a reasonable opportunity to prevent the harm but nevertheless, (4) chose not to act." *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 343 (5th Cir. 2020). Again, the burden is on the plaintiff to demonstrate that the state of the law at the time clearly established that "any reasonable officer would have known that the Constitution required them to intervene" in Mr. Cuthsall's circumstances. *Id.*, at 345. *See also Timpa v. Dillard*, 20 F.4th 1020 (5th Cir. 2021).

Moreover, Federal Rule of Civil Procedure 8(a) mandates a claim contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

Here, none of these three requirements were alleged with requisite specificity. *All* of the named deputies - whether patrol deputies who initially encountered Mr. Cutshall or SWAT deputies who were later called to the scene - were lumped together in the Complaint for bystander liability:

> Thus, Defendant Deputies, collectively, may be liable under 42 U.S.C. § 1983 under a theory of bystander liability when the officer: 1) knows that a fellow officer is violating an individual's constitutional rights; 2) has a reasonable opportunity to prevent the harm and; 3) chooses not to act.

ROA.50. (Footnotes omitted).

The counts in Mr. Cutshall's complaint do not identify which deputy allegedly used excessive force and which deputy allegedly observed the use of the excessive force and failed to intervene. This Court assesses each officer's actions separately. *Darden, supra,* 880 F.3d at 731. The ambiguous nature of the complaint makes this Court's task impossible.[5]

Returning to the laundry list of actions taken in ascending order as set forth above, some of the officers obviously could not have intervened in those actions that occurred when they were not present at truck.

---

[5]Two additional bases for dismissing the bystander liability claim appear to exist: First, Mr. Cutshall's complaint states, "Thus, Defendant Deputies, collectively, *may* be liable under 42 U.S.C. § 1983 under a theory of bystander liability. . ." (Italics added). The use of 'may be liable' seems to violate Federal Rule of Civil Procedures Rule 8(a)(2) requirement that the complaint contain "a short and plain statement of the claim showing that the pleader *is* entitled to relief." (Italics added). Second, an officer clearly can not be liable for failing to intervene in his own conduct. Based on these defects alone, the bystander liability allegation should be dismissed for failure to state an individualized claim against each of the deputies.

No officer standing in Deputy Batton, Lieutenant Calhoun, Sergeant Carrizales, Deputy Holley, and Deputy Marshall's shoes would believed he or she was violating a constitutional duty.

D.    Count 6 - Summary Punishment

Mr. Cutshall alleged in count 6 that he was somehow the victim of 'summary punishment.'  His complaint provided no facts supporting this claim. Rather, this count merely re-alleges his prior assertions regarding excessive force. ROA.51.  The individual deputies therefore incorporate by reference as if fully set forth here the foregoing portions of this brief addressing Mr. Cutshall's excessive force and failure to intervene claims.

Moreover, this Court should note that 'summary punishment' claims typically appear in three general areas of Fifth Circuit caselaw: the school environment, jail context, and court proceedings.  *See Hassan Ex Rel. Hassan v. Lubbock Independent School District*, 55 F.3d 1075, footnote 21 (5th Cir. 1985), *citing Dunn v. Tyler Independent School District*, 460 F.2d 137, 144 (5th Cir.1972)("*Obviously school officials have available to them in day-to-day operation of schools a scope of summary punishment without even the limited type of hearing required in more serious circumstance[s].*"); *Valencia v. Wiggins*, 981 F.2d 1440 (5th Cir. 1993)("*As to the applicable law, the district court concluded that because Valencia was a pretrial detainee, the case involved the Fourteenth Amendment's protection against summary punishment, not the Fourth*

Amendment's prohibition of "unreasonable seizures" or the Eighth Amendment's prohibition of "cruel and unusual punishments.""); and *Berry v. McLemore* 795 F.2d 452 (5th Cir. 1986), *citing Sandstrom v. Butterworth*, 738 F.2d 1200 (11th Cir. 1984)("In addition, summary punishment for a constructive contempt is unconstitutional.")

Individuals in the school system, the jail system, and the court system are subject to the disciplinary rules and due process requirements for each environment, implicating potential 'summary punishment' issues.

Here, Mr. Cutshall was simply an individual at large who refused to comply with (or even respond to) lawful police requests, instructions, and commands that he stop and exit his truck. There is no dispute that he was ultimately removed from the vehicle against his will. However, he was not in school, jail (yet), or the courtroom. No adjudicatory official imposed any 'sentence' upon him. Mr. Cutshall was not subject to 'punishment' - summary or otherwise.

