No. 25-20386

_____

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

_____

*Trinidad Cutshall,*

*Plaintiff - Appellee,*

*v.*

*Donald Dillow, Sergeant, in his Individual Capacity; Nahuel Faiura, Deputy, in his Individual Capacity; Todd Klosterman, Sergeant, in his Individual Capacity; N. Poirier, Deputy, in his Individual Capacity; D.R. Calhoun, Lieutenant, in his Individual Capacity; M.A. Carrizales, Sergeant, in his Individual Capacity; R.W. Holley, Deputy, in his Individual Capacity; C. Marshall, Deputy, in his Individual Capacity; P. Batton, Deputy, in his Individual Capacity,*

*Defendants - Appellants.*

_____

CONSOLIDATED WITH:

No. 25-20499

_____

*Trinidad Cutshall,*

*Plaintiff - Appellee,*

*v.*

*Kenneth Sandor, Deputy, Individually; E. Hernandez, Deputy, Individually; J. Luna, Deputy, Individually; S. Cogburn, Deputy, Individually,*

*Defendants - Appellants.*

---

Appeal from the United States District Court for the
Southern District of Texas - Houston Division, Civil Action No: 4:25-cv-02899,
Honorable David Hittner, District Judge Presiding

---

### APPELLEE'S BRIEF IN RESPONSE AND OPPOSITION TO BRIEF OF APPELLANTS KENNETH SANDOR, DEPUTY, INDIVIDUALLY; E. HERNANDEZ, DEPUTY, INDIVIDUALLY; J. LUNA, DEPUTY, INDIVIDUALLY; S. COGBURN, DEPUTY, INDIVIDUALLY,

---

Respectfully submitted,

**LAW OFFICES OF GARRETT GIBBINS, PLLC**

*/s/ Garrett Lee Gibbins*
Garrett Lee Gibbins
Texas Bar Number: 24125243
South Carolina Bar Number: 105706
New Mexico Bar Number: 163276
Arizona Bar Number: 039804
Colorado Bar Number: 61100
Oklahoma Bar Number: 36371
Illinois Bar Number:  6351087
Tennessee Licensure Pending
Federal ID: 3864602
728 West Donovan Street
Houston, Texas 77091
Email: garrettgibbins4747@yahoo.com
Phone: 512-587-8572
***Counsel for Plaintiff - Appellee:
Trinidad Cutshall***

**ORAL ARGUMENT REQUESTED**

### CERTIFICATE OF INTERESTED PERSONS

The undersigned Counsel of Record certifies that the following listed persons and entities as described in the fourth sentence of 5th Circuit Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the Honorable Justices of this Honorable Court may evaluate possible disqualification or recusal.

1. Mr. Garrett Lee Gibbins, Houston, Texas, Attorney for Trinidad Cutshall;

2. Mr. Francis Joseph Ford of the Harris County Attorney's Office, Houston, Texas, Attorney for Harris County, Texas;

3. Mr. David Adler, Houston, Texas, Attorney for C. Marshall, R.W. Holley, D.R. Calhoun, M.A. Carrizales, and P. Batton;

4. Mr. Richard Kuniansky, Houston, Texas, Attorney for Donald Dillow, Nahuel Faiura, Todd Klosterman, and N. Poirier.

Respectfully submitted,

**LAW OFFICES OF GARRETT GIBBINS, PLLC**

*/s/ Garrett Lee Gibbins*
Garrett Lee Gibbins
Texas Bar Number: 24125243
South Carolina Bar Number: 105706
New Mexico Bar Number: 163276
Arizona Bar Number: 039804
Colorado Bar Number: 61100
Oklahoma Bar Number: 36371
Illinois Bar Number:  6351087
Tennessee Licensure Pending
Federal ID: 3864602
728 West Donovan Street
Houston, Texas 77091
Email: garrettgibbins4747@yahoo.com
Phone: 512-587-8572
***Counsel for Plaintiff - Appellee:***
***Trinidad Cutshall***

i

## STATEMENT REGARDING ORAL ARGUMENT

Appellee prays that this Honorable Court grant him the opportunity to argue his case in-person through an Oral Argument.  Appellee prays for such relief as this is a case that is comprised of sophisticated facts and law.  An Oral Argument may allow this Honorable Court to better understand the complexities of this matter. Appellee prays for the opportunity to Orally Argue this case before this Honorable Court. Through an Oral Argument all of this Honorable Court's questions, comments, and concerns will be prioritized, addressed, and answered in their entirety.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS……………………………………………i.

STATEMENT REGARDING ORAL ARGUMENT…………………………………ii.

TABLE OF AUTHORITIES…………………………………………………v-x.

JURISDICTIONAL STATEMENT………………………………….…x.

ISSUES PRESENTED………………………………………………………x-xiv.

I.    STATEMENT OF THE CASE……………………………………………1.

    A.    **Factual Background**…………………………………………1.

    B.    **Facts Specific to Each Individual Appellant**……………………..7.

        i.    **Appellant Sandor**……………………………………7.

        ii.    **Appellant Hernandez**………………………………..8.

        iii.    **Appellant Luna**……………………………………11.

        iv.    **Appellant Cogburn**………………………………..12.

    C.    **Procedural Background**………………………………………14.

II.    SUMMARY OF THE ARGUMENT………………………………………15.

III.    ARGUMENT & AUTHORITIES…………………………………………19.

    A.    **Appellee was the victim of excessive force under 42 U.S.C. § 1983 by Appellants and Appellants are not entitled to qualified immunity**……………………………………………19.

        i.    ***Santander v. Salazar***………………………………19.

        ii.    ***Walls v. Sheriff's Office of Caddo Parish***……………….23.

    *iii.*    ***Graham v. Connor***………………………………………26.

    *iv.*    ***Barnes v. Felix***…………………………………………...32.

    *v.*    ***Ayers v. Hilliard***………………………………………41.

    *vi.*    ***Greene v. DeMoss***………………………………………43.

    *vii.*    ***Austin v. City of Pasadena, Texas***…………………………46.

**B.**    **Appellants are liable via Bystander Liability and/or Failure to Intervene under 42 U.S.C. § 1983 and Appellants are not entitled to qualified immunity**…………………………………..52.

    *i.*    ***Greene v. DeMoss***………………………………………52.

    *ii.*    ***Austin v. City of Pasadena, Texas***…………………………55.

**C.**    **Appellants are liable for failure to render medical aid in a timely manner under 42 U.S.C. § 1983 and Appellants are not entitled to qualified immunity**…………………………………..56.

    *i.*    ***Austin v. City of Pasadena, Texas***…………………………56.

    *ii.*    ***Kelson v. Clark***…………………………………………61.

    *iii.*    ***Allen v. Hays***………………………………………...…63.

**D.**    **Appellants are liable for gross negligence and Appellee's other state law claims and Appellants are not entitled to qualified immunity**…………………………………………………..66.

    *i.*    ***Meadours v. Ermel***………………………………………66.

    *ii.*    ***Languirand v. Hayden***……………………………………72.

**E.**    **Appellants are liable for summary punishment under 42 U.S.C. § 1983 and Appellants are not entitled to qualified immunity**…74.

    *i.*    ***Valencia v. Wiggins***………………………………………74.

      *ii.*    ***Kingsley v. Hendrickson***…………………………………78.

**IV.**   **CONCLUSION**…………………………………………...…79.

**V.**    **PRAYER**……………………………………………………80.

**CERTIFICATE OF SERVICE**………………………………………82.

**CERTIFICATE OF COMPLIANCE**……………………………………83.

## TABLE OF AUTHORITIES

**FEDERAL STATUTES:**

28 U.S.C. § 1291………………………………………………x.

28 U.S.C. § 1292………………………………………………x.

42 U.S.C. § 1983……………………………………*passim* at v. - 84.

**CASES:**

**UNITED STATES SUPREME COURT CASES:**

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)………………………………..21.

*Barnes v. Felix*, 605 U.S. 73 (2025)………………………………*passim* at 32-41.

*Bell v. Wolfish*, 441 U.S. 520 (1979)…………………………………29, 76.

*Block v. Rutherford*, 468 U.S. 576 (1984)………………………………78.

*Brigham City v. Stuart*, 547 U.S. 398 (2006)…………………………34.

*County of Los Angeles v. Mendez*, 581 U.S. 420 (2017)…………………………35.

*Dist. Of Columbia v. Wesby*, 583 U.S. 48 (2018)……………………………..38.

*Elder v. Holloway*, 510 U.S. 510 (1994)………………………………………21.

*Estelle v. Gamble*, 429 U.S. 97 (1976)………………………………..……59.

*Farmer v. Brennan*, 511 U.S. 825 (1994)……………………………………..…57.

*Graham v. Connor*, 490 U.S. 386 (1989)…………………….*passim* at 26-32, 76.

*Hudson v. McMillian*, 503 U.S. 1 (1992)………………………………………42.

*Ingraham v. Wright*, 430 U.S. 651 (1977)…………………………….……76.

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015)…………………….35, 49, 78-79.

*Mitchell v. Forsyth*, 472 U.S. 511 (1985)……………………………………..…x.

*Mullenix v. Luna*, 577 U.S. 7 (2015)……………………………………..…20.

*Plumhoff v. Rickard*, 572 U.S. 765 (2014)……………………………….…35.

*Reichle v. Howards*, 566 U.S. 658 (2012)………………………………………20.

*Scott v. Harris*, 550 U.S. 372 (2007)…………………………………………38.

*Scott v. United States*, 436 U.S. 128 (1978)…………………………………29.

*Smith v. Wade*, 461 U.S. 30 (1983)……………………………………………74.

*Tennessee v. Garner*, 471 U.S. 1 (1985)………………………………26, 29, 45.

*Terry v. Ohio*, 392 U.S. 1 (1968)………………………………………………29.

*United States v. Place*, 462 U.S. 696 (1983)…………………………………..29.

**UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT CASES:**

*Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415 (5th Cir. 2017)…57, 59.

*Allen v. Hays*, 65 F.4th 736 (5th Cir. 2023)…………………………26, 63-66.

*Anderson v. Estrada*, 140 F.4th 634 (5th Cir. 2025)……………………………x.

*Anderson v. McCaleb*, 480 F.App'x 768 (5th Cir. 2012)...........................51.

*Arnold v. Williams*, 979 F.3d 262 (5th Cir. 2020)............................21, 45.

*Austin v. City of Pasadena, Texas*, 74 F.4th 312 (5th Cir. 2023)...*passim* at 46-65.

*Autin v. City of Baytown*, 174 F.App'x 183 (5th Cir. 2005).......................51.

*Ayers v. Hilliard*, 172 F.3d 867 (5th Cir. 1999)...............................41-42.

*Bakutis v. Dean*, 129 F.4th 299 (5th Cir. 2025)......................................26.

*Barnes v. Felix*, 91 F.4th 393 (5th Cir. 2024).......................*passim* at 32-41.

*Barnes v. Felix*, 152 F.4th 669 (5th Cir. 2025).......................*passim* at 32-41.

*Boyd v. McNamara*, 74 F.4th 662 (5th Cir. 2023)......................…......24.

*Brothers v. Zoss*, 837 F.3d 513 (5th Cir. 2016).......................................51.

*Bush v. Strain*, 513 F.3d 492 (5th Cir. 2008)........................................25.

*Carroll v. Ellington*, 800 F.3d 154 (5th Cir. 2015)..........................21-22, 53.

*Darden v. City of Ft. Worth*, 880 F.3d 722 (5th Cir. 2018)..........................51.

*Deville v. Marcantel*, 567 F.3d 156 (5th Cir. 2009)............................…....25.

*Domino v. Text. Dep't of Crim. Just.*, 239 F.3d 752 (5th Cir. 2001)...............62.

*Dyer v. Houston*, 964 F.3d 374 (5th Cir. 2020).......................................57.

*Easter v. Powell*, 467 F.3d 459 (5th Cir. 2006)...........................57, 59, 62.

*Ferguson v. Bank of New York Mellon Corp.*, 802 F.3d 777 (5th Cir. 2015)...20.

*Garza v. City of Donna*, 922 F.3d 626 (5th Cir. 2019)..............................65.

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305 (5th Cir. 2002)...............................................................................74.

*Greene v. DeMoss*, No. 21-3004, 2022 WL 3716201 (5th Cir. 2022)……………………………………………………...*passim* at 43-53.

*Griggs v. Brewer*, 841 F.3d 308 (5th Cir. 2016)……………………………….45.

*Hale v. Townley*, 45 F.3d 914 (5th Cir. 1995)………………………………….53.

*Hamilton v. Kindred*, 845 F.3d 659 (5th Cir. 2017)……………………….…...53.

*Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996) (*en banc*)…………………62.

*Henderson v. Norfolk Southern Corp.*, 55 F.3d 1066 (5th Cir. 1995)…………..74.

*Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319 (5th Cir. 2020)……………………………………………………39, 45, 53.

*Kelson v. Clark*, 1 F.4th 411 (5th Cir. 2021)…………………………………61-63.

*Languirand v. Hayden*, 717 F.2d 220 (5th Cir. 1983)…………………………72-74.

*Lytle v. Bexar County*, 560 F.3d 404 (5th Cir. 2009)…………………….…...21.

*Mace v. City of Palestine*, 333 F.3d 621 (5th Cir. 2003)…………………………65.

*Massey v. Wharton*, 477 F.App'x 256 (5th Cir. 2012)………………………….51.

*Meadours v. Ermel*, 483 F.3d 417 (5th Cir. 2007)………………………….66-72.

*Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012)………………………..………51.

*Ontiveros v. City of Rosenberg*, 564 F.3d 379 (5th Cir. 2009)…………………..20.

*Peace v. City of Center*, 372 F.2d 649 (5th Cir. 1967)…………………………74.

*Pena v. City of Rio Grande City*, 879 F.3d 613 (5th Cir. 2018)……………..…...20.

*Poole v. City of Shreveport*, 691 F.3d 624 (5th Cir. 2012)…………………..20, 45.

*Ramirez v. Martinez*, 716 F.3d 369 (5th Cir. 2013)……………………………37.

*Salazar v. Molina*, 37 F.4th 278 (5th Cir. 2022)………………………………24.

*Sanchez v. Young Cnty.*, 866 F.3d 274 (5th Cir. 2017)……………………………65.

*Santander v. Salazar*, 133 F.4th 471 (5th Cir. 2025)……………………..19-23, 26.

*Sims v. Griffin*, 35 F.4th 945 (5th Cir. 2022)…………………………...………..49.

*Singleton v. Casanova*, No. 22-50327, 2024 WL 2891900 (5th Cir. 2024)…...…26.

*Spiller v. Harris Cnty., Texas*, 113 F.4th 573 (5th Cir. 2024)………………21-22.

*Strokes v. Gann*, 498 F.3d 483 (5th Cir. 2007)…………………………………20.

*Thompson v. Upshur Cnty.*, 245 F.3d 447 (5th Cir. 2001)……………………49, 56.

*Timpa v. Dillard*, 20 F.4th 1020 (5th Cir. 2021)………………………………49-51.

*Tucker v. City of Shreveport*, 998 F.3d 165 (5th Cir. 2021)……………...……….45.

*Valencia v. Wiggins*, 981 F.2d 1440 (5th Cir. 1993)…………………………74-77.

*Wagner v. Bay City*, 227 F.3d 316 (5th Cir. 2000)………………………………65.

*Walls v. Sheriff's Office of Caddo Parish*, No. 23-30253, 2023 WL 8451219 (5th Cir. 2023)………………………………………………………………………23-26.

*Westfall v. Luna*, 903 F.3d 534 (5th Cir. 2018)…………………………………46.

*White v. U.S. Corrections*, L.L.C., 996 F.3d 302 (5th Cir. 2021)………………64.

*Whitley v. Hanna*, 726 F.3d 631 (5th Cir. 2013)……………………………53, 56.

**TEXAS STATUTES:**

TEX. CIV. PRAC. & REM. CODE § 101.057(2)………………………………70-71.

TEX. CIV. PRAC. & REM. CODE § 101.106………………………………………70-71.

TEX. CIV. PRAC. & REM. CODE § 101.106(a)………………………………70-71.

**TEXAS SUPREME COURT CASES:**

*Newman v. Obersteller*, 960 S.W.2d 621 (Tex. 1997)………………………70-71.

*Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10 (Tex. 1994)………………….…74.

**OTHER AUTHORITIES:**

BRIEF FOR UNITED STATES AS *AMICUS CURIAE* 14……………………….…35.

## JURISDICTIONAL STATEMENT

This Honorable Court has jurisdiction over this interlocutory appeal pursuant to 28 U.S.C. §§ 1291; 1292, respectively. Additionally, this Honorable Court has so reasoned that, "This Court has jurisdiction because 'a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment.'" *Anderson v. Estrada*, 140 F.4th 634 (5th Cir. 2025); citing *Mitchell v. Forsyth*, 472 U.S. 511 (1985). Appellee hereby stipulates that Appellants' notice of appeal was timely. ROA.1427-28.

