# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
August 24, 2026
Lyle W. Cayce
Clerk

No. 25-20386

Trinidad Cutshall,

*Plaintiff—Appellee*,

*versus*

Donald Dillow, *Sergeant, in his Individual Capacity*; Nahuel Faiura, *Deputy, in his Individual Capacity*; Todd Klosterman, *Sergeant, in his Individual Capacity*; N. Poirier, *Deputy, in his Individual Capacity*; D. R. Calhoun, *Lieutenant, in his Individual Capacity*; M. A. Carrizales, *Sergeant, in his Individual Capacity*; R. W. Holley, *Deputy, in his Individual Capacity*; C. Marshall, *Deputy, in his Individual Capacity*; P. Batton, *Deputy, in his Individual Capacity*,

*Defendants—Appellants*,

consolidated with

No. 25-20499

Trinidad Cutshall,

*Plaintiff—Appellee*,

*versus*

KENNETH SANDOR, *Deputy, Individually*; E. HERNANDEZ, *Deputy, Individually*; J. LUNA, *Deputy, Individually*; S. COGBURN, *Deputy, Individually*,

*Defendants—Appellants*.

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:25-CV-2899

---

Before HIGGINBOTHAM, SMITH, and OLDHAM, *Circuit Judges*.

PER CURIAM:*

Truck driver Trinidad Cutshall led Houston police on a brief slow-speed chase before they disabled his truck. In the hours-long standoff that ensued, officers employed nonlethal rounds, tear gas, a dog, and multiple SWAT vehicles, before dragging Cutshall from the cab. Cutshall sued thirteen of the arresting officers, alleging violations of his Fourth and Fourteenth Amendment rights. The officers moved to dismiss, invoking qualified immunity, and the district court denied their motions. Because qualified immunity bars some of Cutshall's claims, we REVERSE and REMAND.

I

On December 27, 2023, Houston Police Sergeant Carrizales encountered an 18-wheeler driving at about 5 mph on I-10 outside of Houston. After Carrizales failed to get the driver's attention with his lights, siren, or verbal commands, officers used spike strips to immobilize the truck. The driver, Trinidad Cutshall, continued to engage the throttle and change gears—apparently unaware that his truck was immobilized. Officers fired

---

* This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

several 40mm non-lethal foam rounds at the passenger window, attempting to break the window to both get Cutshall's attention and provide a better view inside the cab. On Lieutenant Calhoun's orders, Deputy Batton fired four of these rounds, while Deputy Holley fired two. None broke Cutshall's window or elicited a response from him. Once these efforts failed, SWAT took over the operation. Carrizales, Calhoun, Batton, and Holley withdrew.

Next, SWAT members took up positions around Cutshall's truck. Sergeant Dillow parked an armored vehicle called a BEAR in front of the truck to prevent it from moving. Deputy Sandor fired two 40mm tear gas rounds at the cab. One deputy reported that Cutshall "would jump and beg[in] to look around" when these rounds were fired, but that Cutshall would then "go back into a stare like we were not there." Deputy Hernandez used a ROOK (essentially an armored forklift with a hydraulic ram instead of tines) to break the rear passenger window. Deputy Luna then placed a single CS canister into the cab, which had no effect. Hernandez used the ROOK to remove the passenger door and cleared an opening in the rear of the cab "in order to gain a better visual of the suspect and his surroundings inside the vehicle." Deputy Hernandez and Deputy Luna then withdrew.

With the cab open, SWAT members approached and observed Cutshall but could not see his hands. Deputy Poirier then fired three 40mm non-lethal foam rounds at Cutshall, which "displayed a desirable effect on the suspect," although Cutshall "still refused to exit." After observing Cutshall "lower his right hand out of sight," Deputy Marshall deployed police dog Timon, and Timon bit Cutshall's right arm. Deputy Marshall then entered the cab and unbuckled Cutshall's seatbelt, but Cutshall still "continued to resist." Deputy Marshall removed Timon and "backed up approximately 8 feet," taking no further part in removing Cutshall.