E.    Count 7 - Failure To Render Timely Medical Care

Emergency medical care was provided to Mr. Cutshall immediately after he was finally removed from his truck. ROA 687-688   After Mr. Cutshall was placed into custody at 15:59, Deputy Cogburn called for emergency medical services (EMS)  personnel - who were already at the scene - to approach and check Mr. Cutshall's welfare   ROA.671, 685, 687, 690.   The EMS staff evaluated Mr. Cutshall's condition. ROA.676. After the evaluation, Mr. Cutshall placed in an

ambulance and taken to a hospital.  ROA.702.  The medical records attached to plaintiff's complaint shows Mr. Cutshall arrived at the hospital at 16:57.  ROA.63.  This was approximately one hour after he was arrested.  (The hospital records also describe Mr. Cutshall as "Occasionally speaking unintelligibly. Not responding to commands or questions.  Attempting to hit staff."  ROA.68)

Defendants ask this Court to take judicial notice that the scene of the incident (15900 block of I-10 East in Channelview, Texas.  ROA.652) is approximately 24 miles from Ben Taub Hospital to which Mr. Cutshall was transported.  ROA.63.  *See* Federal Rule of Evidence 201.  *See also Lewis v. Danos*, 83 F.4th 948 (5th Cir. 2023).

There are no facts - none - supporting the allegation that any defendant failed to render timely medical care. (With all due respect to Mr. Cutshall's counsel, this claim appears at a minimum to be perilously close to frivolous.)

F.     Counts 8 and 15 - State Court Claims/Gross Negligence

In addition to raising a claim under 42 U.S.C. §1983, Mr. Cutshall alleges Texas state law claims in counts 8-15. (The claims in counts 9-14 are against Harris County alone.)

In count 8, Mr. Cutshall names Harris County and the individual deputies violated the Texas Tort Claims Act, and again states that the individual deputies were acting in the scope of their employment.  ROA.52.

In count 15, Mr. Cutshall alleges gross negligence against 'defendants collectively under Texas law." ROA. 56. In this count, Mr. Cutshall "adopts, incorporates, restates, and re-alleges all previous paragraphs . . ." Thus, he again states in this count that the individual defendants were acting in the scope of their employment. ROA.56.

Both of these claims should be dismissed. *See Singleton v. Casteel*, 267 S.W.3d 547 (Tex. App.- Houston [14[th] Dist.] 2008). In *Singelton*, the Texas Court of Appeals held:

> The Texas Tort Claims Act provides a limited waiver of immunity for certain suits against governmental entities and caps recoverable damages. See TEX. CIV. PRAC. & REM.CODE ANN. § 101.023 (Vernon 2005).After the Tort Claims Act was enacted, however, plaintiffs often sought to avoid the Act's damages cap or other strictures by suing governmental employees because claims against them were not always subject to the Act. Mission Consol. Indep. Sch. Dist. v. Garcia, 253 S.W.3d 653, 656 (Tex.2008)(citing Michael S. Hull et al., House Bill 4 and Proposition 12: An Analysis with Legislative History, Part Three: Detailed Analysis of the Medical Liability Reforms,36 TEX. TECH. L.REV. 169, 290-93(2005)).

> To prevent such circumvention, and to protect government employees, the Texas Legislature created an election-of-remedies provision. Id. As originally enacted, section 101.106 barred any action against governmental employees after claims against the governmental unit were reduced to a judgment or settled. While employees were thus afforded some protection when claims against the governmental unit were reduced to judgment or settled, there was nothing to prevent a plaintiff from pursuing alternative theories against both the employee and the governmental unit through trial or other final resolution.Id.

> In 2003, as part of its comprehensive tort reform efforts, the Texas Legislature amended section 101.106.Id.That section, entitled "Election of Remedies," now provides:

(a) **The filing of a suit under this Chapter against a governmental unit constitutes an irrevocable election by the plaintiff and immediately and** *forever bars any suit or recovery by the plaintiff against any individual employee of the governmental unit regarding the same subject matter*.

. . .

As the Texas Supreme Court recently explained in [Mission Consol. Indep. Sch. Dist. v. Garcia,253 S.W.3d 653, 656 (Tex.2008)],

The revision's apparent purpose was to force a plaintiff to decide at the outset whether an employee acted independently and is thus solely liable, or acted within the general scope of his or her employment such that the governmental unit is vicariously liable, thereby reducing the resources that the government and its employees must use in defending redundant litigation and alternative theories of recovery.By requiring a plaintiff to make an irrevocable election at the time suit is filed between suing the governmental unit under the Tort Claims Act or proceeding against the employee alone, section 101.106 narrows the issues for trial and reduces delay and duplicative litigation costs. Id. at 657.

. . .