## ISSUES PRESENTED

The first issue presented for review is whether the District Court erred in denying Appellants' Motions to Dismiss on the basis of qualified immunity regarding Appellee's claims for excessive force under 42 U.S.C. § 1983. The District Court did not err in so denying said Motions to Dismiss on the basis of qualified immunity. ROA.1425-26. The Appellants engaged in excessive force under 42 U.S.C. § 1983 because Appellee has shown: 1) an injury; 2) which

resulted directly and only from a use of force that was clearly excessive and; 3) the excessiveness of which was clearly unreasonable. *Greene v. DeMoss*, No. 21-3004, 2022 WL 3716201, at *3 (5th Cir. 2022). Appellants are not entitled to qualified immunity because Appellee has shown: 1) a statutory or Constitutional violation based on the alleged facts and; 2) the Appellants' actions violated clearly established law that every person would have known. *Id.* at *2. Thus, the District Court did not err in denying Appellants' Motions to Dismiss via qualified immunity. ROA.1425-26.

The second issue presented for review is whether the District Court erred in denying Appellants' Motions to Dismiss on the basis of qualified immunity regarding Appellee's claims for bystander liability under 42 U.S.C. § 1983. The District Court did not err in so denying said Motions to Dismiss on the basis of qualified immunity. ROA.1425-26. Appellants are liable via bystander liability (i.e., a/k/a failure to intervene) because Appellee has shown that Appellants: 1) knew fellow officers were violating Appellee's Constitutional rights; 2) were present at the scene of the Constitutional violations; 3) had reasonable opportunities to prevent the harm but, nevertheless; 4) chose not to act. *Id.* at *4. Appellants are not entitled to qualified immunity because Appellee has shown: 1) a statutory or Constitutional violation based on the alleged facts and; 2) the Appellants' actions violated clearly established law that every person would have

known. *Id.* at *2. Thus, the District Court did not err in denying Appellants' Motions to Dismiss via qualified immunity.[1]  ROA.1425-26.

The third issue presented for review is whether the District Court erred in denying Appellants' Motions to Dismiss on the basis of qualified immunity regarding Appellee's claims for failure to render timely medical aid under 42 U.S.C. § 1983.   The District Court did not err in so denying said Motions to Dismiss on the basis of qualified immunity.  ROA.1425-26.  Appellants are liable for failing to render timely medical aid under 42 U.S.C. § 1983 because Appellee has shown that Appellants: acted with deliberate indifference to Appellee's serious medical needs because Appellants: 1) refused to treat Appellee; 2) ignored Appellee's complaints; 3) intentionally treated Appellee incorrectly and; 4) engaged in similar conduct that clearly evinced a wanton disregard for Appellee's

---

[1] Appellee's Original Petition consists of Fifteen different Counts, not all of which are directed at Appellants. ROA.40-58. However, Appellants' Brief (i.e. Appellants Dillow, Faiura, Klosterman, and Poirier; *see* Document 29), only mentioned Counts One and Four (i.e., Excessive Force and Bystander Liability under 42 U.S.C. § 1983).  Appellants Dillow, Faiura, Klosterman, and Poirier failed to mention Counts Six and Seven (i.e., Summary Punishment and Failure to Provide Medical Aid in a Timely Manner under 42 U.S.C. § 1983). Additionally, Appellants Dillow, Faiura, Klosterman, and Poirier failed to mention Appellee's state law claims that implicate Appellants Dillow, Faiura, Klosterman, and Poirier directly and indirectly (i.e., Counts Eight-Fifteen).   As such, said issues and arguments of Appellants Dillow, Faiura, Klosterman, and Poirier were not mentioned and should be waived as moot.  Thus, because Appellants Dillow, Faiura, Klosterman, and Poirier have waived said unmentioned issues on appeal, Appellee prays to this Honorable Court that said unmentioned issues survive dismissal in their entirety as to those Appellants.  However, this Honorable Court should note that after Appellee pointed this out to this Honorable Court, Mr. Kuniansky (Counsel not only for Appellants Dillow, Faiura, Klosterman, and Poirier but, also, for Appellants Sandor, Hernandez, Luna, and Cogburn then raised additional new arguments on appeal (i.e., summary punishment, failure to provide timely medical aid, and state law claims/gross negligence), to which Appellee is now responding.

serious medical needs.  Appellee has shown that Appellants were: 1) aware of facts from which an inference of a substantial risk of serious harm to an individual could be drawn and; 2) that Appellants actually drew the inference.    Additionally, Appellee need not have died, or be permanently impaired, before an actionable claim arises for delayed emergency treatment *[emphasis added]*; rather, Appellee may recover for pain suffered during a delay in treatment caused by deliberate indifference.  Thus, the District Court did not err in denying Appellants' Motions to Dismiss via qualified immunity.  ROA.1425-26.

The fourth issue presented for review is whether Appellee's state law claims, particularly, his claim of gross negligence should survive.  First and foremost, state law claims, particularly those of gross negligence, have survived dismissal via qualified immunity on numerous occasions in the Fifth Circuit. *See infra*, paragraphs 3.97-3.112.    Here, when viewed objectively from the standpoint of Appellants, the acts or omissions involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others (i.e., Appellee) and; 2) the Appellants had actual, subjective awareness of the risks involved, but nevertheless proceeded with a conscious indifference to the rights, safety, or welfare of others. Additionally, punitive damages are absolutely proper in the case at bar.  As such, Appellants are liable for gross negligence and Appellants are not entitled to qualified immunity.

The fifth issue presented for review is whether Appellee may prevail on his claim of Summary Punishment under 42 U.S.C. § 1983. The Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment. Such punishment can consist of actions taken with an expressed intent to punish. In the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not rationally related to a legitimate non-punitive governmental purpose or that the actions appear excessive in relation to that purpose. Proof of intent (or motive) to punish is not required for a pretrial detainee to prevail on a claim that his Due Process rights were violated. Rather, a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose. Here, Appellants engaged in malicious and sadistic conduct that was not rationally related to any legitimate governmental purpose. As such, Appellants are liable for Summary Punishment under 42 U.S.C. § 1983 and are not entitled to qualified immunity.

# I.     STATEMENT OF THE CASE

## A.     Factual Background

1.1     This is a factually intensive case fleshed out in great detail within Appellee's Original Complaint.  ROA.11-61. For the sake of brevity, Appellee sets forth to this Honorable Court the following facts in a rather concise manner.  On or about December 27, 2023, Appellee was a long-haul truck driver operating a tractor-trailer down Interstate 10 in Harris County, Texas.    Appellee was completely sober and there was no alcohol nor illicit drugs in Appellee's system *[emphasis added]*.  ROA.286, 296.



***Snippet from ROA.286. proving that there was no alcohol in Appellee's system at the time of the incidents made the bases of this lawsuit.***

1

**HARRIS HEALTH**
SYSTEM

Cutshall, Trinidad Rey
MRN: 082642641  DOB: 1/25/1981  Sex :M
Adm: 12/27/2023 , D/C 1/2/2024
Medicaid #

**12/27/2023 - ED to Hosp-Admission (Discharged) in 5G MED/SURG (continued)**

Labs (continued)

| | | | | |
|---|---|---|---|---|
| Positive if urine level > or = 300 ng/mL. | | | | |
| Amphetamine<br>Comment:<br>Calibrated Standard: D-Methamphetamine<br><br>Positive if urine level > or = 1000 ng/mL. | Negative | Negative | — | BTLAB |
| Barbiturate<br>Comment:<br>Calibrated Standard: Secobarbital<br><br>Positive if urine level is > or = 200 ng/Ml | Negative | Negative | — | BTLAB |
| Benzodiazepine<br>Comment:<br>Calibrated Standard: Lormethazepam<br><br>Positive if urine level is > or = 200 ng/mL | Negative | Negative | — | BTLAB |
| Cocaine<br>Comment:<br>Calibrated Standard: Benzoylecgonine<br><br>Positive if urine level > or = 300 ng/mL. | Negative | Negative | — | BTLAB |
| PCP<br>Comment:<br>Calibrated Standard: Phencyclidine<br><br>Positive if urine level > or = 25 ng/mL. | Negative | Negative | — | BTLAB |
| Cannabinoid<br>Comment:<br>Calibrated Standard: 11 nor-delta(9)-THC carboxylic acid<br><br>Positive if urine level > or = 50 ng/mL. | Negative | Negative | — | BTLAB |

*Snippet from ROA.296. proving that there were no illicit drugs in Appellee's system at the time of the incidents made the bases of this lawsuit.*

1.2    Appellee was operating his tractor-trailer around 5mph for around an hour and exhibiting signs of disorientation.  This is because Appellee was suffering from septic shock resulting from coronavirus. ROA.653.



Cutshall, Trinidad Rey
MRN: 082642641  DOB: 1/25/1981  Sex :M
Adm: 12/27/2023 , D/C 1/2/2024
Medicaid #

**12/27/2023 - ED to Hosp-Admission (Discharged) in 5G MED/SURG**
**Coding Queries (continued)**

CDI Queries (continued)

PLEASE RESPOND VIA EPIC IN-BASKET MESSAGE REPLY. After we receive your reply, this message
will become part of the permanent legal medical record.

Documentation in the 12/28/23 states, *#Dog bite wounds
- c/f sepsis (leukocytosis, tachy, fever)
- possibly due to dog bite" and
*AKI
- creatinine improved with IVF*.

Documentation in the Progress note on 12/28/23 states, "Sepsis
#COVID+

*Snippet from ROA.653. proving that Appellee was suffering from Sepsis resulting from Coronavirus at the time of the incidents made the bases of this lawsuit, thus, proving medical emergency.*

1.3     Hundreds of authorities shut down Interstate 10. Appellants acknowledged numerous times that Appellee was non-responsive, was of no threat, was completely disoriented, and was likely suffering from a medical emergency.[2] Nevertheless, during the arrest made the bases of this litigation, Appellants shot

---

[2] *See* ROA.695. (where Appellant Carrizales insinuates in the incident report that Appellee was likely experiencing a medical emergency); *see also* ROA.698. (where Appellant Batton acknowledged that the rubber bullets fired at Appellee yielded no reaction from him); *see* ROA.710. (where Appellant Luna acknowledged that the tear gas deployed had a minimal effect on Appellee); *see* ROA.705-06. (where Appellant Dillow acknowledged Appellee was staring off into the distance in front of him, did not acknowledge Appellants' presence, was completely immune to any bullets or tear gas, and appeared to think he was continuing to be driving); *see* ROA.711. (where Appellant Cogburn acknowledged that Appellee appeared to be completely disoriented all the while).

Appellee with rubber bullets[3], deployed tear gas[4], ripped Appellee to shreds with vicious German Shepherds[5], and punched Appellee repeatedly in the back of the skull while another deputy was holding Appellee down until the point of unconsciousness.[6] All of these acts are on video and the undersigned Counsel is willing to show this Honorable Court this video proof at the time of Oral Argument, should this Honorable Court grant it *[emphasis added]*. It is simply horrid and tragic to watch.

1.4    Appellee was later indicted on felony evading charges, which were of course dismissed in their entirety. ROA.742-45. This was because Appellee did not have the *mens rea* of "intentionally" to satisfy the statute for felony evading.

---

[3] *See* ROA.661. (where Appellant Holley brags about shooting Appellee with rubber bullets); *see also* ROA.662. (where Appellant Sandor also brags about shooting Appellee with rubber bullets); *see also* ROA.698. (where Appellant Batton also brags about shooting Appellee with rubber bullets).

[4] *See* ROA.662. (where Appellant Sandor brags about deploying tear gas on Appellee); *see also* ROA.710. (where Appellant Luna also brags about deploying tear gas on Appellee).

[5] *See* ROA.671. where Appellant Marshall brags about ripping Appellee to shreds with his canine German Shepherd. Appellee possesses a video that he wishes to show this Honorable Court at the time of Oral Argument, should it be granted, where Appellee is screaming, "Please God, help me," while the German Shepherd is ripping him to shreds. At the same time, Appellants Poirier and Klosterman are punching Appellee in the back of the skull until the point of unconsciousness while another deputy holds Appellee down. *See* ROA.709. (where Appellant Poirier brags about punching Appellee in the back of the skull until the point of unconsciousness); *see also* ROA.704 (where Appellant Klosterman also brags about punching Appellee repeatedly in the back of the skull after he witnesses Appellant Poirier do so).

[6] *See* ROA.671, 704, 709. (where Appellants Poirier and Klosterman brag about punching Appellee in the back of the skull in unison until the point of unconsciousness, while another deputy holds Appellee down, and also while Appellant Marshall rips Appellee to shreds with a vicious German Shepherd).

In fact, Appellee had no *mens rea* at all at the time of the incidents made the bases of this litigation because he was completely disoriented, was of no threat, and was suffering from a medical emergency. Appellee desperately needed medical attention rather than almost being brutally murdered by Appellants in cold blood.

1.5    Appellee was the victim of policy brutality and excessive force that our Constitution and this Honorable Court has so expressly loathed in years' past. This incident has made the national news and the underlying lawsuit has been the talk of both ABC and FOX news channels in Houston, Texas.[7]   It is Appellee's hope that through this landmark case, Americans everywhere will accept that police brutality is archaic and obsolete and has no place in a modern and civilized society. As such, Appellee prays to this Honorable Court that it may affirm the judgment of the District Court in its entirety that denied Appellants' Motions to Dismiss in their entirety. ROA.1425-26.

---

[7] https://abc13.com/post/harris-county-deputies-sued-18-wheeler-pursuit-driver-claimed-he-was-beat-chase-during-medical-emergency/17789371/ (ABC) ; https://www.youtube.com/watch?v=_FTVvNndtyE (FOX).



*This is a photo of Appellee after being beaten, shot with rubber bullets, ripped to shreds by German Shepherds, succumbing to tear gas, and being punched repeatedly by law enforcement in the head and face until the point of unconsciousness.*  **ROA.13.**

**B.     Facts Specific to Each Individual Appellant**

**i.     Appellant Sandor**

1.6     Right beside Appellant Holley was Appellant Sandor. Both Appellants were discharging rubber bullets at Appellee while all the chaos was going on. Apparently, Appellant Holley shooting rubber bullets at Appellee was not enough and this is why a second Appellant [Appellant Sandor] began showering Appellee with rubber bullets.

1.7     In fact, Appellant Sandor wrote in his report:

> *I was tasked with deploying less lethal munitions [rubber bullets] into the cab of the vehicle in an attempt to get the suspect [Appellee] to come out.  I deployed two (2) less lethal 40mm Ferret munition rounds into the passenger side of the vehicle.  The first round was an OC munition and the second was a CS munition.  Both Ferret founds were successfully deployed into the suspect vehicle.*[8]

1.8     Not one, but two Appellant Deputies were showering Appellee with projectiles.  This the classic paradigm of excessive force and police brutality that deprived Appellee of his constitutional protections on the day of the incidents made the bases of this litigation.

---

[8] ROA.662.

### ii.  Appellant Hernandez

1.9    Appellant Hernandez not only operated the aforementioned ROOK,[9] but also deployed tear gas all over Appellee.  In fact, Appellant Hernandez brags in his narrative:

> *I was assigned as the operator of our Armored Critical Incident vehicle which is referred to as the ROOK.  I arrived on scene with the Hydraulic Breaching Ram attached to the front of the ROOK... I was ordered to breach the back right cab window of the 18 wheeler with the Hydraulic breaching ram of the ROOK in order to deploy chemical munitions [tear gas] inside the vehicle to gain compliance.  I successfully moved the ROOK into position and breached the back right passenger cab window using the Hydraulic breaching ram, allowing a SWAT Operator to hand deploy chemical munitions inside the 18 wheeler's cab... I was then ordered to breach and remove the passenger side door of the 18 wheeler in order to gain a better visual of the suspect [Appellee] and his surroundings inside the vehicle.  I moved the ROOK into position, breached the passenger side window with the hydraulic breaching ram.  I used the hydraulic breaching ram in a sweeping motion and successfully removed the passenger door of the 18 wheeler, allowing SWAT Operators to gain a better visual of the suspect [Appellee] and his immediate surroundings inside the vehicle.*[10]

1.10   In conjunction with everything else aforementioned, Appellant Hernandez thought it prudent to utilize even more excessive force to apprehend an individual that was already unconscious and had already succumbed to a medical

---

[9] ROA.19.

[10] ROA.688.

emergency.    German Shepherds, rubber bullets, and closed-first punches to the back of the head, were not enough for Appellant Hernandez to be satisfied.

1.11    Rather, Appellant Hernandez utilized heavy machinery [i.e., ROOK], and deployed tear gas on Appellee, blinding him immediately and causing permanent damage to Appellee's vision.    This is the classic paradigm of excessive force and police brutality that violated Appellee's Constitutional protections on the day of the incidents made the bases of this litigation.