Four deputies (Poirier, Faiura, Cogburn, and Klosterman) entered the cab. A tussle ensued, and Deputy Poirier reported punching Cutshall several times "[d]ue to the . . . level of resistance." Cutshall then grabbed Poirier's forearm, and in response, Deputy Poirier and Deputy Klosterman punched Cutshall in the face several times each. Cutshall then released Poirier and grabbed Klosterman instead. At the same time, Poirier and Cogburn observed pocketknives clipped to Cutshall's pants pocket, and saw Cutshall reach for the knives. Deputy Cogburn reported calling out that Cutshall was reaching for a knife during the fight, and that he was able to remove the knives from Cutshall's pants and throw them out of reach. Deputy Faiura did not see the knives at the time, but did see Cutshall reach for his pants pocket. Finally, the four deputies removed Cutshall from the cab, assisted by another officer, Sergeant Dillow, who pulled Cutshall out, dropped him to the ground, and handcuffed him.

Once handcuffed, deputies walked Cutshall to a waiting ambulance. Cutshall was placed on a stretcher and taken to Ben Taub Hospital. There, he remained uncooperative and tried to "hit staff." Cutshall was later indicted for felony evading arrest, but the charges were dropped.

Cutshall sued thirteen of the officers involved in his arrest under 42 U.S.C. § 1983 and state law. As to federal law, Cutshall pleaded two Fourth Amendment claims (for excessive force and failure to intervene) and two Fourteenth Amendment Due Process claims (for summary punishment and failure to render medical aid). Cutshall attached two documents to his complaint: an incident report containing narrative descriptions of the events from the officers, and six hundred pages of hospital records from his stay at Ben Taub Hospital.

Thirteen of the officers then filed motions to dismiss, which the district court denied in a pair of identical two-page orders. The district court

stated that it had "considered the motions, submissions, and applicable law *in detail*." ROA.1234 (emphasis in original). All thirteen officers appealed the denial of their motions to dismiss. Our review is de novo.

## II

First, jurisdictional housekeeping is in order. Congress granted federal courts of appeals jurisdiction over "final decisions." 28 U.S.C. § 1291. That generally means lower court judgments that totally resolve litigation. *See Mitchell v. Forsyth*, 472 U.S. 511, 524–25 (1985). But there is an exception: The collateral-order doctrine teaches that pre-final judgment orders qualify as "final[,] and thus appealable[,] if they are conclusive, resolve important questions separate from the merits, and are effectively unreviewable on appeal from the final judgment in the underlying action." *Frias v. Hernandez*, 142 F.4th 803, 811 (5th Cir. 2025) (Oldham, J., concurring) (discussing *Mitchell*) (quotation omitted). Unsurprisingly, "the class of cases capable of satisfying this stringent test should be understood as small, modest, and narrow." *Id.* (quoting *United States v. Wampler*, 624 F.3d 1330, 1334 (10th Cir. 2010) (Gorsuch, J.)) (quotation marks omitted).

This formalism matters because, while all thirteen defendants in this case filed motions to dismiss, they had varied approaches to which claims they wanted dismissed and on what grounds. Five of the motions[1] invoked qualified immunity as to Cutshall's § 1983 claims. The remaining eight motions[2] invoked qualified immunity as to Cutshall's § 1983 claims but did not mention the state law claims. Even more confusing, the motions varied

---

[1] Filed by Deputies Marshall, Holley, and Batton, Sergeant Carrizales, and Lieutenant Calhoun.

[2] Filed by Deputies Hernandez, Luna, Sandor, Poirier, Faiura, and Cogburn, and Sergeants Dillow and Klosterman.

in their treatment of the § 1983 claims as well. The first five motions requested dismissal of Cutshall's excessive force claims but did not mention bystander liability, summary punishment, or failure to render aid. And the remaining eight motions requested dismissal of the excessive force and bystander liability claims but did not mention summary punishment or failure to render aid.

On appeal, the officers ask this court to reverse and hold that the district court should have dismissed all of Cutshall's claims; yet their scattershot pleading means only some of those claims are before us. As we see it, the officers have invoked our interlocutory appellate jurisdiction as to the claims they challenged on qualified immunity grounds in their motions to dismiss—but only those claims. *See Johnson v. Williams*, 95 F.3d 50, 50 (5th Cir. 1996) (per curiam) (no appellate jurisdiction where defendants "ha[d] not yet plead the affirmative defense of qualified immunity"); *cf. Dean v. Phatak*, 162 F.4th 555, 561 (5th Cir. 2025) ("[O]ur review is circumscribed by the limits on our jurisdiction.") (quotation omitted). That means we have jurisdiction over Cutshall's excessive force claims against all thirteen officers, and his bystander liability claims against Hernandz, Luna, Sandor, Poirier, Faiura, Cogburn, Dillow, and Klosterman. Since none of the officers even mentioned Cutshall's summary punishment or failure to render aid claims, let alone invoked qualified immunity as a defense, we lack jurisdiction over those claims. *See Dean*, 162 F.4th at 562.