Pursuant to section 101.106(e), "[i]f a suit is filed under this chapter against both a governmental unit and any of its employees, the employees shall be immediately dismissed on the filing of a motion by the governmental unit."  Here, Casteel filed suit alleging torts against both the City and the officers.  Because "all tort theories" are "under this chapter" for purposes of section 101.106, subsection (e) applies to Casteel's tort claims.   See Garcia, 253 S.W.3d at 659; Brown, 260 S.W.3d 118, 123. Further, both the City and the officers sought dismissal of the claims against the officers under subsection (e).   Thus, Singleton and Hammann were entitled to dismissal of Casteel's claims against them.

*Singleton, supra.* (Footnotes omitted; bolding and italics added).

This Court holds the bar based on a plaintiff's election applies to all categories, including intentional torts.  *See Bustos v. Martini Club, Inc.*, 599 F.3d 458, (5th Cir. 2010)("*Accordingly, we defer to the Supreme Court of Texas and*

*hold that the election of remedies provisions in § 101.106 apply to state law intentional tort claims against a governmental unit and its employees.*")

Thus, Mr. Cutshall made his election by suing Harris County. The Texas law claims and gross negligence claim against the individual deputies should be dismissed.

## CONCLUSION

This case vividly illustrates why the doctrine of qualified immunity is critically important to the daily functioning of law enforcement agencies. Mr. Cutshall tied up more than 40 law enforcement officers by his behavior, and stopped traffic on a major highway in Houston for hours during the middle of a workday. ROA.681. He was eventually removed from his vehicle only by deputies grabbing him and pulling him out. Mr. Cutshall essentially argues that *any* use of force by law enforcement officers is excessive.

Now he seeks to drag these defendant deputies through protracted litigation.[6] The District Court erred by allowing Mr. Cutshall's suit to proceed.

Over approximately four hours[7], the individual deputies gradually increased the intensity of the methods employed to stop and then apprehend Mr. Cutshall.

---

[6]Mr. Cutshall's complaint does not explain why he has sued some but not all of the deputies involved.

[7]The pursuit of Mr. Cutshall appears to have begun at 12:42. ROA.652. He arrrived at the hospital by 16:57. ROA.63.

Throughout the entire episode, the deputies used the bare minimum force required to effect Mr. Cutshall's arrest.

None of the individual deputies who used force upon Mr. Cutshall violated a clearly established right during their use of such force, as alleged in count 1. None of the deputies who were present - but did not use force - stood by idly and failed to intervene while excessive force was used as alleged in count 4. Mr. Cutshall did not receive 'summary punishment' as alleged in count 6. Mr. Cutshall received timely - indeed, almost instantaneous - medical care, contrary to the allegation in count 7. No deputy violated any Texas state law during the pursuit and apprehension of Mr. Cutshall, as alleged in count 8. Finally, none of the individual deputies committed gross negligence during the incident caused by Mr. Cutshall.

For the foregoing reasons, this Court should reverse the District Court's decision denying qualified immunity to Deputy P. Batton, in his individual capacity; Lieutenant D.R. Calhoun, in her individual capacity; Sergeant M.A. Carrizales, in his individual capacity; Deputy R.W. Holley, in his individual capacity; and Deputy C. Marshall (in addition to the other individual law enforcement officers named by the plaintiff).

Alternatively, this Court should remand the case with instructions that the District Court identify the factual disputes for each defendant that overcome the qualified immunity defense. *See Lempar v. Collier*, 710 F. App'x 231 (5th Cir. 2018)("*A denial of qualified immunity must identify factual disputes tied to a*

*particular defendant that overcome the immunity defense. Meadours v. Ermel, 483 F.3d 417, 422 (5th Cir. 2007). We have thus remanded cases in which the district court did not tie the existence of disputed issues to each defendant. Id. at 423; Hill v. New Orleans City, 643 Fed. Appx. 332, 338 (5th Cir. 2016). That is the proper course here given the number of defendants and the conclusory district court ruling.*")

Respectfully submitted,


/s/ David Adler

_____

David Adler

Attorney for Appellants:
(in their individual capacities)
Deputy P. Batton,
Lieutenant D.R. Calhoun
Sergeant M.A. Carrizales
Deputy R.W. Holley, and
Deputy C. Marshall


## CERTIFICATE OF SERVICE

A copy of this brief was served on all counsels of record via PACER on December 3, 2025.

/s/ David Adler

_____

David Adler

## CERTIFICATE OF COMPLIANCE

Pursuant to 5TH CIR. R. 35.5, undersigned counsel certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 35 (a)(7)(b).

1.    Including the portions exempted by 5TH CIR. R. 32(f), this brief contains 11,791 words.

2.    This brief has been prepared in proportionally spaced typeface using Corel WordPerfect software in Times New Roman 14 point font in text and Times New Roman 12 point font in footnotes.

3.    Undersigned counsel understands that a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in Fed. R. App. P. 35 (b)(2), may result in the Court's striking this brief and imposing sanctions against the person signing the brief.

/s/ David Adler

_____

David Adler