***Harris County Sheriff's Office ROOK.*** **ROA.19.**



*Photo of Appellee's tractor-trailer following the breach by the ROOK.* **ROA.19.**

### iii.    Appellant Luna

1.12    Appellant Luna joined Appellant Hernandez in shooting Appellee with tear gas, blinding Appellee and causing Appellee to sustain permanent vision and nerve damage.  Appellant Luna brags in his narrative:

> *I was advised by [Appellant Klosterman] that I would be deploying a flameless Tri-Chamber CS canister into the vehicle [i.e., tear gas]... The Tri-Chamber CS canister was deployed in the rear cabin of the semi-truck to deny him area in the semi-truck and cause him discomfort **[emphasis added]** for his peaceful surrender.   The suspect [Appellee] had several different ways to exit the semi-truck.   **I was advised over the radio the gas had minimal effect on the suspect [Appellee] [emphasis added]**.*[11]

1.13    Perhaps Appellee was not reacting to two Appellant Deputies shooting at him with tear gas was because he had succumbed to a medical emergency and was already unconscious *[emphasis added]*.  Instead of recognizing that something was medically wrong, Appellant Deputies continued onward with their parade.  Appellee was almost brutally murdered on the day of the incidents made the bases of this litigation by the Harris County Sheriff's Office and this Honorable Court should not tolerate said conduct.  This is the classic paradigm of excessive force and police brutality that deprived Appellee of his constitutional protections on the day of the incidents made the bases of this litigation.

---

[11] ROA.710.

### iv.    Appellant Cogburn

1.14    Appellant Cogburn was the supervisor of Appellant Dillow.[12]   In fact, Appellant Cogburn was the Appellant Deputy that ordered the BEAR and ROOK on the scene.  Appellant Cogburn brags in his narrative:

> *I sent Harris County Sheriff's Office SWAT personnel to the location with Harris County Sheriff's Office BEAR and ROOK… I arrived shortly after and began my duties as Team Leader… **I observed the driver [Appellee]… and he appeared to be disoriented with all the events and movement around him [emphasis added]**… [Appellant Sandor]… deployed one (1) 40mm CS Ferret through the front passenger windshield of the suspect's [Appellee's] vehicle.   **The chemical agent seemed to have no effect and the suspect continued to look down the highway as if he was still driving the 18-wheeler [emphasis added]**… Appellant Sandor then deployed a 40mm OC Ferret into the same area… **The suspect [Appellee] still did not appear to be effected by the chemical agent [emphasis added]**.*[13]

1.15    Perhaps two SWAT armored vehicles, rubber bullets, and tear gas did not faze Appellee because he had already succumbed to a medical emergency and was unconscious ***[emphasis added]***.  Instead of recognizing such and immediately ordering medical aid and attention, Appellant Cogburn continued to order and authorize a series of military attacks on Appellee.  This is the classic paradigm of excessive force and police brutality that this Honorable Court should not tolerate.

---

[12] ROA.711.

[13] ROA.711.

It is a miracle that Appellee was not murdered by Appellant Deputies on the day of the incidents made the bases of this litigation.



*Harris County Sheriff's Office SWAT BEAR Armored Vehicle.* **ROA.32.**



*Another image of the Harris County Sheriff's Office SWAT BEAR Armored Vehicle.* **ROA.32.**

## C.    Procedural Background

1.16   On June 22, 2025, Appellee filed his Original Complaint and Jury Demand.   ROA.11-61.   Appellee had much trouble serving Appellants Sandor, Hernandez, Luna, and Cogburn because they were extremely evasive.   As such, on September 2, 2025, Appellee filed a Motion for Substituted Service on said Appellants. ROA.1030-33. In support of his service efforts, Appellee attached affidavits to said Motion for Substituted Service. ROA.1036-43. Then, that very day, on September 2, 2025, the Honorable David Hittner granted Appellee's Motion for Substituted Service. ROA.1107. On September 5, 2025, Appellants Sandor, Hernandez, Luna, and Cogburn were served via Substituted Service. ROA.1236-39.   Then, on October 22, 2025, Appellants Sandor, Hernandez, Luna,

14

and Cogburn filed a myriad of different Motions to Dismiss based on qualified immunity.  ROA.1257-1340.

1.17   On October 23, 2025, Appellee filed a plethora of different Responses in Opposition to Appellants' various Motions to Dismiss based on qualified immunity. ROA.1341-1424. Then, on October 28, 2025, the Honorable David Hittner denied all of the Motions to Dismiss in their entirety. ROA.1425-26. On October 29, 2025, Appellants filed their Notice of Interlocutory Appeal. ROA.1427-28.   Then on December 23, 2025, Appellants filed their Appellants' Brief to which Appellee is responding.  *See* Document 18.

## II.    SUMMARY OF THE ARGUMENT

2.1    In the case at bar, Appellee's claims for excessive force and bystander liability under 42 U.S.C. § 1983 should survive dismissal in their entirety because qualified immunity does not apply here.  Appellee's excessive force claim under 42 U.S.C. § 1983 is viable and should survive dismissal as Appellee has stated: 1) an injury; 2) which resulted directly and only from a use of force that was clearly excessive and; 3) the excessiveness of which was clearly unreasonable.

2.2    Appellants engaged in excessive force from an objective standpoint in weighing the totality of the circumstances from the beginning of their encounter with Appellee until the very end. There was no crime being committed by Appellee. Appellee posed no immediate threat to the safety of Appellants or others. Additionally, Appellee was not actively resisting arrest nor attempting to evade

arrest by flight.  As such, the force employed was clearly disproportionate to the need.  There was no negotiation, nor attempt to de-escalate the situation, prior to the tactics employed.  Thus, Appellee's claims of excessive force under 42 U.S.C. § 1983 should survive dismissal in their entirety.

2.3    Additionally, Appellants are not entitled to qualified immunity in the case at bar because: 1) Appellants violated Appellee's statutory and Constitutional rights and; 2) the rights were clearly established at the time of the challenged conduct.  Any force used on an individual when the individual is subdued, not resisting, not fleeing, and especially when the individual is succumbing to a medical emergency is clearly excessive and, thus, qualified immunity does not apply.

2.4    Additionally, here, Appellants: 1) knew that fellow deputies were violating Appellee's Constitutional rights; 2) were present at the scene of the Constitutional violations; 3) had reasonable opportunities to prevent the harms but nevertheless; 4) chose not to act.  Thus, Appellee's claims for bystander liability under 42 U.S.C. § 1983 should survive dismissal in their entirety as qualified immunity does not apply.

2.5    Appellants are also liable for a failure to render medical aid under 42 U.S.C. § 1983 and are not entitled to qualified immunity. Appellants are liable for failing to render timely medical aid under 42 U.S.C. § 1983 because Appellee has shown that Appellants: acted with deliberate indifference to Appellee's serious

16

medical needs because Appellants: 1) refused to treat Appellee; 2) ignored Appellee's complaints; 3) intentionally treated Appellee incorrectly and; 4) engaged in similar conduct that clearly evinced a wanton disregard for Appellee's serious medical needs.

2.6    Appellee has shown that Appellants were: 1) aware of facts from which an inference of a substantial risk of serious harm to an individual could be drawn and; 2) that Appellants actually drew the inference. Additionally, Appellee need not have died, or be permanently impaired, before an actionable claim arises for delayed emergency treatment *[emphasis added]*; rather, Appellee may recover for pain suffered during a delay in treatment caused by deliberate indifference. Thus, the District Court did not err in denying Appellants' Motions to Dismiss via qualified immunity. ROA.1425-26.

2.7    Additionally, Appellee's state law claims, particularly, his claim of gross negligence should survive. First and foremost, state law claims, particularly those of gross negligence, have survived dismissal via qualified immunity on numerous occasions in the Fifth Circuit. *See infra*, paragraphs 3.97-3.112. Here, when viewed objectively from the standpoint of Appellants, the acts or omissions involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others (i.e., Appellee) and; 2) the Appellants had actual, subjective awareness of the risks involved, but nevertheless proceeded with a conscious indifference to the rights, safety, or welfare of others. Additionally,

17

punitive damages are absolutely proper in the case at bar.  As such, Appellants are liable for gross negligence and Appellants are not entitled to qualified immunity.

2.8    Additionally, Appellee may prevail on his claim of Summary Punishment under 42 U.S.C. § 1983. The Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment. Such punishment can consist of actions taken with an expressed intent to punish. In the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not rationally related to a legitimate non-punitive governmental purpose or that the actions appear excessive in relation to that purpose. Proof of intent (or motive) to punish is not required for a pretrial detainee to prevail on a claim that his Due Process rights were violated.

2.9    Rather, a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose. Here, Appellants engaged in malicious and sadistic conduct that was not rationally related to any legitimate governmental purpose.  As such, Appellants are liable for Summary Punishment under 42 U.S.C. § 1983 and are not entitled to qualified immunity.

## III.   ARGUMENT & AUTHORITIES

**A.    Appellee was the victim of excessive force under 42 U.S.C. § 1983 by Appellants and Appellants are not entitled to qualified immunity.**

### i.    *Santander v. Salazar*

3.1    This Honorable Court so beautifully articulated the proper analysis when analyzing excessive force claims under 42 U.S.C. § 1983 in its seminal and recent *Santander* opinion.  *Santander v. Salazar*, 133 F.4th 471 (5th Cir. 2025). There, on a summer evening in July of 2022, Plaintiff-Appellant and his wife were patrons at a sports bar in Fort Worth, Texas.  *Id.* at 476.  The Defendant-Appellee was an off-duty police officer employed by the Fort Worth Police Department and was wearing his department-issued badge and service weapon.  *Id.*  Plaintiff-Appellant had not consumed any alcohol that evening at the time of the incidents made the bases of said litigation.  *Id.* at 480.

3.2    Following a verbal altercation with other staff members of the sports bar, Defendant-Appellee pushed Plaintiff-Appellant from the back suddenly and without provocation, causing Plaintiff-Appellant to fall to the ground face first onto the concrete.  *Id.* at 476.  Subsequently, Defendant-Appellee punched Plaintiff-Appellant several times in the face and head and caused Plaintiff-Appellant to lose consciousness.  *Id.*  Plaintiff-Appellant was arrested and charged with public intoxication, however, the charges were eventually dismissed in their entirety.  *Id.*

3.3    Plaintiff-Appellant sued Defendant-Appellee for excessive force under 42 U.S.C. § 1983. *Id.* at 477. Defendant-Appellee of course filed a 12(b)(6) Motion to Dismiss for a failure to state a claim asserting qualified immunity as his defense. *Id.* The district court dismissed the case with prejudice, concluding that Plaintiff's-Appellant's complaint failed to allege that Defendant-Appellee violated any clearly established right. *Id.*

3.4    This Honorable Court first reasoned that, "We review a district court's decision on a Rule 12(b)(6) motion *de novo*, accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff." *Id.;* citing *Ferguson v. Bank of New York Mellon Corp.*, 802 F.3d 777, 780 (5th Cir. 2015); (quoting *Strokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007). Additionally, this Honorable Court so sagaciously reasoned that "the [plaintiff's] well-pleaded factual allegations enjoy a presumption of truth." *Id.;* citing *Pena v. City of Rio Grande City*, 879 F.3d 613, 620 (5th Cir. 2018).

3.5    This Honorable Court so reasoned that:

> A plaintiff asserting an excessive force claim under the Fourth Amendment must demonstrate: "1) an injury; 2) which resulted directly and only from a use of force that was clearly excessive and; 3) the excessiveness of which was clearly unreasonable." *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012) (quoting *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009)… A right is clearly established if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566

U.S. 658 (2012)… **Relevant here, it is clearly established that "officers engage in excessive force when they physically strike a suspect who is not resisting arrest** *[emphasis added]*." *Spiller v. Harris Cnty., Texas*, 113 F.4th 573, 578 (5th Cir. 2024); *see also Carroll v. Ellington*, 800 F.3d 154, 177 (5th Cir. 2015) ("**The law was clearly established at the time of the deputies' conduct that, once a suspect** has been handcuffed and subdued, and **is no longer resisting, an officer's subsequent use of force is excessive**.")… *Cf. Lytle v. Bexar County*, 560 F.3d 404, 413 (5th Cir. 2009) ("An exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased.").[14]

Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing: 1) that the official violated a statutory or Constitutional right and; 2) that the right was clearly established at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)… However, "an assertion of qualified immunity does not subject the complaint to a heightened pleading standard." *Arnold v. Williams*, 979 F.3d 262, 267 (5th Cir. 2020)… The Supreme Court has expressly rejected the idea that it is the plaintiff's burden to "identify the universe of statutory or decisional law from which the [district] court can determine whether the right allegedly violated was clearly established." *Elder v. Holloway*, 510 U.S. 510, 514 (1994). The operation of such a rule would be unpredictable in advance of the district court's adjudication and would "simply release defendants because of shortages in counsel's or the court's legal research or briefing." *Id.*[15]

---

[14] *Santander*, 133 F.4th at 479-81.

[15] *Santander*, 133 F.4th at 478.

3.6     This Honorable Court reasoned that because Plaintiff-Appellant was not resisting, the force used was clearly excessive to the need and qualified immunity did not apply so as to shield Defendant-Appellee.   *Id.* at 480.   This Honorable Court found its *Spiller* and *Carroll* opinions compelling in that "**it is clearly established that officers engage in excessive force when they physically strike a suspect who is not resisting arrest… once a suspect has been subdued and is no longer resisting, an officer's subsequent use of force is excessive *[emphasis added]*.**"   *Id.;* citing *Spiller*, 113 F.4th at 578; *Carroll*, 800 F.3d at 177. In the end, this Honorable Court held that Plaintiff-Appellant stated a plausible excessive force claim so as to support the denial of qualified immunity with regard to such a claim.   *Id.* at 483.   As such, the district court's dismissal of Plaintiff-Appellant's excessive force claim was reversed.   *Id.*

3.7     Here, Appellants acknowledged numerous times that Appellee was non-responsive, was of no threat, was not resisting, was completely disoriented, and was likely suffering from a medical emergency.   *See supra*, note 2.   Like the Plaintiff-Appellant in *Santander*, Appellee here was sober,[16] was of no threat, and was not resisting in any way.   Also, like the Defendant-Appellee in *Santander*, Appellants here were ruthlessly punching Appellee in the head and face area.   *See* supra, notes 3-6. Also, like the Plaintiff-Appellant in *Santander*, Appellee's criminal case here was dismissed in its entirety. ROA.742-45.

---

[16] ROA.286, 296.

3.8    Here, in looking holistically at the totality of the circumstances, from an objective standpoint, Appellee was suffering from a medical emergency,[17] was sober,[18] and was not resisting in any way.[19] Instead of proffering medical attention, Appellants shot Appellee with rubber bullets, ripped him to shreds with German Shepherds, deployed tear gas, and punched him repeatedly in unison in the back of the skull until the point of unconsciousness while another deputy was holding Appellee down. *See supra*, notes 3-6. This is the classic paradigm of excessive force that this Honorable Court has so expressly loathed. Thus, Appellee prays that this Honorable Court look to its seminal *Santander* opinion for wisdom and affirm the judgment of the District Court that denied Appellants' Motions to Dismiss based on qualified immunity in their entirety. ROA.1425-26.

### ii.    *Walls v. Sheriff's Office of Caddo Parish*

3.9    This Honorable Court also analyzed the very issues made the bases of this appeal in its seminal *Walls* opinion. *Walls v. Sheriff's Office of Caddo Parish*, No. 23-30253, 2023 WL 8451219 (5th Cir. 2023). There, deputies attempted to execute an arrest warrant for a wanted individual suspected to be on a homeowner's premises. *Id.* at *1. The individual was not found and the situation escalated between the property owner and the investigating deputies. *Id.* The

---

[17] ROA.653.

[18] ROA.286, 296.

[19] *See supra*, note 2.

situation escalated to the point where consent to search the premises was revoked. *Id.*

3.10   One of the investigating deputies threw the property owner against his kitchen counter, handcuffed him, aggressively and violently pulled him from his home, slammed him against the hood of his patrol car, and forced him into the back of the car.   *Id.*   After a short period of time, the property owner suffered a heart attack and died.   *Id.*   The property owner's two surviving sons (hereinafter "Plaintiffs-Appellees") filed a lawsuit against the deputies alleging excessive force under 42 U.S.C. § 1983.  *Id.* The deputies (hereinafter "Defendants-Appellants") of course moved for a 12(b)(6) dismissal based on qualified immunity.   *Id.*   The district court denied the qualified immunity defense and the Defendants-Appellants timely appealed.  *Id.*

3.11   This Honorable Court analyzed what exactly must be shown to overcome a qualified immunity defense and once again reasoned that in order to survive a qualified immunity 12(b)(6), a plaintiff must show: 1) that their Constitutional rights were violated and; 2) the rights at issue were clearly established at the time of the alleged misconduct.   *Id.* at *2.; citing *Salazar v. Molina*, 37 F.4th 278, 281 (5th Cir. 2022).   This Honorable Court reasoned that, "Our Court has repeatedly said that circuit precedent can clearly establish the law." *Id.*; citing *Boyd v. McNamara*, 74 F.4th 662, 670-71 (5th Cir. 2023).