The same is true for Cutshall's state law tort claims, since none of the officers invoked official immunity as a defense to those claims. True, five of the officers mentioned the Texas Tort Claims Act's ("TTCA") ban on exemplary damages. *See* Tex. Civ. Prac. & Rem. Code § 101.024 ("This chapter does not authorize exemplary damages."). But not one motion invoked any immunity from suit the officers enjoyed under Texas law, whether at common law or under the TTCA's election-of-remedies

provision. *See id.* §§ 101.026, 101.106 (a)–(f); *see also City of Houston v. Rodriguez*, 704 S.W.3d 462, 468 (Tex. 2024) (describing official immunity in Texas). With no state law immunity from suit at stake, the denial of the officers' motions to dismiss cannot fall within *Mitchell*'s narrow exception to the finality requirement. 472 U.S. at 530.

## III

As such, we will address only those claims over which we have appellate jurisdiction: (A) the excessive force claims against all thirteen officers and (B) the bystander liability claims against Hernandez, Luna, Sandor, Poirier, Faiura, Cogburn, Dillow, and Klosterman.

### A

Start with the excessive force claims. The Fourth Amendment includes "a right to be free from excessive force during a seizure." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012). To establish a violation of that right, plaintiffs "must demonstrate: (1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Anderson v. Estrada*, 140 F.4th 634, 642 (5th Cir. 2025) (quotation omitted). The lion's share of our excessive force decisions turn on the latter two prongs, as "the test of reasonableness . . . is not capable of precise definition or mechanical application." *Id.* (quotation omitted). The inquiry is guided by the *Graham* factors, "including (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). But courts need not wade into a multi-factor morass where a plaintiff's prima facie case fails at the jump, e.g., where the plaintiff's "injuries are so slight that they will [not]

satisfy the injury element." *Flores v. City of Palacios*, 381 F.3d 391, 398 (5th Cir. 2004).

We apply this framework to Cutshall's excessive force claims. Given the number of officers Cutshall sued, it is helpful to divide the defendants into groups, arranged in chronological order from the beginning of Cutshall's arrest to the end.

<u>Carrizales, Batton, and Holley</u>

In his complaint and attached exhibits,[3] Cutshall alleges that Deputies Batton and Holley fired "rubber bullets at" him, and "shot [him] with rubber bullets." Cutshall accuses Sergeant Carrizales of authorizing Batton and Holley to fire the bullets and ordering the use of spike strips to stop his truck. The report attached to Cutshall's complaint, in turn, states that Carrizales initially pulled Cutshall over and that Carrizales and Calhoun authorized the use of rubber bullets by Batton and Holley. It also states that Batton fired four

[3] Cutshall attached an incident report to his complaint. The report contains descriptions of Cutshall's arrest from all but one of the 13 defendants, plus several other officers. "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." FED. R. CIV. P. 10(c). And where a plaintiff files a complaint with supporting exhibits, but the complaint "is contradicted by the contents of [the] exhibit[,] . . . the exhibit and not the [complaint] controls." *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004). Of course, where the plaintiff incorporates an exhibit but "expressly rejects those elements of the [exhibit] that conflict with [his] account," the implication is that the plaintiff questions the veracity of the report. *Pena v. City of Rio Grande City*, 879 F.3d 613, 620 n.9 (5th Cir. 2018). In such cases, courts read the complaint with common sense, "presum[ing] only that the Officers made the assertions contained in the report, not that those assertions are in fact truthful." *Id.* Absent that rejection, however, the contents of attached exhibits are treated as factual allegations in the complaint. *U.S. ex. rel. Riley*, 355 F.3d at 377. Because Cutshall attached the officers' report, relies on the narratives therein to support his claims, and does not question the veracity of those narratives, we will consider the report and its contents as part of Cutshall's complaint.

foam rounds at Cutshall's windows that failed to break the glass, while Holley two foam rounds that missed Cutshall's truck entirely.

Pressed at oral argument, Cutshall's counsel could not explain what these officers should have done differently, seeming to concede that none of their actions constituted excessive force. Oral Arg. at 26:00–45 (Q: "I assume that that's okay . . . using the strips?" A: "I think that's fine, I think where they messed up [was] getting in [the] cab.").