3.12    This Honorable Court then so reasoned that:

> Assuming our precedent can clearly establish the law, two of our cases are relevant here.  *See Bush v. Strain*, 513 F.3d 492 (5th Cir. 2008); *Deville v. Marcantel*, 567 F.3d 156 (5th Cir. 2009).  In *Bush*, we denied qualified immunity where the officer slammed a compliant arrestee's face into the window of a nearby car, injuring her jaw and teeth.  *See* 513 F.3d at 500-02.  And in *Deville*, we denied qualified immunity where the officer pulled over a woman for speeding, ordered her out of the car, and then (when she did not comply) broke the vehicle's window, pulled the woman out, and caused her multiple injuries (including "contusions to both wrists, neuropathy of her hands, right shoulder strain, left shoulder bruising (with hand prints), and multiple cuts caused by broken glass").  *See* 567 F.3d at 167-69. Under *Bush* and *Deville*, the district court did not err.  On the well-pleaded facts of this case, [the property owner/ decedent] was not suspected of any crime, posed no immediate threat to the safety of the deputies or others, and made no attempt to actively resist arrest or evade arrest by flight.[20]

3.13    This Honorable Court ultimately affirmed the judgment of the district court which denied the 12(b)(6) Motion to Dismiss based on qualified immunity. *Id.* at \*3. Here, this Honorable Court should look to its *Walls* opinion to arrive at the same conclusion that the *Walls* Court did - that the force utilized in the case at bar was clearly excessive to the need in violation of 42 U.S.C. § 1983.  Here, just like the property owner/decedent in *Walls*, Appellee: posed no immediate threat to

---

[20] *Walls*, No. 23-30253, 2023 WL 8451219 at \*2; [citing *"Graham* Factors," *see infra*, paragraphs 3.15-3.27].

the safety of the deputies or others, made no attempt to actively resist arrest, and was not attempting to evade arrest by flight.[21]

3.14   If Appellee was attempting to evade arrest by flight, he would have been driving faster than 5mph. Clearly, Appellee was suffering from a medical emergency.  ROA.653.  Multiple Appellants admitted that Appellee was dazed and confused and was not fighting back nor resisting arrest in any manner.  *See supra*, note 2.  Nevertheless, Appellants proceeded to nearly murder Appellee.  *See supra*, notes 3-6. This is the classic paradigm of excessive force in violation of the United States Constitution that this Honorable Court has so expressly loathed in years' past.[22]    Thus, Appellee prays that this Honorable Court look to its seminal *Santander* and *Walls* opinions for wisdom and affirm the judgment of the District Court that denied Appellants' Motions to Dismiss based on qualified immunity in their entirety.  ROA.1425-26.

### iii.   *Graham v. Connor*

3.15   The United States Supreme Court set forth the proper analysis when analyzing excessive force claims in its seminal *Graham* opinion.    *Graham v.*

---

[21] *See "Graham* Factors," *infra*, paragraphs 3.15-3.27.

[22] *See also Bakutis v. Dean*, 129 F.4th 299, 306 (5th Cir. 2025) ("The Supreme Court's jurisprudence, as well as our own, has repeatedly declared the use of deadly force to be objectively reasonable - for Fourth Amendment purposes - *only* when... the suspect poses an immediate and significant threat of death or serious physical injury to the officer or others [i.e., *Graham* Factors];" citing *Singleton v. Casanova*, No. 22-50327, 2024 WL 2891900 (5th Cir. 2024); *Tennessee v. Garner*, 471 U.S. 1 (1985); *Bakutis*, 129 F.4th at 307; citing *Tennessee*, 471 U.S. at 11 ("A police officer may not seize an unarmed, non-dangerous suspect by shooting him."); *Allen v. Hays*, 65 F.4th 736, 744-45 (5th Cir. 2023).

*Connor*, 490 U.S. 386 (1989).   There, the Plaintiff-Petitioner sued for excessive force under 42 U.S.C. § 1983 for injuries sustained when law enforcement officers used physical force against him during an investigatory stop. *Id.* at 388.   The Plaintiff-Petitioner, a diabetic, felt the onset of an insulin reaction.   *Id.*   The Plaintiff-Petitioner then asked a friend to drive him to a nearby convenience store so he could purchase some orange juice to counteract the reaction.   *Id.*

3.16   Once in the convenience store, the Plaintiff-Petitioner saw a number of people ahead of him in the check-out line.   *Id.* at 388-89.   Concerned about the delay, the Plaintiff-Petitioner hurried out of the store and asked his friend to drive him to a friend's house instead.   *Id.* at 389. An officer saw the Plaintiff-Petitioner hastily enter and leave the store.   *Id.*   The officer became suspicious and followed the Plaintiff's-Petitioner's car.   *Id.*   About one-half mile from the store, the officer (hereinafter "Defendant-Respondent") made an investigatory stop.   *Id.*

3.17   Although the officer was told that Plaintiff-Petitioner was suffering from a "sugar reaction," the officer ordered the Plaintiff-Petitioner to wait while he found out what, if anything, had happened at the convenience store.   *Id.*   When the Defendant-Respondent returned to his patrol car to call for backup assistance, the Plaintiff-Petitioner got out of the car, ran around it twice, and finally sat down on the curb, where he passed out briefly.   *Id.*

3.18   In the midst of this, other backup officers (i.e., members of the Defendant-Respondent et. al. group) arrived on scene. *Id.* One of the officers rolled

27

the Plaintiff-Petitioner over on the sidewalk and cuffed his hands together tightly. *Id.* All requests to get Plaintiff-Petitioner some sugar were ignored. *Id.* Several officers (i.e., members of the Defendant-Respondent et. al. group) lifted the Plaintiff-Petitioner from the back, carried him over to the patrol car, and placed him face down on the hood. *Id.* Regaining consciousness, the Plaintiff-Petitioner again requested his diabetic medicine. *Id.*

3.19   The Defendant-Respondent then shoved Plaintiff's-Petitioner's head into the hood of the car. *Id.* Plaintiff-Petitioner was then thrown head-first into the back of the patrol car. *Id.* A friend brought Plaintiff-Petitioner some orange juice but the Defendant-Respondent refused to let Plaintiff-Petitioner have it. *Id.* Then the Defendant-Respondent received a report that Plaintiff-Petitioner did nothing wrong at the convenience store and the Plaintiff-Petitioner was released. *Id.*

3.20   At some point during his encounter with the police, the Plaintiff-Petitioner sustained a broken foot, cuts on his wrists, a bruised forehead, and an injured shoulder; he also claimed to have developed a loud ringing in his right ear that continues to this day. *Id.* at 390. The Plaintiff-Petitioner then sued for excessive force under 42 U.S.C. § 1983. The case was tried before a jury and Defendant-Respondent moved for a directed verdict. *Id.* The directed verdict was granted based on a faulty analysis and affirmed on appeal. *Id.* at 390-91.

3.21    The United States Supreme Court held and made explicit that:

> All claims that law enforcement officers have used
> excessive force - deadly or not - in the course of an
> arrest, investigatory stop, or other seizure of a free citizen
> should be analyzed under the Fourth Amendment and its
> "reasonableness" standard… Determining whether the
> force used to effect a particular seize is "reasonable"
> under the Fourth Amendment requires a careful balancing
> of "the nature and quality of the intrusion on the
> individual's Fourth Amendment interests" against the
> countervailing governmental interests at stake." *United
> States v. Place*, 462 U.S. 696, 703 (1983)… "The test of
> reasonableness under the Fourth Amendment is not
> capable of precise definition or mechanical application."
> *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)… However, its
> proper application requires careful attention to the facts
> and circumstances of each particular case, including the:
> [1] severity of the crime at issue; [2] whether the suspect
> poses poses an immediate threat to the safety of the
> officers or others and; [3] whether he is actively resisting
> arrest or attempting to evade arrest by flight [hereinafter
> "*Graham* Factors"].  *See Tennessee*, 471 U.S. at 8-9 (the
> question is "whether the totality of the circumstances
> justifies a particular sort of seizure.")… the
> "reasonableness" inquiry in an excessive force case is an
> objective one: the question is whether the officers'
> actions are "objectively reasonable" in light of the facts
> and circumstances confronting them, without regard to
> their underlying intent or motivation.  *See Scott v. United
> States*, 436 U.S. 128, 137-39 (1978); *see also Terry v.
> Ohio*, 392 U.S. 1, 21 (1968) (in analyzing the
> reasonableness of a particular search or seizure, "it is
> imperative that the facts be judged against an objective
> standard").[23]

---

[23] *Graham*, 490 U.S. at 395-97.

3.22   The United States Supreme Court ultimately held that "the Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances, and subjective concepts like 'malice' and 'sadism' have no proper place in that inquiry." *Id*. at 399.   Because the court of appeals and the district court analyzed the case under an improper analysis, the United States Supreme Court ultimately vacated and remanded the matter for reconsideration of that issue under the proper Fourth Amendment standard. *Id*.

3.23   Here, this Honorable Court should look to *Graham* and the *Graham* Factors when analyzing Appellee's claims of excessive force under 42 U.S.C. § 1983 in the case at bar.   The first *Graham* factor is the severity of the crime at issue.   Here, the suspected crime was really no crime at all - Appellee was a victim of a medical emergency.   ROA.653. This is why all criminal charges against Appellee were ultimately dismissed in their entirety.   ROA.742-45.   Appellee was traveling 5mph on an interstate that was shut down completely.   So even though Appellee would argue there was no crime at play, it was certainly not severe in any way, shape, or form.

3.24   The second *Graham* factor is whether the suspect posed an immediate threat to the safety of the officers or others.   As aforementioned, Appellee was of absolutely no threat whatsoever to anybody.   In fact, Appellee was not even able to appreciate what was going on around him as he was suffering from a medical emergency and was dazed and confused by all of the excessive force around him.

*See supra*, notes 3-6.   Instead of proffering medical aid and attention, Appellants

nearly brutally murdered Appellee.

3.25   The third *Graham* factor is whether the suspect is actively resisting

arrest or attempting to evade arrest by flight.   Appellee was not resisting arrest nor

attempting to evade arrest by flight.   This is why multiple Appellants stated that

Appellee was disoriented, dazed, and confused and why all criminal charges were

dismissed in their entirety.   *See supra*, note 2; ROA.742-45, respectively.   The

Harris County District Attorney's Office properly arrived at the conclusion that

Appellee did not possess the requisite *mens rea* of "intentionally" to be properly

convicted of felony evading in a motor vehicle due to his medical emergency.

ROA.653.  As such, they properly dismissed all charges. ROA.742-45.

3.26   Here, in analyzing Appellee's claims of excessive force under

*Graham's* "objective reasonableness" standard and in weighing the *Graham*

Factors, this Honorable Court can only logically arrive at one conclusion - that

Appellee was the victim of excessive force and police brutality under the

Constitution.   No reasonable officer from an objective standpoint would condone

such evil, wicked, vile, deplorable, and abysmal conduct exemplified by

Appellants. *See supra*, notes 3-6.

3.27   It is a miracle that Appellee has lived to tell his story.   Appellee prays

that this Honorable Court look to the *Graham* opinion to properly arrive at the

conclusion that Appellee was the victim of excessive force by Appellants.   Thus,

Appellee prays that this Honorable Court affirm the judgment of the District Court that denied Appellants' Motions to Dismiss based on qualified immunity in their entirety.  ROA.1425-26.

### iv.    *Barnes v. Felix*

3.28    This Honorable Court most recently analyzed the issues made the bases of this litigation on remand from the United States Supreme Court in its seminal *Barnes* opinion.  *Barnes v. Felix*, 152 F.4th 669 (5th Cir. 2025).  There, on the afternoon of April 28, 2016, Roberto Felix, Jr., (hereinafter "Defendant-Appellee"), a law enforcement officer patrolling a highway outside of Houston, Texas, received a radio alert about an automobile on the road with outstanding toll violations.  *Barnes v. Felix*, 605 U.S. 73, 76 (2025).    Defendant-Appellee soon spotted the car and initiated a traffic stop on the highway's shoulder.  *Id*.

3.29    Parking his own car just behind, Defendant-Appellee walked to the driver's side door and asked the driver, Ashtian Barnes (hereinafter "Decedent") for his license and proof of insurance.  *Id*. at 77.  The Decedent replied that he did not have his license with him, and that the car was a rental in his girlfriend's name. *Id*.  All the while, the Decedent was rummaging through a pile of papers inside the vehicle, which caused Defendant-Appellee to tell the Decedent several times to stop "digging around." *Id*.

3.30    The Defendant-Appellee also commented that he smelled a strong odor of marijuana and asked the Decedent if there was anything in the car that he

should know about. *Id*. The Decedent responded that he might have some identification in the trunk. *Id*. The Defendant-Appellee then told the Decedent to open the trunk from his seat. *Id*. The Decedent did so, while also turning off the ignition. *Id*. All that happened (as a dash cam recording of the incident shows) in less than two (2) minutes. *Id*.

3.31    Then things began moving even faster. *Id*. With his right hand resting on his holster, the Defendant-Appellee told the Decedent to get out of the car. *Id*. The Decedent opened the door but did not exit; instead, he turned the ignition back on. *Id*. The Defendant-Appellee unholstered his gun and, as the car began to move forward, jumped onto its doorsill. *Id*. The Defendant-Appellee twice shouted at the Decedent to not move. *Id*. With no visibility into the car, the Defendant-Appellee fired two (2) quick shots inside. *Id*.

3.32    The Defendant-Appellee then radioed for back-up. *Id*. By the time that the back-up arrived, the Decedent was dead. *Id*. About five (5) seconds elapsed between when the car started moving and when it stopped. *Id*. Within that period, two (2) seconds passed between the moment that the Defendant-Appellee stepped on the doorsill and the moment he fired his first shot. *Id*.

3.33    The Decedent's mother, Janice Barnes, (hereinafter "Plaintiff-Appellant"), sued under 42 U.S.C. § 1983 alleging excessive force in violation of the Fourth Amendment. *Id*. The District Court granted Defendant's-Appellee's Motion for Summary Judgment and this Honorable Court affirmed. *Id*.; *Barnes v.*

*Felix*, 91 F.4th 393 (5th Cir. 2024).   This Honorable Court in its 2024 *Barnes*

opinion reasoned that:

> The inquiry is confined to whether the officer was in
> danger at the moment of the threat that resulted in his use
> of deadly force. Any prior events leading up to the
> shooting, including actions the officer took, were simply
> not relevant.  And here, as the District Court found, the
> precise moment of the threat was the two seconds when
> [Defendant-Appellee] was clinging to a moving car.
> Because [Defendant Appellee] could then have
> reasonably believed his life in danger, the panel
> concluded, his decision to shoot did not violate
> [Decedent's] Constitutional rights.[24]

3.34   The United States Supreme Court then granted certiorari to address

whether, in resolving Fourth Amendment excessive-force claims, courts may apply

the "Moment-of-Threat" rule just described.  *Id*.  The United States Supreme Court

held that courts may not because that rule constricts the proper inquiry of weighing

the totality of the circumstances.  *Id*.

3.35   The United States Supreme Court so reasoned that:

> A claim that a law enforcement officer used excessive
> force during a stop or arrest is analyzed under the Fourth
> Amendment. *Graham*, 490 U.S. at 395.  The touchstone
> of the Fourth Amendment is reasonableness as measured
> in objective terms. *Brigham City v. Stuart*, 547 U.S. 398
> (2006).  So the question in a case like this one, as this
> Court has often held, is whether the force deployed was
> justified from the perspective of a reasonable officer on
> the scene, taking due account of both the individual
> interests and the governmental interests at stake.

---

[24] *Id*. at 78.; *Barnes*, 91 F.4th at 397-98.

*Graham*, 490 U.S. at 396; *County of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017).[25]

That inquiry into the reasonableness of police force requires analyzing the "totality of the circumstances." *Id.* at 427-28.; *Garner*, 471 U.S. at 9… For example, the "severity of the crime" [i.e., *Graham* Factor 1] prompting the stop can carry weight in the analysis. *Graham*, 490 U.S. at 396.; *Garner*, 471 U.S. at 11. So too can the actions of the officer took during the stop… *See id.*; *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). And the stopped person's conduct is always relevant because it indicates the nature and level of the threat he poses, either to the officer or to others [i.e., *Graham* Factors 2-3]. *See id.*; *Graham*, 490 U.S. at 396.[26]

Most notable here, the "totality of the circumstances" inquiry into a use of force has no time limit… Earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones. Or as the Federal Government puts the point, those later, "in-the-moment" facts "cannot be hermetically sealed off from the context in which they arose." BRIEF FOR UNITED STATES AS *AMICUS CURIAE* 14… Prior events may show, for example… why a reasonable officer would have perceived otherwise ambiguous conduct of a suspect as threatening. Or instead, they may show why such an officer would have perceived the same conduct as innocuous *[emphasis added]*. The history of the interaction, as well as other past circumstances known to the officer, thus may inform the reasonableness of the use of force.[27]

The Court's decision in *Plumhoff v. Rickard*, 572 U.S. 765 (2014), well illustrates the point. The excessive-

---

[25] *Barnes*, 605 U.S. at 79.

[26] *Barnes*, 605 U.S. at 80.