We agree. Batton and Holley fired a handful of foam rounds at Cutshall's window, none of which contacted Cutshall. Carrizales, for his part, initially followed Cutshall in a police cruiser before ordering the use of spike strips to stop Cutshall. Cutshall has pleaded no injuries related to these actions, let alone injuries "result[ing] directly and only from" them. *Anderson*, 140 F.4th at 642. Simply put, having one's tires popped and windows struck with foam is not "more than a de minimis injury," cognizable under the Fourth Amendment. *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001). And even if it were, Cutshall's counsel is right: the officers responded reasonably. Cutshall was at the wheel of a multi-ton semi-truck, did not respond to Carrizales's siren and lights, and ignored lawful commands to stop and exit the vehicle. *See Graham*, 490 U.S. at 396 (noting "threat to . . . safety" and resistance level as relevant factors). Stopping the truck and attempting to get Cutshall's attention with nonlethal rounds was a reasonable—perhaps the *only* reasonable—response, given the danger to the public posed by a rogue semi-truck on the highway. *See Scott v. Harris*, 550 U.S. 372, 383–85 (2007); *Salazar-Limon v. City of Houston*, 826 F.3d 272, 278 (5th Cir. 2016).

We hold that Cutshall failed to plead a plausible excessive force claim against Carrizales, Batton, or Holley.

<u>Sandor, Hernandez, and Luna</u>

Once SWAT took over the scene, Deputies Sandor, Hernandez, and Luna next tried to get Cutshall out of his truck. They used tear gas and the ROOK police vehicle. First, Sandor fired several tear gas rounds at Cutshall's windshield. Then, Deputy Hernandez used the ROOK to break the rear window of Cutshall's truck, before eventually ripping Cutshall's passenger door off. Finally, Deputy Luna tossed a tear gas canister into Cutshall's truck, using the newly cleared ports in the vehicle's passenger side. Once again, at oral argument Cutshall's appeared to concede that none of these officers used excessive force either. Oral Arg. at 26:45–27:00. With or without that concession, however, Cutshall's claims against these officers fail.

Cutshall at least pleads a plausible injury because he says the gas "blind[ed]" him and caused "permanent vision and nerve damage." But only Sandor and Luna used tear gas—Hernandez only used the ROOK to clear ports in the side of Cutshall's truck. In the qualified immunity context, the court "evaluate[s] each officer's actions separately, to the extent possible." *Poole*, 691 F.3d at 628. Considering Hernandez's acts individually, and in the context of Cutshall's repeated refusal to exit his truck, breaking a window and removing the truck's door did not constitute excessive force. *See Rucker v. Marshall*, 119 F.4th 395, 403 (5th Cir. 2024) (no excessive force where officer broke window after suspect "refused officer commands to get out of his car at least 20 times").

Even if Hernandez is responsible for Sandor and Luna's use of tear gas, the result is the same. "We have repeatedly held that 'noncompliance or continued physical resistance' justifies the use of force." *Rucker*, 119 F.4th at 403 (collecting cases). When Hernandez, Luna, and Sandor arrived on the scene, they confronted a suspect at the wheel of a semi-truck, refusing lawful commands to exit, apparently still attempting to drive, all while ignoring every attempt to get his attention. "Fourth Amendment jurisprudence has

long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. Employing tear gas to force Cutshall out of the truck without physical force was a reasonable escalation under the circumstances. *See Laney v. City of St. Louis*, 56 F.4th 1153, 1156–57(8th Cir. 2023). It therefore cannot ground Cutshall's excessive force claim.

<u>Marshall</u>

When sirens, loudspeaker commands, foam rounds, and tear gas did not induce Cutshall to exit, SWAT finally decided to physically remove him. The first officer to make contact was Deputy Marshall, who was accompanied by a police dog named Timon. Cutshall's complaint described Marshall as using "excessive and brutal force" on a "disoriented and confused" victim and alleges that Marshall's "vicious German Shepherd" "ripped [him] to shreds." These assertions are accompanied by exhibits attached to the complaint—specifically the police report of the incident—which clarify Cutshall's allegations against Marshall. *See supra,* 8 n.3. In the exhibits, Marshall reports that he approached the cab along with SWAT members and ordered Cutshall to surrender. After several foam rounds were fired at Cutshall, Marshall states that Cutshall lowered his right hand out of sight, and that Marshall then deployed Timon to secure Cutshall's hand "in an attempt to prevent a deadly force encounter." Once the dog bit him, Cutshall "yell[ed]" and still refused "additional commands . . . to come out." Deputy Marshall followed Timon into the truck and managed to unbuckle Cutshall's seat belt, but Cutshall "us[ed] his legs to lock himself in the driver's seat." When Marshall saw other deputies enter the truck, he "chose to physically take [the K9] off to prevent further injuries to the suspect or team members."