[27] *Barnes*, 605 U.S. at 80-81.

force claim there concerned the fatal shooting of a driver at the end of a "dangerous car chase" lasting more than five minutes. *Id.* at 768. The driver had sped away from a traffic stop on a well-used road, and tried to outrun as many as six (6) police cruisers at speeds sometimes exceeding 100 miles per hour. Eventually the fleeing car ran into one of the cruisers and came "to a near standstill." *Id.* at 776. The driver, though, still tried to escape, pumping the gas in a way that sent his wheels "spinning" and then putting the car into reverse. *Id.* At that point, one of the officers fired several shots into the car. In a suit brought against the officer, the driver's daughter contended that those shots were taken when the chase was "already over." *Id.* at 777. But this Court rejected that claim based on everything that had happened during the incident - the driver's "outrageously reckless" behavior over the prior "five minutes," as well as his last-second efforts to again take flight. *Id.* at 776. Given all of those events, the Court explained, a reasonable officer would have concluded that the driver was "intent on resuming" his getaway and, if allowed to do so, would "again pose a deadly threat for others." *Id.* at 777. In short, the shooting was justified "at the moment" it occurred partly because of what had transpired in the preceding period. *Id.*[28]

3.36   The United States Supreme Court so reasoned that the "Moment-of-Threat" rule "prevents that sort of attention to context, and thus conflicts with this Court's instruction to analyze the totality of the circumstances." *Id.* Additionally, the Court so reasoned, "No rule that precludes consideration of prior events in assessing a police shooting is reconcilable with the fact-dependent and context-sensitive approach we have prescribed. A court deciding a use-of-force case

---

[28] *Barnes*, 605 U.S. at 81.

cannot review the totality of the circumstances if it has put on chronological blinders." *Id.* at 82.  The Court further reasoned, "a court cannot thus 'narrow' the totality-of-the-circumstances inquiry, to focus on only a single moment.  It must look too, in this and all excessive-force cases, at any relevant events coming before." *Id.* at 83.  The United States Supreme Court then vacated and remanded this matter back down to this Honorable Court. *Id.* at 84.

3.37   On remand, this Honorable Court first noted that, "it follows that the choice to use deadly force… is presumptively reasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others." *Barnes*, 152 F.4th at 672; *Graham*, 490 U.S. at 396 [i.e., *Graham* Factors 2-3].   This Honorable Court took note that the United States Supreme Court, particularly, Justice Kavanaugh, put great weight on whether a suspect was evading or not. *Id.* at 674.  Particularly, this Honorable Court noted that Justice Kavanaugh reasoned that dangers to the public and police multiply when a driver flees. *Id.*

3.38   This Honorable Court so reasoned that:

> To establish a Fourth Amendment violation based on an officer's use of excessive force, plaintiffs "must show: 1) an injury; 2) which resulted from the use of force that was clearly excessive to the need and; 3) the excessiveness of which was objectively unreasonable. *Ramirez v. Martinez*, 716 F.3d 369, 377 (5th Cir. 2013). The court considers the totality of the circumstances: 1) the severity of the crime at issue [i.e., *Graham* Factor 1]; 2) whether the suspect posed an immediate threat to the safety of officers or others [i.e., *Graham* Factor 2] and; 3) whether the suspect was actively resisting arrest or

37

attempting to evade arrest by flight [i.e., *Graham* Factor 3]. *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020) (citing *Graham*, 490 U.S. at 396). This is no cursory review; the court must "slosh its way through the fact bound morass of reasonableness," careful to balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Scott v. Harris*, 550 U.S. 372, 383 (2007); *Graham*, 490 U.S. at 396. But when an officer invokes qualified immunity, as here, the burden shifts to the plaintiff to first demonstrate: 1) the officer violated a Constitutional right and; 2) the unlawfulness of the officer's conduct was clearly established at the time. *Dist. Of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018).[29]

3.39    This Honorable Court ultimately affirmed its prior judgment which granted summary judgment in favor of Defendant-Appellee. *Id.* at 677. This Honorable Court echoed Justice Kavanaugh's great weight that he put on a suspect's flight. *Id.* at 676. This Honorable Court reasoned that, "All that a reasonable police officer could have concluded was that [Decedent] was intent on… flight, and that, if he [were] allowed to do so, he would… pose a deadly threat for others on the road." *Id.*; citing *Graham*, 490 U.S. at 396 [i.e., *Graham* Factors 2-3].

3.40    This Honorable Court feared that had Decedent's intent to flee been allowed by Defendant-Appellee, then this "could have started a perilous high-speed chase during rush hour on Houston's busiest toll road." *Id.* In the end, this Honorable Court determined that Defendant-Appellee was indeed entitled to

---

[29] *Barnes*, 152 F.4th at 674-75.

qualified immunity. *Id.* This Honorable Court weighed the totality of the circumstances from an objective standpoint and determined that Defendant's-Appellee's conduct was objectively reasonable in weighing the *Graham* Factors. *Id.* This Honorable Court abandoned the "Moment-of-Threat" rule, and revered the Law of the Land. *See id.*

3.41   Here, the facts in this case are distinguishable from *Barnes*. In *Barnes*, the Decedent was attempting to evade arrest, which Justice Kavanaugh and this Honorable Court so expressly loathed. Here, there was absolutely no intent from Appellee to flee nor evade in any manner.   Using common sense, any reasonable officer from an objective standpoint would concede that an individual traveling 5mph is not attempting to evade.   This is why Appellee's criminal charges were dismissed in their entirety.  ROA.742-45.

3.42   Additionally, Interstate-10 was completely shut down in the case at bar, unlike the Sam Houston Tollway in *Barnes*. Had the Decedent been allowed to flee in *Barnes*, he most likely would have severely injured and/or killed numerous innocent drivers.   This is exactly the sort of conduct that entitles officers to qualified immunity pursuant to the *Graham* Factors.   Here, however, with Interstate-10 being shut down, Appellee posed no threat to other drivers on the road on the day of the incidents made the bases of this litigation.

3.43   In *Barnes*, the Decedent was exhibiting odd behaviors and rummaging through papers.   Here, multiple Appellants admitted that Appellee was dazed and

confused and was not fighting back nor resisting arrest in any manner. *See supra*, note 2. Nevertheless, Appellants proceeded to nearly murder Appellee. *See supra*, notes 3-6. Here, Appellee was obviously not in his right mind as he was suffering from a medical emergency. ROA.653.

3.44 Here, Appellee needed medical attention, not police brutality. *See supra*, notes 3-6. In *Barnes*, the Decedent smelled of marijuana and was under the influence. Here, Appellee was completely sober and there was no alcohol nor illicit drugs in Appellee's system *[emphasis added]*. ROA.286, 296. Finally, here, Appellee did not have any weapons whatsoever that could have harmed Appellants. As such, the case at bar is distinguishable from *Barnes* in many different ways.

3.45 In abandoning the "Moment-of-Threat" rule, Appellants cannot argue that "hindsight is 20/20" nor that they were "faced with a split-second situation." The United States Supreme Court has made clear that those sorts of excuses will no longer be tolerated. *See generally Barnes*, 605 U.S. 76-90. This Honorable Court must not look to any "split-second" arguments proffered by Appellants, as those excuses are no longer justified by the Law of the Land.

3.46 This Honorable Court must look to the totality of the circumstances (i.e., from the very beginning to the end of the encounter with Appellee, temporally) and view the actions of Appellants from an objective standpoint of reasonableness in utilizing the *Graham* Factors as their guide and aid. Common

sense will tell this Honorable Court that what happened on the day of the incidents made the bases of this litigation was simply wrong and immoral.

3.47    This case is known all over the United States of America at this point, and can set a dangerous precedent that condones police brutality if this Honorable Court allows Appellants to escape the realms of justice.  Police brutality has no place in history and especially has no place in modern society.  It is obsolete and archaic.  As such, Appellee prays that this Honorable Court affirm the judgment of the District Court that denied Appellants' Motions to Dismiss based on qualified immunity in their entirety.  ROA.1425-26.

### v.    *Ayers v. Hilliard*

3.48    This Honorable Court also analyzed the issues made the bases of this litigation in its seminal *Ayers* opinion.  *Ayers v. Hilliard*, 172 F.3d 867 (5th Cir. 1999).  There, a Texas state prisoner (hereinafter "Plaintiff-Appellant") filed a lawsuit against the Texas Department of Criminal Justice and various correctional officers (hereinafter "Defendants-Appellees") alleging excessive force.  *Id.* at *1.  Plaintiff-Appellant alleged that Defendants-Appellees attacked him without provocation, handcuffed him, and tried to force him to walk away from his unit and into a field.  *Id*.

3.49    When Plaintiff-Appellant refused, Defendants-Appellees hit him in the head four (4) times and forced his face into the ground.  *Id*.  Then when Plaintiff-Appellant continued to refuse to walk farther into the field, Defendants-

Appellees hit him in the face and head approximately eight (8) times, tried to choke him, kicked him, made racially insulting statements, and threatened to kill him. *Id*. Defendants-Appellees of course moved for a 12(b)(6) dismissal which was granted. *Id*.

> 3.50   This Honorable Court reasoned on appeal that:

> > In the case before us, the factual allegations in [Plaintiff's-Appellant's] pleadings, taken alone, suggest that the force used by [Defendants-Appellees] was excessive… The abuse directed at [Plaintiff-Appellant] is arguably of a sort "repugnant to the conscience of mankind" necessary to find… uses of force unconstitutional. *See Hudson v. McMillian*, 503 U.S. 1 (1992).[30]

3.51   This Honorable Court ultimately vacated and remanded the 12(b)(6) dismissal. *Id.* at *3. Here, the way that Appellee was nearly brutally murdered in unison by Appellants is also "repugnant to the conscience of mankind." *Id.* at *2. This Honorable Court should look to its wisdom as set forth in its seminal *Ayers* opinion in order to arrive at the conclusion that Appellee was the victim of excessive force under 42 U.S.C. § 1983. As such, Appellee prays that this Honorable Court affirm the judgment of the District Court that denied Appellants' Motions to Dismiss based on qualified immunity in their entirety. ROA.1425-26.

---

[30] *Ayers*, 172 F.3d at *2.

### vi.     *Greene v. DeMoss*

3.52   This Honorable Court once again analyzed the issues made the bases of this litigation in its seminal *Greene* opinion.  *Greene v. DeMoss*, No. 21-30044, 2022 WL 3716201 (5th Cir. 2022).  There, Ronald Green (hereinafter "Decedent"), was driving on U.S. Highway 80 in Monroe, Louisiana, around 12:00am on May 10, 2019.   *Id*. at *1.    Trooper Dakota DeMoss (hereinafter "Defendants-Appellants"),[31] attempted to stop Decedent for an unspecified violation.   *Id*. Decedent sped away and a pursuit ensued.  *Id*. Decedent eventually crashed into a wooded area and he was left uninjured. *Id*. Several additional law enforcement officials (included in "Defendants-Appellants"), imminently arrived on scene. *Id*.

3.53   Decedent exited his vehicle and began vehemently apologizing.  *Id*. Decedent was pinned to the ground by Defendants-Appellants.  *Id*.  Subsequently, Decedent was beaten, smothered, choked, and tased at least three (3) times.  *Id*. Decedent was left beaten, bloodied, and in cardiac arrest.  *Id*.

3.54   During this police brutality, Decedent was begging the Defendants-Appellants to stop.   *Id*.   Decedent never resisted, posed no threat, apologized repeatedly,  and  immediately  surrendered  upon  exiting  his  vehicle. *Id*. Nevertheless,  Defendants-Appellants  (comprised  of  at  least  seven  [7]  law

---

[31] This case involves Trooper DeMoss and various other law enforcement officials, all of which were sued on claims of excessive force and bystander liability under 42 U.S.C. § 1983.  As such, "Defendants-Appellants" refers to each of them singularly, collectively, or in combination with others.

enforcement officials) engaged in the aforementioned excessive force in unison. *Id*. At 12:29am, one of the Defendants-Appellants called for an ambulance. *Id*. When the ambulance arrived at 12:51am, Decedent was covered in blood with multiple taser barbs attached to his body. *Id*. The paramedics transported Decedent to the hospital where he was pronounced dead. *Id*. The autopsy revealed that Decedent's cause of death was cardiac arrest and he was also diagnosed with an unspecified head injury. *Id*. The autopsy further revealed signs of trauma including blunt-force injuries to the head and face, together with facial lacerations, abrasions, and contusions. *Id*.

3.55 The Decedent's daughter filed a lawsuit against the seven (7) Defendants-Appellants for excessive force and bystander liability under 42 U.S.C. § 1983.[32] The Decedent's daughter also asserted Louisiana state law claims against the officers for battery. *Id*. The Defendants-Appellants of course moved for a 12(b)(6) dismissal based on qualified immunity. *Id*. The District Court denied the Defendants'-Appellants' Motions to Dismiss. *Id*.

3.56 The District Court concluded that "qualified immunity is inappropriate because every reasonable officer would have known that he could not beat, smother, and choke an unresisting suspect who was subdued and posing

---

[32] The bystander liability analysis from the *Greene* opinion under 42 U.S.C. § 1983 will be discussed *infra*, Section B.

no threat."[33]  *Id*. at *2.  The District Court allowed the state law claims to survive

dismissal as well.  *Id*.  The Defendants-Appellants of course appealed.  *Id*.

3.57    This Honorable Court reasoned that:

> Excessive force claims arising from an arrest or
> investigatory stop invoke the protection provided by the
> Fourth Amendment… against unreasonable seizure.
> *Tucker v. City of Shreveport*, 998 F.3d 165, 171 (5th Cir.
> 2021).   Plaintiffs must show: 1) an injury; 2) which
> resulted directly and only from a use of force that was
> clearly excessive and; 3) the excessiveness of which was
> clearly unreasonable.  *Griggs v. Brewer*, 841 F.3d 308,
> 312 (5th Cir. 2016) (citing *Poole*, 691 F.3d at 628).
> Reasonableness "requires a careful balancing of 'the
> nature and quality of the intrusion on the individual's
> Fourth Amendment interests' against the countervailing
> governmental interests at stake."  *Graham*, 490 U.S. at
> 396 (quoting *Tennessee*, 471 U.S. at 8).  **It is "long…
> established" in this circuit that "officers engage in
> excessive force when they physically strike a suspect
> who is not resisting arrest *[emphasis added]***."  *Joseph
> ex rel. Estate of Joseph*, 981 F.3d at 342.[34]

> Qualified immunity…[requires] a two-step inquiry: 1)
> first we ask whether there was a statutory or
> Constitutional violation based on the alleged facts and; 2)
> second, we ask if the defendant's actions violated clearly
> established law that every reasonable person would have
> known.  *Tucker*, 998 F.3d at 172… Qualified immunity
> does not heighten the Rule 8 pleading standard.  *Arnold*,

---

[33] The District Court similarly denied qualified immunity on the bystander claims because "every reasonable officer would have understood that he could not stand by while other officers engaged in excessive force."  *Id*.; *see infra*, Section B.

[34] *Greene*, No. 21-30044, 2022 WL 3716201 at *3.

979 F.3d at 267 (quoting *Westfall v. Luna*, 903 F.3d 534,
542 (5th Cir. 2018).[35]

3.58   This Honorable Court affirmed the judgment of the District Court
which denied dismissal based on qualified immunity.   *Id*. at *5.   This Honorable
Court reasoned that excessive force was clearly established because Decedent was
pinned down, begging officers to stop, apologizing repeatedly, and nevertheless
fell victim to police brutality.   *Id*. at *4.

3.59   Here, similarly to *Greene*, Appellee is on video screaming, "God,
please help me!"   Here, Appellee was crying out for help, on camera, while
Appellants were ruthlessly engaging in excessive force.   *See supra*, notes 3-6.
Like the Decedent in *Greene*, Appellee here was not resisting in any way and posed
no threat.   *See supra*, note 2.   Unlike the Decedent in *Greene*, however, Appellee
was not attempting to evade arrest in any manner and this is why his criminal
charges were dismissed in their entirety.   ROA.742-45.   As such, Appellee prays
that this Honorable Court affirm the judgment of the District Court that denied
Appellants' Motions to Dismiss based on qualified immunity in their entirety.
ROA.1425-26.

### vii.    *Austin v. City of Pasadena, Texas*

3.60   This Honorable Court also analyzed the issues made the bases of this
litigation in its seminal *Austin* opinion.   *Austin v. City of Pasadena, Texas*, 74 F.4th

---

[35] *Greene*, No. 21-30044, 2022 WL 3716201 at *2.

312 (5th Cir. 2023). There, at 2:33am on March 28, 2019, multiple Pasadena Police Department Officers (hereinafter "Defendants-Appellees) arrested 32-year-old Jamal Ali Shaw (hereinafter "Decedent") for suspicion of public intoxication. *Id.* at 319. Decedent was thereafter booked into jail. *Id.* At 6:07am, Decedent was placed into a detention cell without incident. *Id.*

3.61    A video recording shows that around 6:15am, Decedent fell to the floor due to an epileptic seizure. *Id.* Other detainees in the same cell as Decedent alerted the jail staff that Decedent was having a seizure. *Id.* At 6:17am, Decedent was seen making up and down movements with his head, convulsing, and foaming at the mouth. *Id.* At 6:21am, Defendants-Appellees attempted to pin and straddle Decedent. *Id.* at 320. Defendants-Appellees then tased Decedent several times between 6:21am to 6:22am. *Id.*

3.62    Decedent was then tased a few more times at 6:22:48am. *Id.* At 6:23am, Decedent was dragged on the floor by Defendants-Appellees. *Id.* Decedent was then tased more as he kicked his legs. *Id.* At 6:23am, the ambulance arrived. *Id.* At 6:24:40am, Defendants-Appellees pressed their knees into Decedent's back, holding him down on the floor. *Id.* At 6:26:10am, two (2) Emergency Medical Technician's ("EMTs") arrived at the cell with a gurney, but were denied entry and waited outside of the cell. *Id.*

3.63    At 6:26:30am, Decedent was handcuffed behind his back. *Id.* The Defendants-Appellees then held Decedent down while another staff member went

to retrieve a restraint chair at 6:27:27am. *Id*. A few seconds later, Decedent was lifted by his shoulders and was stood up in order to walk Decedent to the door, however, Decedent collapsed. *Id*. At this time, an EMT asked Defendants-Appellees if they wanted to place Decedent on the stretcher, but the Defendants-Appellees declined. *Id*. Approximately two (2) minutes passed when the EMTs first asked to help until they were allowed to do so. *Id*.