Given the facts alleged in the complaint and attached exhibit, Cutshall pleaded no excessive force claim against Marshall based on his use of Timon. "[A]n officer's use of *deadly* force [is] reasonable when a suspect moves out of the officer's line of sight such that the officer could reasonably believe the suspect was reaching for a weapon." *Manis v. Lawson*, 585 F.3d 839, 844 (5th Cir. 2009) (emphasis added). *A fortiori*, the use of non-deadly force under the same circumstance is reasonable. Marshall reasonably believed that Cutshall was reaching for a weapon and deployed Timon in response. And Marshall then removed Timon when other officers moved in, to avoid unnecessary harm to Cutshall or the other officers.

Cutshall failed to plead an excessive force claim against Marshall.

<u>Poirier, Faiura, Cogburn, and Klosterman</u>

As Marshall removed Timon officer from the cab, four other (human) officers entered the truck's cab. Deputy Poirier and Sergeant Klosterman entered through the rear of Cutshall's cab, while Deputies Faiura and Cogburn entered through the passenger door. Poirier reported punching Cutshall several times "[d]ue to the confined space and [the] suspect's level of resistance." When Cutshall grabbed Poirier's arm, both Poirier and Klosterman punched him several more times to get Cutshall to release Poirier. Three of the deputies reported seeing knives, and two reported that Cutshall reached toward those knives throughout the encounter. Cogburn stated that Cutshall managed to "place his hands on several" of the knives, before Cogburn grabbed his hand, removed the knives from Cutshall's pants, and threw them aside. Finally, the deputies managed to remove Cutshall's legs from the bottom of his seat, pulling him from the truck through the passenger door and dropping him onto the ground.

Cutshall failed to state an excessive force claim against these officers. As already noted, "noncompliance or continued physical resistance justifies

the use of force." *Rucker*, 119 F.4th at 403 (quotation marks omitted). Given the potential danger posed by Cutshall, who had by this point refused hours of commands to leave his truck while continually trying to drive away, the use of force to extract him was reasonable. *See Anderson*, 140 F.4th at 644–45 ("Repeated[ly] . . . declining to follow an officer's orders constitute[s] active resistance."). Moreover, Cutshall fought being removed from the truck. Three of the four deputies (Poirier, Faiura, and Cogburn) stated that Cutshall had several knives attached to the front of his pants, and Cogburn explicitly reports that Cutshall tried to use them. Faiura recounts that Cutshall reached for the pockets containing the knives throughout the encounter. Sergeant Klosterman did not see the knives, but did see Cutshall grab Poirier "causing [him] pain." In response, the deputies punched Cutshall in the face several times and dragged him from the truck. While Cutshall alleges that he was unarmed and unconscious at the time, that is directly contradicted by multiple narratives in the exhibits attached to the complaint. Those exhibits state that Cutshall actively fought with officers and attempted to reach for knives. Under those circumstances, officers can reasonably use force to subdue the suspect. *See Rucker*, 119 F.4th at 403; *Poole*, 691 F.3d at 629. Because Poirier, Faiura, Cogburn, and Klosterman's use of force was objectively reasonable, Cutshall failed to plead an excessive force claim against them.

Calhoun and Dillow

Finally, Cutshall sued two officers who supervised his arrest: Sergeant Dillow and Lieutenant Calhoun. Insofar as Cutshall attempts to pin other officers' conduct on Calhoun and Dillow as supervisors, he faces a steep road: "Supervisors cannot be held liable on a theory of vicarious liability." *Bustos v. Martini Club Inc.*, 599 F.3d 458, 468 (5th Cir. 2010). Instead, a plaintiff must show that the supervisor *himself* breached a duty by failing to supervise, and "[t]he threshold for pleading a failure-to-supervise claim is

high." *Tuttle v. Sepolio*, 68 F.4th 969, 975 (5th Cir. 2023). It means showing "(1) that the supervisor failed to train or supervise the subordinate; (2) a causal link between the failure to train or supervise and the constitutional violation; and (3) that the failure to train or supervise amounts to deliberate indifference." *Id.*

Cutshall did not meet that burden. Start with Calhoun, who Cutshall describes as "the master-mind" behind Deputy Holley firing foam rounds at Cutshall's truck and unspecified officers stopping "the tractor-trailer with stop sticks and spikes." As we have already noted, neither the foam rounds nor the spike strips injured Cutshall and their use was a reasonable response to Cutshall refusing to stop his truck. Because the underlying conduct Calhoun supervised was not unconstitutional, Cutshall failed to show "a causal link between [Calhoun's] failure to . . . supervise and [a] constitutional violation." *Tuttle*, 68 F.4th at 975. His excessive force claim against Calhoun therefore fails.