3.64 The EMTs then administered two (2) injections to calm Decedent's behavior at 6:36am and 6:44am, respectively. *Id*. Decedent remained in the restraint chair for approximately seventeen (17) minutes, until 6:47am. *Id*. While in the restraint chair, Decedent yelled, called for his mother, and cried, "Help me!" *Id*. Decedent was placed in the ambulance and as it began to leave the jail at 6:57am, Decedent suffered cardiac arrest and died the next day due to cardiopulmonary arrest. *Id*.

3.65 The administrator of Decedent's estate filed a lawsuit alleging: 1) excessive force; 2) bystander liability and; 3) improper/delayed medical treatment

under 42 U.S.C. § 1983.[36]   *Id*. at 320-21.   The Defendants-Appellees of course

moved for a 12(b)(6) dismissal based on qualified immunity. *Id*.

3.66   This Honorable Court so reasoned that:

> Force…is 'excessive…' when the force is objectively
> unreasonable." *Id*. at 322.; citing *Kingsley*, 576 U.S. at
> 396-97. Courts weigh the following factors to determine
> reasonableness: 1) the relationship between the need for
> the use of force and the amount of force used; 2) the
> extent of the plaintiff's injury; 3) any effort made by the
> officer to temper or to limit the amount of force; 4) the
> severity of the security problem at issue; 5) the threat
> reasonably perceived by the officer and; 6) whether the
> plaintiff was actively resisting. *Id*. at 397.[37]

---

[36] Appellee pled improper/delayed medical treatment in his Original Complaint.  ROA.53-54. However, Appellants Dillow, Faiura, Klosterman, and Poirier have failed to raise this issue in their Brief.  As such, this issue will not be discussed as to Appellants Dillow, Faiura, Klosterman, and Poirier. However, because Mr. Kuniansky has now added said argument as to Appellants Sandor, Hernandez, Luna, and Cogburn, it will be discussed as to these Appellants. It is worth noting, however, that in *Austin*, the Plaintiffs-Appellants survived dismissal on their improper/ delayed medical treatment cause of action. This Honorable Court reasoned that, "The Due Process Clause of the Fourteenth Amendment guarantees [individuals] the right not to have their serious medical needs met with deliberate indifference on the part of the confining officials… An officer acts with deliberate indifference to an [individual's] serious medical needs if the officer refuses to treat him, ignores his complaints, intentionally treats him incorrectly, or engages in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id*. at 327-28; citing *Thompson v. Upshur Cnty.*, 245 F.3d 447, 457 (5th Cir. 2001); *Sims v. Griffin*, 35 F.4th 945, 951 (5th Cir. 2022).  Here, several hours went by before Appellee received medical attention even though he had a medical emergency, thus, exemplifying deliberate indifference. ROA.653. As such, Appellee prays that his cause of action for improper/delayed medical treatment survive dismissal in its entirety.   *See infra*, Section B, for a discussion on bystander liability under 42 U.S.C. § 1983. *See infra*, Section C, for a discussion on failure to render medical aid in a timely manner under 42 U.S.C. § 1983.

[37] *Austin*, 74 F.4th at 322.

3.67   This Honorable Court then looked to its seminal *Timpa* opinion to aid its analysis.   *Id*. at 323-24; *see Timpa v. Dillard*, 20 F.4th 1020 (5th Cir. 2021).[38] This Honorable Court found that just as in *Timpa*, the Defendants-Appellees were responding to a medical emergency, not to any purported disturbance or danger to others.   *Id*. at 324.   Additionally, the Decedent was not actively resisting and the Defendants-Appellees were aware of this.   *Id*.   Additionally, an autopsy revealed that the Decedent was completely sober and this Honorable Court reasoned that just as in *Timpa*, a jury could find that reasonable officers in Defendants'-Appellees' position would not have believed that the Decedent needed to be restrained as if he were actively resisting. *Id*.

3.68   This Honorable Court found that the security threat was low and practically nonexistent.   *Id*. at 325.   This Honorable Court also found that nothing prevented the Defendants-Appellees from de-escalating the situation prior to engaging in such excessive force.   *Id*.   This Honorable Court found that "a jury could conclude that the force employed was disproportionate to the need and that the [Defendants-Appellees] engaged in excessive force at various periods once they entered [Decedent's] cell." *Id*.

---

[38] *See Timpa*, 20 F.4th at 1025-36 (where this Honorable Court reversed a grant of qualified immunity to officers who held a man experiencing a mental health episode in a prone position for nearly fifteen (15) minutes. *Timpa* involved officers responding to a medical emergency, which this Honorable Court emphasized only "sharpened the excessiveness" of the use of force in light of precedents involving arrestees "suspected of serious crimes.").

3.69   This Honorable Court then noted that, "We have placed great weight on the quickness with which law enforcement personnel have escalated from negotiation to force." *Id*. at 326.; citing *Brothers v. Zoss*, 837 F.3d 513, 520 (5th Cir. 2016). This Honorable Court then reasoned:

> In the excessive force context, a Constitutional violation is clearly established, [i.e., Prong 2 of qualified immunity analysis], if no reasonable officer could believe the act was lawful. *Darden v. City of Ft. Worth*, 880 F.3d 722, 727 (5th Cir. 2018). We recently held that in this circuit, "**the law has long been clearly established that an officer's continued use of force on a restrained and subdued subject is objectively unreasonable *[emphasis added]*.**" *Timpa*, 20 F.4th at 1034… **For instance…if the suspect lacks any means of evading custody - for example, by being pinned to the ground by multiple officers - force is not justified**. *Joseph*, 981 F.3d at 335…**In *Darden*, we held that "A Constitutional violation occurs when an officer tases, strikes, or violently slams" a suspect who "is not actively resisting**." *Darden*, 880 F.3d at 731. In that case, we reversed the grant of qualified immunity to officers who physically restrained and repeatedly tased a man they suspected of dealing cocaine. *Id*. at 725-26. In addition to *Darden*, we have reversed the grant of qualified immunity to officers in several other cases involving excessive force. *See, e.g., Ramirez*, 716 F.3d 379; *Newman v. Guedry*, 703 F.3d 757, 764 (5th Cir. 2012); *Anderson v. McCaleb*, 480 F.App'x 768, 773 (5th Cir. 2012); *Massey v. Wharton*, 477 F.App'x 256, 263 (5th Cir. 2012); *Autin v. City of Baytown*, 174 F.App'x 183, 186 (5th Cir. 2005). These cases clearly establish the alleged unreasonableness of the [Defendants'-Appellees'] continued tasing and use of force to restrain [Decedent] after he was subdued and restrained and when he was not actively resisting due to a medical emergency *[emphasis added]*… **Because at the time of this**

**incident it was clearly established that the continued use of force… against a restrained and subdued subject who was not actively resisting due to a medical emergency violates [the Constitution], the [Defendants-Appellees] are not entitled to qualified immunity**.[39]

3.70  Here, just like in *Austin*, Appellee was suffering from a medical emergency.  ROA.653.  Appellee was not actively resisting, nor was he a threat to anybody.  *See supra*, note 2.  There was no negotiation nor attempts to de-escalate the situation, the situation went straight to police brutality at its finest, within mere seconds, and the force employed was disproportionate to the need.  *See supra*, notes 3-6.  Additionally, here, Appellee like the Decedent in *Austin*, was sober.  ROA.286, 296.  As such, this Honorable Court should look to its *Austin* opinion and affirm the judgment of the District Court that denied Appellants' Motions to Dismiss based on qualified immunity in their entirety.  ROA.1425-26.

**B.    Appellants are liable via Bystander Liability and/or Failure to Intervene under 42 U.S.C. § 1983 and Appellants are not entitled to qualified immunity.**

   **i.    *Greene v. DeMoss***

3.71  This Honorable Court additionally denied Defendants'-Appellants' Motions to Dismiss via qualified immunity as to bystander liability under 42

---

[39] *Austin*, 74 F.4th at 326-327.

U.S.C. § 1983 in *Greene*.[40] *Greene*, No. 21-30044, 2022 WL 3716201 at *4-5.

This Honorable Court so reasoned:

> "An officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under § 1983." *Carroll*, 800 F.3d at 177 (quoting *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995). The elements of a successful bystander liability claim require that an officer: "1) knew a fellow officer was violating an individual's Constitutional rights; 2) was present at the scene of the Constitutional violation; 3) had a reasonable opportunity to prevent the harm but nevertheless; 4) chose not to act." *Joseph ex rel. Estate of Joseph*, 981 F.3d at 343. Bystander liability requires more than mere presence in the vicinity of the violation; '[courts] also consider whether an officer "acquiesced in" the alleged Constitutional violation.'" *Id.* (quoting *Whitley v. Hanna*, 726 F.3d 631, 647 (5th Cir. 2013)… In May 2019 the law was "clearly established… that an officer [can] be liable as a bystander in a case involving excessive force if he knew a Constitutional violation was taking place and had a reasonable opportunity to prevent the harm." *Hamilton v. Kindred*, 845 F.3d 659, 663 (5th Cir. 2017).[41]

3.72    This Honorable Court then so reasoned:

> Based on the alleged facts that we must take as true, we conclude that any reasonable officer would have known that his failure to intervene over a period of almost thirty (30) minutes or more while his fellow officers beat an unresisting suspect offends the Constitution. Drawing all inferences in [Plaintiff's-Appellee's] favor… Under the first element, all likely knew that a fellow officer was violating [Decedent's] Constitutional rights. Indeed, with each officer's personal participation in the excessive

---

[40] The facts of *Greene v. DeMoss* are discussed in great detail, *supra*, paragraphs 3.52-3.59.

[41] *Greene*, No. 21-30044, 2022 WL 3716201 at *4.

force, it is reasonable to infer that they each knew about the others' unconstitutional conduct. Second, [Plaintiff-Appellee] pleaded that each officer was present at the scene of the beating. Third, because the beating occurred over an alleged span of twenty-nine (29) to fifty-one (51) minutes, it is also reasonable to infer that each officer had an opportunity to intervene during that window. Fourth, [Plaintiff-Appellee] alleges that each officer "watched" as the other officers used excessive force, again reasonably permitting an inference that they chose not to act.[42]

3.73  In the end, this Honorable Court held that Plaintiff's-Appellee's bystander liability claims under 42 U.S.C. § 1983 survived in their entirety. *Id*. at *5. Additionally, Plaintiff's-Appellee's state law claims survived dismissal in their entirety.[43] *Id*. Here, this Honorable Court should look to its seminal *Greene* opinion, and arrive at the same conclusion that Appellee's claims for bystander liability under 42 U.S.C. § 1983 should survive in their entirety.

3.74  Here, Appellants knew that fellow deputies were violating Appellee's Constitutional rights. Instead of proffering medical attention, Appellants shot Appellee with rubber bullets, ripped him to shreds with German Shepherds, deployed tear gas, and punched him repeatedly in unison in the back of the skull until the point of unconsciousness while another deputy was holding Appellee down. *See supra*, notes 3-6.

------

[42] *Id*. at *4.

[43] As such, this case also proffers additional support for *infra*, Section D, that Appellee's state law claims should survive in their entirety.

3.75   Appellants were present during all of this, and acquiesced in said Constitutional deprivations. Instead of stopping such evil conduct, Appellants stood back and enjoyed the show.   In *Greene*, officers stood by and watched the Constitutional deprivations for around twenty-nine (29) to fifty-one (51) minutes. Here, Appellants stood by for hours while Appellee was almost nearly murdered.

3.76   Here, Appellants had much more time to intervene than the Defendants-Appellants did in *Greene*. This is the classic paradigm of failure to intervene and bystander liability under 42 U.S.C. § 1983 that this Honorable Court has so expressly loathed in the past.   As such, Appellee prays that this Honorable Court affirm the judgment of the District Court that denied Appellants' Motions to Dismiss based on qualified immunity in their entirety.   ROA.1425-26.

### ii.     *Austin v. City of Pasadena, Texas*

3.77   This Honorable Court also additionally denied Defendants'-Appellees' Motions to Dismiss via qualified immunity as to bystander liability under 42 U.S.C. § 1983 in *Austin*.[44]   *Austin*, 74 F.4th at 331.   This Honorable Court echoed the same four (4) elements of bystander liability that the *Green* and *Joseph* Courts did. *Id.*; s*ee supra*, paragraph 3.71.   This Honorable Court reasoned that because Defendants-Appellees stood idle during the incidents of excessive force,

---

[44] The facts of *Austin v. City of Pasadena,* Texas, are discussed in great detail, *supra*, paragraphs 3.60-3.70.

then they are also liable for bystander liability under 42 U.S.C. § 1983.  *Id.*; citing

*Whitley*, 726 F.3d at 646-47.

3.78   Here, Appellants stood back and enjoyed the show as Appellee was

almost nearly brutally murdered.   Appellee needed help, not police brutality.   As

such, Appellee prays that this Honorable Court affirm the judgment of the District

Court that denied Appellants' Motions to Dismiss based on qualified immunity in

their entirety.  ROA.1425-26.

**C.    Appellants are liable for failure to render medical aid in a timely manner under 42 U.S.C. § 1983 and Appellants are not entitled to qualified immunity.**

**i.    *Austin v. City of Pasadena, Texas***

3.79   This   Honorable   Court   also   additionally   denied   Defendants'-

Appellees' Motions to Dismiss via qualified immunity as to failure to render

medical aid in a timely manner under 42 U.S.C. § 1983 in *Austin*.[45]   *Austin*, 74

F.4th at 330.  There, this Honorable Court so beautifully reasoned:

> The Due Process Clause of the Fourteenth Amendment
> guarantees [individuals] the right to "not have their
> serious medical needs met with deliberate indifference on
> the part of the confining officials." *Thompson*, 245 F.3d
> at 457… To succeed on a deliberate indifference claim,
> plaintiffs must show: 1) the official was aware of facts
> from   which   the   inference   could   be   drawn   that   a
> substantial risk of serious harm exists and; 2) the official
> actually   drew   that   inference…   Deliberate   indifference
> may   be   established   through   inferences   arising   from

---

[45] The facts of *Austin v. City of Pasadena, Texas,* are discussed in great detail, *supra*, paragraphs 3.60-3.70.

circumstantial evidence, and a fact-finder may infer the requisite knowledge from the fact that the risk of harm was "obvious." *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994); *Dyer v. Houston*, 964 F.3d 374, 385 (5th Cir. 2020) (reasonable juror could conclude officer was deliberately indifferent where unjustifiably high risk to detainee's health was obvious).[46]

An officer acts with deliberate indifference to a detainee's serious medical needs if the officer: 1) refuses to treat him; 2) ignores his complaints; 3) intentionally treats him incorrectly or; 4) engages in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.  *Sims*, 35 F.4th at 951… A delay in medical care violates the Constitution "if there has been deliberate indifference [that] results in substantial harm." *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006).  "Promptly failing to call for emergency assistance when a detainee faces a known, serious medical emergency constitutes unconstitutional conduct." *Cope v. Cogdill*, 3 F.4th 198, 209 (5th Cir. 2021).  **The detainee need not die, or be permanently impaired, before an actionable claim arises for delayed emergency treatment *[emphasis added]***; rather, a plaintiff may recover for pain suffered during a delay in treatment caused by deliberate indifference. *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 422-23 (5th Cir. 2017).[47]

3.80   This Honorable Court reasoned that in *Austin*, although EMS was called immediately upon the realization that the Decedent was experiencing a seizure, this was not enough to entitle Defendants-Appellees to qualified immunity. *Id.*   There, the Defendants-Appellees were trained to respond to a medical

---

[46] *Austin*, 74 F.4th at 327-28.