Cutshall next alleges that Sargeant Dillow was "one of the lead supervisors in this parade" and "authorized his team of 'Army Rangers' to employ the aforementioned tactics." He also accuses Dillow of "ramm[ing] [Cutshall's truck] with the BEAR, deploy[ing] tear gas, and thr[owing] [Cutshall] down on the hard concrete." Taking the vague reference to "aforementioned tactics" to encompass a supervisory claim, the analysis is the same as it was for Calhoun: With no valid excessive force claim against any individual officer, Cutshall can have no supervisory claim against Dillow. *See Tuttle*, 68 F.4th at 975.

As to Dillow "ramming" Cutshall's truck with the BEAR, Cutshall's complaint contradicts itself. In his summary of the facts, Cutshall included a

photograph of the scene of his arrest, after the officers removed him from the truck:

In the photograph, Cutshall is on the ground next to his truck, meaning that by his own telling, Dillow must have already exited the BEAR to assist in




*Evidence of national media attention.*[4]

finally handcuffing Cutshall. Yet the photo shows (1) a sizeable gap between Cutshall's truck and the BEAR, and (2) Cutshall's front bumper totally undamaged. Moreover, several of the narratives in the report attached to Cutshall's complaint describe Dillow parking the BEAR near Cutshall's truck, not "ramming" the truck. Because the allegation is contradicted by both the complaint itself and the attached report, we will not credit it.

As to deploying "tear gas," our earlier analysis applies: Under the circumstances of a barricaded, non-compliant suspect, it is reasonable to use chemical irritants to induce compliance. *See Graham*, 490 U.S. at 396.

Likewise, the officers did not use unreasonable force to remove Cutshall from the cab. Exhibits to the complaint reveal that Cutshall "continue[d] to fight with" officers throughout his removal from the cab—even attempting to "bite [Cogburn] and other deputies." Cutshall blames this behavior on his coronavirus diagnosis, but that is neither here nor there. Whatever explains the behavior *now*, the fact remains that Cutshall fought with officers throughout his removal from the cab. "[C]ase law establish[es] that officers are trained to use nonlethal force to gain compliance if a subject actively resists arrest," *Carroll v. Ellington*, 800 F.3d 154, 174–75 (5th Cir. 2015), including using force to reduce a resisting suspect to the ground, *Buehler v. Dear*, 27 F.4th 969, 977–78 (5th Cir. 2022). That is exactly what happened here: Dillow assisted in removing a fighting and biting suspect from a cramped truck and understandably dropped that suspect on the ground in the process. That was not objectively unreasonable. Cutshall therefore failed to plead a plausible excessive force claim against Dillow.

B

The complex procedural posture of this case means that we are not quite done. Eight of the officers, Hernandez, Luna, Sandor, Poirier, Faiura, Cogburn, Dillow, and Klosterman moved to dismiss Cutshall's "bystander liability" claims against them and appealed the denial of those motions. These claims are properly before us.

A bystander liability claim only arises where an "officer (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (quotation omitted). Where there is no underlying violation, "secondary liability claims . . . fail" by necessity. *Id.* at 649. At least in this appeal, the only underlying claims that could qualify are the excessive force claims against the other five officers. But

Cutshall failed to plead a plausible excessive force claim against any of the officers. As such, his bystander liability by way of excessive force claims necessarily fail as a matter of law. *See Martinez v. City of Rosenberg, Texas*, 123 F.4th 285, 290 (5th Cir. 2024) ("[T]he district court properly dismissed Martinez's bystander liability claim because it cannot stand absent an underlying constitutional violation."). We express no opinion on whether Cutshall's other § 1983 claims for summary punishment and failure to render aid could serve as underlying claims for purposes of bystander liability.

* * *

Cutshall's excessive force claims fail because the defendants acted reasonably, and his bystander liability claims fail for lack of an underlying constitutional violation. As a result, the officers' qualified immunity entitled them to dismissal of these claims. Because the district court held otherwise, we REVERSE its decision and REMAND for proceedings not inconsistent with this opinion.