[47] *Austin*, 74 F.4th at 328.

emergency by: placing the person on their side, placing something under their head so they do not hurt themselves, and obviously call the ambulance right away. *Id.* at 329. Additionally, in order to avoid someone suffering from positional asphyxiation, they were trained to obviously not have a detainee on their chest. *Id*. Defendants-Appellees were certainly not entitled to tase the Decedent repeatedly all the while as this could have significantly increased the risk of a heart attack. *Id.*

3.81   The Defendants-Appellees understood that a person suffering from a medical emergency typically remains confused and disoriented and experiences involuntary movements. *Id.* The Defendants-Appellees, however, seemingly responded counter to their training and arguably exacerbated Decedent's condition. *Id.* There, the Defendants-Appellees did not cushion Decedent's head but, instead, applied force while he likely was in a confused state and unable to understand what the Defendants-Appellees expected of him. The Defendants-Appellees dragged the Decedent across the concrete floor; tased him in the chest; caused him to fall on the floor and hit his head; held him in prone position on his chest and; again repeatedly tased him. *Id.*

3.82   This Honorable Court so reasoned that:

> Viewing the evidence in the light most favorable to [Plaintiffs-Appellants], we find that this is "obviously" wrong treatment for a [medical emergency] and that they [Defendants-Appellees] either intentionally treated [Decedent] incorrectly, or engaged in similar conduct that clearly evinced a wanton disregard for any serious medical needs. *See Sims*, 35 F.4th at 951. Accordingly, a

jury could find that each [Defendant-Appellee] knew they were intentionally treating [Decedent] incorrectly for a [medical emergency], thereby violating his constitutional right to protection. *See Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)… When EMTs arrived at [Decedent's] cell, the [Defendants-Appellees] denied the EMTs entry. The EMTs waited outside of the cell for about two (2) minutes until the [Defendants-Appellees] brought [Decedent] out, at which time an EMT asked if they wanted them to put [Decedent] on a stretcher. The [Defendants-Appellees] declined to do so and instead confined [Decedent] to a restraint chair with his arms handcuffed behind his back for at least seventeen (17) minutes. According to [Plaintiffs'-Appellants'] medical expert, this double restraint significantly compounded the effects of physical and electrical asphyxiation [Decedent] had already suffered. Utilizing the restraint chair also seemingly delayed [Decedent's] transport to a hospital. [Decedent] flatlined in the ambulance before it left the jail. Viewing the evidence in the light most favorable to [Plaintiffs-Appellants], we find that a jury could decide it should have been obvious to each [Defendant-Appellee] that [Decedent] was in need of immediate emergency treatment; that a different medical emergency existed than when EMS was called for the seizure; and that [Decedent's] breathing and heart had been compromised from being held in stress positions and tased. A jury could determine that, by improperly delaying emergency medical treatment, the [Defendants-Appellees] increased [Decedent's] pain and likelihood of death and were therefore deliberately indifferent to his serious medical needs. *See Easter*, 467 F.3d at 464; *Alderson*, 848 F.3d at 422-23.[48]

3.83   In the end, this Honorable Court reversed the district court's grant of qualified immunity for Defendants-Appellees as to the claims of improper and

---

[48] *Austin*, 74 F.4th at 329-30.

delayed medical treatment under Section 1983. *Id.* at 330. Here, it is undisputed that during the entire series of incidents made the bases of this litigation, Appellee was suffering from a medical emergency, namely, septic shock resulting from coronavirus. ROA.653. Appellants also expressly acknowledged numerous times that Appellee was non-responsive, was of no threat, was not resisting, was completely disoriented, and was likely suffering from a medical emergency. *See supra*, note 2.

3.84    Nevertheless, nothing was done to treat Appellee effectively. Instead, Appellants shot Appellee with rubber bullets, ripped him to shreds with German Shepherds, deployed tear gas, and punched him repeatedly in unison in the back of the skull until the point of unconsciousness while another deputy was holding Appellee down. *See supra*, notes 3-6. This went on for hours *[emphasis added]*. The undersigned Counsel has video proof of all of Appellee's allegations [emphasis added], and will show said video proof to this Honorable Court at the time of Oral Argument, should this Honorable Court grant it *[emphasis added]*.

3.85    Here, Appellants acted with deliberate indifference to Appellee's serious medical needs because they: 1) refused to treat him; 2) ignored his complaints; 3) intentionally treated him incorrectly and; 4) engaged in similar conduct that would clearly evince a wanton disregard for any serious medical need. The undersigned Counsel has video proof of Appellants laughing and taking turns shooting at Appellee yelling out, "It's my turn! Let me have a shot!" What

happened here was entertainment for Appellants. This is sadistic. As such, this Honorable Court should look to its wisdom enumerated in *Austin*, and find that Appellants are liable for failure to render medical aid in a timely manner in violation of 42 U.S.C. § 1983.

### ii. *Kelson v. Clark*

3.86   This Honorable Court also additionally denied Defendants'-Appellants' Motions to Dismiss via qualified immunity as to failure to render medical aid in a timely manner under 42 U.S.C. § 1983 in its seminal *Kelson* opinion. *Kelson v. Clark*, 1 F.4th 411 (5th Cir. 2021). There, at approximately 5:30pm on December 30, 2026, the Decedent, was homeless and previously diagnosed with schizophrenia. *Id.* at 414. The Decedent was assaulted and robbed outside a soup kitchen in Dallas, Texas. *Id.* Shortly, thereafter Decedent was again assaulted - this time, a punch to the head - causing him to fall and hit his head on a wall. *Id.*

3.87   Shortly thereafter, three (3) Dallas Police Officers and two (2) Dallas Fire-Rescue Paramedics (i.e., Defendants-Appellants) arrived on scene. *Id.* The Decedent cried out to Defendants-Appellants that he needed medical attention for his head injuries, for which it was alleged that blood and contusions from the beatings were patently visible. *Id.* Instead of treating Decedent immediately, the Defendants-Appellants waited more than ten (10) minutes to begin treatment as Decedent grimaced in pain while sitting down on the sidewalk. *Id.* The

Defendants-Appellants mocked Decedent, just as Appellants did here, and accused Decedent of being intoxicated. *Id.* Just like here, there was no proof that Decedent was intoxicated. *Id.*; ROA.286, 296. Nevertheless, the Decedent was arrested for public intoxication and taken to jail. *Id.* at 415. The next morning at 5:00am, the Decedent was found to be dead. *Id.*

3.88    This Honorable Court so beautifully reasoned:

> After arriving on scene, [Defendants-Appellants] allegedly failed to provide any substantive treatment to [Decedent], despite patently visible blood and contusions and [Decedent's] repeated protestations of a head injury… Our Court has emphasized that an "official's knowledge of a substantial risk of harm may be inferred if the risk was obvious." *Easter*, 467 F.3d at 463-64… Moreover, instead of treating or even evaluating the visible head injuries, [Defendants-Appellants] allegedly mocked [Decedent]… Taken together, this is enough to allege that the officials: refused to treat him; ignored his complaints and; engaged in similar conduct that would clearly evince a wanton disregard for any serious medical need. *Domino v. Text. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001)… It is undisputed that at the time [Defendants-Appellants] allegedly failed to treat [Decedent], the law was clearly established that pretrial detainees have a Fourteenth Amendment right to medical care. *Hare v. City of Corinth*, 74 F.3d 633, 645 (5th Cir. 1996) (*en banc*).[49]

3.89    Here, as aforementioned, Appellee was suffering from a medical emergency and Appellants engaged in excessive force for several hours prior to proffering medical treatment to Appellee. ROA.653; *See supra*, notes 3-6. Just

---

[49] *Kelson*, 1 F.4th at 418-421.

like the Decedent in *Kelson*, Appellee was dazed and confused. *See supra*, note 2. Additionally, like the Decedent in *Kelson*, there was no proof that Appellee was intoxicated or under the influence of illicit drugs and, in fact, Appellee was completely sober. ROA.286, 296. As aforementioned, the undersigned Counsel also has video proof of Appellants mocking and making fun of Appellee while taking turns shooting him with rubber bullets and tear gas for their own sadistic entertainment. This Honorable Court should look to its wisdom enumerated in *Kelson*, and find that Appellants are liable for failure to render medical aid in a timely manner in violation of 42 U.S.C. § 1983.

### iii.   Allen v. Hays

3.90   This Honorable Court also additionally denied Defendants'-Appellees' Motions to Dismiss via qualified immunity as to failure to render medical aid in a timely manner under 42 U.S.C. § 1983 in its seminal *Allen* opinion. *Allen*, 65 F.4th at 741. There, on November 4, 2015, the Decedent was driving through Houston, Texas, with his friend in the passenger seat of his pickup. *Id*. The Decedent had a documented history of PTSD. *Id*. The Decedent had twice struggled to comply with orders from Houston police, but officers had resolved both non-violent incidents with de-escalation tactics and follow-up mental health checks. *Id*.

3.91   That night, Defendants-Appellees stopped the Decedent for a routine traffic stop. *Id*. After the Decedent pulled the truck over, Defendants-Appellees

approached the passenger's and driver's sides of Decedent's vehicle with pointed

guns. *Id*. Decedent was asked to roll his window down, but the window was not

functioning properly. *Id*. Defendants-Appellees heard the Decedent say that he

was going to reach for his wallet. *Id*. The Defendants-Appellees instructed the

Decedent to stop moving, to stop reaching, and to remove his foot from the gas

pedal. *Id*. at 742.

3.92    The Defendants-Appellees shot the Decedent six (6) times, hitting him

at point blank range. *Id*. After being shot, the Decedent fell into the gas pedal and

crashed into a nearby tree. *Id*. The Defendants-Appellees then radioed for backup.

*Id*. Several minutes later, the backup officers arrived, broke the driver's side

window with a rifle, and dragged the Decedent onto the street. *Id*. Once the

Decedent was on the ground, the Defendants-Appellees handcuffed him. *Id*. At no

point did any officer attempt to use any life-saving procedures on the Decedent.

*Id*. EMS was not called until six (6) minutes after the shooting. *Id*. The Decedent

died at the scene. *Id*. There were no weapons in the Decedent's car. *Id*.

3.93 This Honorable Court reasoned that:

> At this stage, "we accept all well-pled facts as true,
> construing all reasonable inferences in the complaint in
> the light most favorable to the plaintiff." *White v. U.S.
> Corrections*, L.L.C., 996 F.3d 302, 306-07 (5th Cir.
> 2021)…[Decedent] was bleeding, moaning, groaning
> from pain, and in obvious and critical need of emergency
> medical care and treatment but [Defendants-Appellees]
> did not provide life-saving measures or timely summon
> medical care or permit medical personnel to treat

[Decedent]… The Fourteenth Amendment right of a pretrial detainee to medical care is violated if an officer acts with deliberate indifference to a substantial risk of serious medical harm and resulting injuries. *Mace v. City of Palestine*, 333 F.3d 621, 625 (5th Cir. 2003) (citing *Wagner v. Bay City*, 227 F.3d 316, 324 (5th Cir. 2000). Though *Mace* held that "the officer must have the subjective intent to cause harm," *id.* at 626, subsequent Fifth Circuit decisions have refined *Mace* based on earlier cases and have rejected the subjective-intent requirement, generally requiring a plaintiff to show only that defendants "were: 1) aware of facts from which an inference of a substantial risk of serious harm to an individual could be drawn and; 2) that they actually drew the inference." *Garza v. City of Donna*, 922 F.3d 626, 634 (5th Cir. 2019) (citing *Sanchez v. Young Cnty.*, 866 F.3d 274, 280 (5th Cir. 2017)… [here, Decedent] was shot, crashed into a tree, [Defendants-Appellees] waited six (6) minutes after the shooting to call for medical care, dragged [Decedent] out of the truck, handcuffed him on the ground, and never attempted to provide CPR, oxygen, chest compressions, or any other life-saving measures… In this posture, that is sufficient to survive a motion to dismiss.[50]

3.94    Here, the undersigned Counsel also has video evidence of Appellants throwing Appellee on the ground like a slain animal following a trophy hunt after hours of engaging in excessive force and police brutality. *See supra*, notes 3-6. Unlike *Allen*, said police brutality went on for hours and involved hundreds of sergeants, lieutenants, and deputies of the Harris County Sheriff's Office. Counsel for Appellant writes in his Appellants' Brief, "[Appellee's] complaint does not

---

[50] *Allen*, 65 F.4th at 743-48.

explain why he has sued some but not all of the deputies involved." *See* Document 35, page 40, note 6.

3.95   Appellee has carefully reviewed the evidence and has only named the individuals involved in his Complaint that engaged in the most evil, wicked, and vile conduct of all.   Each of the named Appellants engaged in the worst of the worst abysmal conduct.   For the sake of judicial economy and efficiency, this is why Appellee only named thirteen (13) individual sergeants, lieutenants, and deputies - to ensure that the most culpable parties would be brought to justice.

3.96   Like the Decedent in *Allen*, Appellee was thrown on the hard concrete like a dog and there was no immediate CPR, oxygen, chest compressions, or any other life-saving measures that transpired.   It is a miracle that Appellee did not die. This Honorable Court should look to its wisdom enumerated in *Allen*, and find that Appellants are liable for failure to render medical aid in a timely manner in violation of 42 U.S.C. § 1983.

**D.    Appellants are liable for gross negligence and Appellee's other state law claims and Appellants are not entitled to qualified immunity.**

### i.    *Meadours v. Ermel*

3.97  This Honorable Court took up the issues of state law claims, particularly, a claim of gross negligence against individual officers in the Section 1983 context of excessive force in its seminal *Meadours* opinion. *Meadours v. Ermel*, 483 F.3d 417 (5th Cir. 2007).   There, on the evening of October 29, 2001,

the Decedent's sister contacted 911 to request mental health assistance for the Decedent. *Id*. at 419. The Decedent's mental state had steadily deteriorated following the September 11, 2001, attacks, and for the week prior to the call he was having what his sister would describe as a "mental episode." *Id*. During the episode, the Decedent was paranoid and delusional and thought his neighbors were "out to get him." *Id*.

3.98 In the days and hours leading up to said 911 call, the Decedent's behavior had become increasingly bizarre, and the Decedent believed that if his feet touched the ground while the sun was out, he would die. *Id*. In her call, the Decedent's sister made clear that she was seeking mental health assistance for her brother and not reporting a crime. *Id*. However, the Decedent's sister advised the dispatcher that the Decedent had "flipped out" and she did not know what he was going to do. *Id*. A myriad of different police officers and EMS personnel were imminently dispatched (i.e., Defendants-Appellants).

3.99 When the Defendants-Appellants arrived, they waited at the edge of the neighborhood and talked with the sister on the phone for seven (7) to eight (8) minutes. *Id*. at 419-20. During that conversation, she informed the Defendants-Appellants about some of Decedent's paranoid and delusional behavior. *Id*. She requested that the Decedent be taken in for treatment. *Id*. She also warned the Defendants-Appellants that the Decedent was a large and strong man (i.e., 6 foot 2 inches and weighed 203 pounds), and that he possessed a number of tools that

could be used as weapons. *Id*. She additionally feared the possibility of being involuntarily hospitalized. *Id*. In her deposition, the sister stated that she informed the Defendants-Appellants of Decedent's size only so they would not be surprised by his large frame and hurt him. *Id*.

3.100 As the Defendants-Appellants neared the house, the interior and exterior lights were turned off, making the area very dark. *Id*. The Defendants-Appellants then surrounded the house. *Id*. The Defendants-Appellants found the Decedent in the backyard, sitting on a swing, wearing between four (4) and six (6) baseball caps and a tool belt with a stuffed animal attached to it. *Id*. at 420. When the Defendants-Appellants called out to the Decedent, the Decedent stood up and faced the Defendants-Appellants. *Id*. The Decedent was holding a large screwdriver, later identified as being 10 3/4 inches long. *Id*.

3.101 The Defendants-Appellants repeatedly instructed the Decedent to drop the screwdriver. *Id*. When the Decedent refused, the Defendants-Appellants whipped out a beanbag shotgun. *Id*. The Decedent's behavior became increasingly aggressive and he began kicking something attached to the ground. *Id*. The Defendants-Appellants later testified that in that moment they believed that the Decedent was a threat to himself and others and, consequently, they were not able to leave the situation nor allow the Decedent to leave. *Id*. The Defendants-Appellants began to subdue the Decedent by covering him with a blanket of sorts

while simultaneously firing a series of beanbag rounds that struck the Decedent's upper thigh. *Id*.

3.102 In response, the Decedent ran and jumped over a fence into a dog pen and climbed atop a doghouse. *Id*. At this point, the Decedent still had possession of the screwdriver. *Id*. As the Defendants-Appellants followed the Decedent into the dog pen, they again warned the Decedent to drop the screwdriver. *Id*. The Decedent again refused. *Id*. The Defendants-Appellants fired more beanbag rounds at the Decedent but he remained on top of the doghouse with the screwdriver in his hand. *Id*.

3.103 A third beanbag round was fired at the Decedent which caused him to fall off of the dog house. *Id*. On this point, there was a significant disagreement in the record (i.e., Plaintiffs-Appellees claimed it was a real series of bullets, Defendants-Appellants claimed it was a series of beanbag rounds). *Id*. After falling/jumping from the top of the dog house, the Decedent began to run toward a door leading to the garage with the screwdriver held in what the Defendants-Appellants described as a "stabbing grip." *Id*. at 421. One of the Defendants-Appellants was standing near this door and it appeared as though the Decedent was charging at him with lethal intent. *Id*. In response, the Defendants-Appellants repeatedly fired their service weapons, each a different caliber, killing the Decedent. *Id*. A total of twenty-three (23) shots were fired, with fourteen (14) striking the Decedent, although the shooting only lasted a few seconds. *Id*.

3.104 In addition to a claim of excessive force under 42 U.S.C. § 1983, that Plaintiffs-Appellees prevailed in, the Plaintiffs-Appellees also brought state law claims against the Defendants-Appellants for gross negligence, assault and battery, and intentional infliction of emotional distress. *Id*. The Defendants-Appellants moved for summary judgment contending amongst other things that they were entitled to qualified immunity under Texas law. *Id*. This Honorable Court noted that, "Any difference between the qualified immunity standard and the official immunity standard is immaterial here, and we reach the same result on this claim as we do on the § 1983 claim: the officers are not entitled to summary judgment." *Id*. at 424.

3.105 Additionally this Honorable Court so sagaciously reasoned that:

> Furthermore, we find that Texas Civil Practice and Remedies Code § 101.106(a) does not bar [Plaintiffs'-Appellees'] suit in this case *[emphasis added]*.[51] That statute, barring suits against governmental employees if plaintiffs bring suit against the governmental unit, does not apply to intentional torts. *See* TEX. CIV. PRAC. & REM. CODE § 101.057(2) (excluding from the entire chapter claims "arising out of assault, battery, false imprisonment, or any other intentional tort"). We recognize that some Texas courts have extended section 101.106 to include intentional torts, relying on the fact that the Texas Supreme Court, albeit without discussion applied section 101.106 to an intentional tort in *Newman*

---

[51] That section reads: "The filing of a suit under this chapter against a governmental unit constitutes an irrevocable election by the plaintiff and immediately and forever bars any suit or recovery by the plaintiff against any individual employee of the governmental unit regarding the same subject matter." TEX. CIV. PRAC. & REM CODE § 101.106(a). Appellants cite this statute in support of their argument. *See* Document 35, pages 37-40.

*v. Obersteller*, 960 S.W.2d 621, 622-23 (Tex. 1997). However, *Newman* stands for the proposition that section 101.106 is an immunity statute, and not a bar. *See* 960 S.W.2d at 622-23. The Court held the "bars any actions" language of the former version of section 101.106 "is an unequivocal grant of immunity in this context." *Id.* at 622. *Newman* never explicitly held that section 101.106 should be applicable to intentional torts. In addition, *Newman* relied on the language of the prior version of section 101.106. Given the uncertainty of *Newman's* applicability here, we feel compelled to follow the plain language of section 101.057(2). Thus, section 101.106 does not apply to claims arising out of intentional torts [i.e., gross negligence]. For the foregoing reasons we affirm the district court's order denying summary judgment.[52]

3.106 This Honorable Court made clear that "section 101.106 is an immunity statute, and not a bar." *Id.* As such, in *Meadours*, the Plaintiffs'-Appellees' claims for gross negligence, in addition to their other state law claims, survived in their entirety. *See id.* Here, unlike the Decedent in *Meadours*, multiple Appellants admitted that Appellee was dazed and confused and was not fighting back nor resisting arrest in any manner. *See supra*, note 2. The Decedent in *Meadours* was armed and dangerous while the Appellee in the case at bar had absolutely no weapons of any sort.

3.107 Additionally, here, Appellee was suffering from a medical emergency. ROA.653. Also unlike *Meadours* where the Decedent was clearly evading, here the Harris County District Attorney's Office properly arrived at the conclusion that

---

[52] *Meadours*, 483 F.3d at 424.

Appellee did not possess the requisite *mens rea* of "intentionally" to be properly convicted of felony evading in a motor vehicle due to his medical emergency. ROA.653.    As such, they properly dismissed all charges. ROA.742-45.    This Honorable Court should look to its wisdom enumerated in *Meadours* to properly arrive at the conclusion that all of Appellee's state law claims, including his claim of gross negligence, should survive in their entirety.

### ii.    *Languirand v. Hayden*

3.108 This Honorable Court made clear that state law claims of gross negligence may certainly survive against individual officers in the Section 1983 context in its seminal *Languirand* opinion.  *Languirand v. Hayden*, 717 F.2d 220 (5th Cir. 1983).  There, on the evening of December 2, 1974, the Plaintiff-Appellee and his friends drove from Bay St. Louis to Pass Christian, Mississippi.  *Id*. at 221. They were just "driving around."  *Id*.  They stopped at a convenience store to buy some beer.  *Id*.  Then they made another stop to "relieve" themselves.  *Id*.  The Plaintiff-Appellee turned onto an unlit gravel road within the Pass Christian city limits in order to do so.  *Id*.

3.109 Meanwhile, a patrolman on the police force (i.e., Defendant), was responding to a radio call concerning a prowler.  *Id*.  As he drove onto this road, he turned off all of his lights.  *Id*.  The Defendant saw the Plaintiff's-Appellee's car parked about "a hundred feet" from the residence of the person who had reported the prowler.  *Id*.  The Defendant stopped his car, got out, and turned on an

overhead spotlight. *Id*. The Defendant testified that he saw a shiny object in one of the friends' hands. *Id*. This was a fact in dispute. *Id*.

3.110 When Plaintiff-Appellee began to drive away, the Defendant shot at Plaintiff's-Appellee's car, shooting his tire out. *Id*. One of the bullets struck Plaintiff's-Appellee's neck, causing him to crash into a tree. *Id*. at 221-22. This shooting later caused Plaintiff-Appellee severe permanent injuries, including partial paralysis from the chest down. *Id*. at 222.

3.111 The case was tried to verdict and resulted in a $1,500,000.00 verdict in favor of Plaintiff-Appellee. *Id*. This was predominantly a case based on *Monell* liability of the City. *See id.* However, this Honorable Court so expressly reasoned that, "Certainly there is evidence from which the jury could reasonably conclude that Defendant (i.e., the individual patrolman/officer who shot Plaintiff-Appellee), was grossly negligent on the occasion in question and, arguably, that the City police chief was grossly negligent in sending Defendant on patrol without adequate training." *Id*. at 230.

3.112 The *Languirand* Court absolutely made clear that state law claims of gross negligence may indeed prevail against individual officers in the Section 1983 excessive force context. *See id.* Here, Appellants were grossly negligent and the

record makes this clear.[53]   Additionally, punitive damages are absolutely proper in the case at bar.[54] As such, this Honorable Court should look to its wisdom enumerated in *Languirand* in order to arrive at the conclusion that Appellee's state law claims, particularly for gross negligence, should survive in their entirety.

## E.   Appellants are liable for summary punishment under 42 U.S.C. § 1983 and Appellants are not entitled to qualified immunity.

### i.   *Valencia v. Wiggins*

3.113 This Honorable Court set forth the proper standard for summary punishment under 42 U.S.C. § 1983 and allowed a plaintiff to survive a qualified immunity defense in its seminal *Valencia* opinion.   *Valencia v. Wiggins*, 981 F.2d

---

[53] This Honorable Court has so expressly defined Gross Negligence as having two (2) requirements: "1) viewed objectively from the standpoint of the actor, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others and; 2) the actor must have actual, subjective awareness of the risks involved, but nevertheless proceeds with a conscious indifference to the rights, safety, or welfare of others." *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 314 (5th Cir. 2002); *see also Henderson v. Norfolk Southern Corp.*, 55 F.3d 1066, 1070 (5th Cir. 1995) (quoting *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex. 1994). Here, from an objective standpoint, what happened to Appellee was simply horrid.   It involved an extreme degree of risk and posed a substantial threat of harm to Appellee and others.   *See supra*, notes 3-6.   The Appellants subjectively knew exactly what they were doing and simply did not care.   *See id.*   As such, they are liable for gross negligence.

[54] Punitive damages are available in a proper case under Section 1983.   *Smith v. Wade*, 461 U.S. 30 (1983).   A jury may be able to assess punitive damages in a Section 1983 action when the defendant's conduct involves reckless or callous indifference to the plaintiff's federally protected rights, as well as when it is motivated by evil motive or intent.   *Id.* at 30. Punitive damages are proper in tort cases not only for actual malicious intent, but also for reckless indifference to the rights of others.   *Id.*   Punitive damages are particularly available when law enforcement engages in excessive force. *See id.* Punitive damages may arise in this arena against a municipality and its officers when there is malice, evil intent, or gross negligence as to be equivalent to such intent. *Peace v. City of Center*, 372 F.2d 649 (5th Cir. 1967).

1440 (5th Cir. 1993). There, the plaintiff-appellee was arrested on drug charges as a result of an undercover police operation conducted by the defendant-appellant. *Id*. at 1442. On July 3, 1987, the plaintiff-appellee was committed to Brewster County (Texas) jail. *Id*. Shortly thereafter, the defendant-appellant ceased work as an undercover agent and became the acting Chief Deputy of Brewster County Jail. *Id*. The defendant-appellant was responsible for supervision of the jail. *Id*.

3.114 One evening three weeks into his pretrial detention, the plaintiff-appellee took part in a jail disturbance in which the inmates made excessive noise and threw objects out of cells. *Id*. The next day, the inmates continued the disturbance by singing and making noise. *Id*. One of the jailers instructed the inmates to quiet down and when they did not do so, the defendant-appellant was summoned. *Id*. The defendant-appellant also instructed the inmates and plaintiff-appellee to quiet down. *Id*.

3.115 Unlike most other inmates, the plaintiff-appellee continued to cause a disturbance. *Id*. The defendant-appellant ordered the plaintiff-appellee out of his cell. *Id*. The plaintiff-appellee refused to come out and questioned why he was being singled out. *Id*. At this point, the defendant-appellant entered the plaintiff's-appellee's cell to enforce his order. *Id*.

3.116 The defendant-appellant grabbed the plaintiff's-appellee's head and bashed it against the cell bars. *Id*. The defendant-appellant then applied a choke-hold and left the plaintiff-appellee momentarily unconscious. *Id*. After getting him

75

to the floor, the plaintiff-appellee was placed in handcuffs. *Id*. The defendant-appellant then struck the plaintiff-appellee three (3) times, just like Appellants Poirier and Klosterman did here, except they punched Appellee a lot more here. *Id*. The plaintiff-appellee thereafter had visible injuries, including bruises on his fae and scratches and cuts on his throat. *Id*.

3.117 This Honorable Court then so beautifully articulated the law:

> As to the applicable law, the district court concluded that because the plaintiff-appellee was a pretrial detainee, the case involved the Fourteenth Amendment's protection against summary punishment… the Supreme Court's decisions in *Graham* and *Bell* indicate that the Due Process Clause in the Fifth (or Fourteenth) Amendment is the appropriate constitutional basis for pretrial detainee excessive force suits.[55] Although *Graham* left open whether the Fourth Amendment applies after arrest, it nevertheless made clear that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment. Likewise, in *Bell*, the Court concluded that the Court of Appeals had properly relied on the Due Process Clause in considering claims of pretrial detainees. *Bell* holds that conditions and restrictions of pretrial detention amount to deprivations of liberty without Due Process if those restrictions or conditions amount to punishment of the detainee. Writing for the Court, then-Associate Justice Rehnquist explained: Not every disability imposed during pretrial detention amounts to punishment in the constitutional sense, however… A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate

---

[55] *Graham v. Connor*, 490 U.S. 386 (1989); *Bell v. Wolfish*, 441 U.S. 520, 559 (1979); *see also Ingraham v. Wright*, 430 U.S. 651, 671 n. 40 (1977) ("where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment.").

> governmental purpose… If a restriction or condition is
> not reasonably related to a legitimate goal — if it is
> arbitrary or purposeless — a court permissibly may infer
> that the purpose of the government action is punishment
> that may not constitutionally be inflicted upon
> detainees.[56]

3.118 This Honorable Court then reasoned that, "the deliberate force used against [plaintiff-appellee] by [defendant-appellant] was excessive and unreasonable under the circumstances, and was applied maliciously and sadistically." *Id*. at 1449. As such, in the end, the plaintiff-appellee survived qualified immunity and prevailed on his claims of summary punishment under 42 U.S.C. § 1983. *Id*. Here, there is no doubt that the force applied by Appellants was excessive, unreasonable, and was applied maliciously and sadistically. *See supra*, notes 3-6.

3.119 It is obvious that said force was deliberate, arbitrary, and purposeless. The Appellants had the express intent to punish Appellee and there was absolutely no relation to a legitimate governmental purpose in doing so. As such, this Honorable Court should look to its wisdom as set forth in *Valencia* and find that Appellee should survive qualified immunity on his claims of summary punishment under 42 U.S.C. § 1983.

---

[56] *Valencia*, 981 F.2d at 1443 - 1445.

ii.    *Kingsley v. Hendrickson*

3.120 The United States Supreme Court also sagaciously set forth the applicable standard when proving summary punishment under 42 U.S.C. § 1983 in its seminal *Kingsley* opinion.    *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). There, the plaintiff-petitioner was violently yanked out of his cell, thrown on the ground, tased, and his head was slammed on a concrete bunk.  *Id*. at 392-93.

3.121 The United States Supreme Court so reasoned that:

> We have said that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment.  And in *Bell*, we explained that such punishment can consist of actions taken with an expressed intent to punish.  But the *Bell* Court went on to explain that, even in the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not rationally related to a legitimate non-punitive governmental purpose or that the actions appear excessive in relation to that purpose… *Bell's* focus on punishment does not mean that proof of intent (or motive) to punish is required for a pretrial detainee to prevail on a claim that his Due Process rights were violated.  Rather, as *Bell* itself shows (and as our later precedent affirms), a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose. Cf. *Block v. Rutherford*, 468 U.S. 576, 585-86 (1984).  Our standard is also consistent with our use of an objective excessive force standard where officers apply force to a person who, like [plaintiff-petitioner], has been accused but not convicted

of a crime, but who, unlike [plaintiff-petitioner], is free on bail. *See Graham, supra.*[57]

3.122 Here, Appellants demonstrated an express intent to punish Appellee. *See supra,* notes 3-6. However, *Kingsley* made clear that even absent an express intent to punish, Appellee can nevertheless prevail on his summary punishment claim under 42 U.S.C. § 1983 by showing that Appellants' actions were not rationally related to a legitimate non-punitive governmental purpose or that the actions appear excessive in relation to that purpose. As aforementioned, what transpired in the case at bar is extremely evil, shocking, wicked, and vile. *See supra,* notes 3-6. As such, this Honorable Court should look to its wisdom as set forth in *Kingsley* and find that Appellee should survive qualified immunity on his claims of summary punishment under 42 U.S.C. § 1983.

## IV.   CONCLUSION

4.1   What happened in this case exudes the horrors of what can happen when people believe that they are above the law. The undersigned Counsel possesses video footage of these extremely shocking and evil events. Throughout the footage, Appellants are having a blast. The Appellants are shooting at Appellee, throwing tear gas at him, punching him, kicking him, and ripping him to shreds with their German Shepherds. In short, it was "open-season." Appellee in these

---

[57] *Kingsley*, 576 U.S. at 397-99.

videos is scared, alone, disoriented, suffering from a medical emergency, confused, and is screaming for help.  What happened here is disturbing.

4.2    This will be a landmark case that has already received national media attention and will continue to do so.  Appellee is not naive enough to assert that this case will end police brutality, however, Appellee sure hopes to make a difference.  Appellee hopes that this case will give a voice to the millions of victims of police brutality in American history who were oftentimes left unheard. The stories throughout history of police brutality will never be forgotten.

## V.    PRAYER

5.1    As such, Appellee prays that this Honorable Court affirm the judgment of the District Court that denied Appellants' Motions to Dismiss based on qualified immunity in their entirety.  ROA.1425-26.

*[Signature Block on Next Page]*

Respectfully submitted,

**LAW OFFICES OF GARRETT GIBBINS, PLLC**

*/s/ Garrett Lee Gibbins*
Garrett Lee Gibbins
Texas Bar Number: 24125243
South Carolina Bar Number: 105706
New Mexico Bar Number: 163276
Arizona Bar Number: 039804
Colorado Bar Number: 61100
Oklahoma Bar Number: 36371
Illinois Bar Number:  6351087
Tennessee Licensure Pending
Federal ID: 3864602
728 West Donovan Street
Houston, Texas 77091
Email: garrettgibbins4747@yahoo.com
Phone: 512-587-8572
***Counsel for Plaintiff - Appellee:***
***Trinidad Cutshall***

### CERTIFICATE OF SERVICE

I certify that on January 12, 2026, pursuant to the FED. R. APP. P. 25, a true copy of Appellee's Brief was duly served upon each party to this cause as set forth below on the CM/ECF system, which will automatically serve a Notice of Electronic Filing to the parties.

*/s/ Garrett Lee Gibbins*
Garrett Lee Gibbins


Via E-File

**LAW OFFICES OF RICHARD KUNIANSKY**

Richard Kunianksy
State Bar No. 11762640
440 Louisiana, Suite 1440
Houston, Texas 77002
Telephone: (713) 622-8333
Email: rkuniansky@gmail.com
***Counsel for Defendants-Appellants
Donald Dillow, Nahuel Faiura,
Todd Klosterman, and N. Poirier***

**&**

**DAVID ADLER, P.C.**

David Adler
State Bar No. 00923150
1415 North Loop West
Suite 905
Houston, Texas 77008
Telephone: (713) 666-7576
Email: davidadler1@hotmail.com
***Counsel for Defendants-Appellants
C. Marshall, R.W. Holley,
D.R. Calhoun, M.A. Carrizales,
and P. Batton***

## CERTIFICATE OF COMPLIANCE

I hereby certify that pursuant to FED. R. APP. P. 32, 5TH CIR. R. 32.3, and this Honorable Court's Order granting Appellee's Motion for Excess Word Count, not to exceed 26,000 words (*see* Documents 44-1 & 44-2), Appellee's Brief contains 20,442 words and is in 14-point font for text and 12-point font for footnotes. Appellee's Brief is double spaced.

*/s/ Garrett Lee Gibbins*
Garrett Lee Gibbins